**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA,** **Case No. 5:17-CR-228 (FJS)**

**v.**

**CHARLES J. TAN,**

**Defendant.**

---

**MIROSLAV LOVRIC, Ass't U.S. Attorney, for the United States**
**BRIAN C. DECAROLIS, Esq., for the Defendant**

**ANDREW T. BAXTER, U.S. Magistrate Judge**

## REPORT-RECOMMENDATION

## I. Preliminary Statement

Defendant Charles J. Tan has been charged by indictment with receipt of a firearm and ammunition in interstate commerce with intent to commit various felonies, under New York law, relating to the shooting death of his father on February 9, 2015. The Defendant has also been charged with two counts of causing another to make false statements in connection with the purchase of the shotgun allegedly used in the shooting. (Dkt. No. 1).[1] On December 7, 2017, the Defendant filed omnibus motions, which included a motion to suppress statements that he made to law enforcement officers who allegedly violated his *Miranda* rights.[2] (Dkt. No. 21 at 15-16). The United States agreed to a suppression hearing, but otherwise opposed

---

[1] Senior District Judge Frederick J. Scullin, Jr.'s Memorandum-Decision and Order dated March 5, 2018 details the charges in the indictment. (Dkt. No. 26 at 1-2).

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

the suppression motion. (Dkt. No. 25 at 12-13).

The Defendant had the burden of production, by a preponderance of the evidence, to establish his right to a suppression hearing by alleging police custodial interrogation in the absence of a *Miranda* warning. Defendants typically attempt to meet that burden by filing an affidavit with their motion papers. *United States v. Miller*, 382 F. Supp. 2d 350, 361-62 (N.D.N.Y. 2005). The government agreed to a suppression hearing based on the defense motion papers even though the Defendant did not file such an affidavit. Accordingly, the burden of proof, by a preponderance of the evidence, has "shift[ed] to the government to prove . . . [that] there was no custodial interrogation implicating *Miranda*, [or] there was some exception to the *Miranda* rule . . . ." *Id.* at 362.

Judge Scullin's March 5, 2018 Memorandum-Decision and Order referred Defendant's suppression motion to this Court. Judge Scullin directed this Court to conduct an evidentiary hearing and, thereafter, to submit proposed findings of fact and recommendations for his review, pursuant to 28 U.S.C. § 636(b)(1)(B). (Dkt. No. 26 at 15). This Court conducted a suppression hearing on March 28, 2018. (3/28/18 Transcript (hereinafter "Tr.")). The parties have also filed post-hearing submissions. (Dkt. Nos. 36, 37).

At the start of the suppression hearing, the parties clarified their respective positions with respect to Defendant's statements to law enforcement. Defense counsel advised that the Defendant was moving to suppress only those statements that he allegedly made at the time he was restrained by two Deputy Sheriffs in the driveway of his parents' home in Pittsford, New York on February 9, 2015. The challenged statements were made in response to the officers'

questions about the location of a firearm and the whereabouts of Defendant's father. (Tr. at 2-10).[3] Defense counsel also confirmed that the sole basis for challenging these statements was that they were made in response to custodial interrogation by officers who failed to give Defendant *Miranda* warnings. (Tr. at 5).

The Assistant U.S. Attorney ("AUSA") conceded that the Defendant was "in custody" at the time he made the statements at issue. (Tr. at 6). But, the prosecutor contended that the officers' questions came within public safety exception to the *Miranda* doctrine,[4] and that Defendant's statements were, in part, volunteered and not responsive to the officers' questions. (Tr. at 6-7, 98-103). In his post-hearing submission, the AUSA also argued that the brief questions posed by the two Deputy Sheriffs did not constitute "interrogation" within the meaning of *Miranda*. (Dkt. No. 36 at 3-6, 11-12).

In his post-hearing submission, defense counsel argued that, in light of all the information the responding officers received from police dispatch about the developing events on February 9, 2015, the arresting officers's questions were unnecessary and beyond the scope of the public safety exception. (Dkt. No. 37 at 1-2). Defense counsel also contends that because the relevant events on February 9, 2015 occurred at a private residence, and not in a crowded public setting, the officers' purported security concerns were not sufficient to trigger the public safety exception. (*Id.* at 2).

---

[3] Defendant is not seeking to suppress one prior statement made to a patrol officer on February 5, 2015 (Tr. at 3-4), or a volunteered statement he made after his arrest on February 9th, when he was being transported to the headquarters of the Monroe County Sheriff (Tr. at 7-9*; see* Govt. Ex. 8).

[4] *See, e.g., New York v. Quarles*, 467 U.S. 649 (1984).

At the suppression hearing, the government called the two Deputy Sheriffs who first encountered the Defendant on February 9, 2015. The government also offered other evidence, without objection (Tr. at 15, 18, 47, 84), including recordings of three 911 calls between the Defendant's mother and the police dispatcher on February 9th (Govt. Exs. 1-3); a recording of the police radio traffic relating to the relevant events on that date (Govt. Ex. 4); a transcript of the information transmitted to the responding officers on the mobile data terminals in their patrol cars (Govt. Ex. 6); and the police reports of the two officers who briefly questioned the Defendant after restraining him (Govt. Exs. 7-8).[5]

The Defendant's mother spoke with a heavy accent, was very emotional, and was very difficult to understand during the 911 calls. (Govt. Exs. 1-3; Govt. Ex. 6 at 2 ("Caller crying diff to understand"; "Caller hysterical")[6]; Tr. at 10-14). Not all of the information gleaned by the 911 dispatcher from those calls was transmitted to the responding officers. The recording of the police radio traffic and the transcript of the information sent to the mobile data terminals of the responding officers[7] reflect the information that was made known to them on February 9th. (Tr. at 17-18, 26-27, 50-51, 55, 87, 92).

Defendant chose not to testify at the hearing and, as noted, did not file an affidavit

---

[5] Government Exhibit 5 is a recording certification from a custodian of records of the City of Rochester Emergency Communications Department, which relates to Exhibits 1 through 3 and 4. (Tr. at 12)

[6] The first page of Govt. Ex. 6 is a CAD Print-out Certification, which is then followed by three relevant pages of data inputted by police dispatch and transmitted to the responding officer's mobile data terminals.

[7] Defense counsel referred to this transcript as the "CAD" report, while the officers who testified at the suppression hearing referred to it as the "job card." (Tr. at 50-51, 66-67, 87-90).

supporting his suppression motion.[8] Thus, the chronology of events on February 9, 2015 is essentially undisputed. However, the opposing attorneys appear to draw different inferences from those facts in a few key areas. These differences require the Court to make factual determinations, taking into account the manner in which the witnesses described the events, and the plausibility of the competing inferences advanced by the attorneys on each side.

## II. Proposed Findings of Fact

Deputies Christopher Cooper and Derek Smith of the Monroe County Sheriff's Office were among several officers dispatched to 37 Coach Side Lane in Pittsford, New York some time after 6:00 p.m. on the evening of February 9, 2015. (Tr. at 23, 65-66). The radio transmissions and communications to the officers' mobile data terminals initially described the incident to which they were responding as a possible domestic dispute between a father and son, as reported during a 911 call from a "hysterical" woman. (Tr. at 24-25, 29, 39, 68; Govt. Ex. 6 at 2). As Deputies Cooper and Smith were making their way to Coach Side Lane, they were further advised by dispatch that the 911 caller had reported that the incident involved a firearm, and that her son may have shot her husband. (Tr. 25, 29, 53-54, 68, 91; Govt. Ex. 6 at 2).[9] A subsequent communication from dispatch relayed the 911 caller's

[8] During the suppression hearing, defense counsel confirmed his understanding that, in the absence of an affidavit or testimony from the Defendant, the Court could rely only on the testimony of the officers called by the government (including cross-examination), and the exhibits admitted in making factual findings and credibility determinations. (Tr. at 10).

[9] Upon notice of a possible shooting, police dispatch directed emergency medical services to respond to the scene. (Tr. at 69; Govt. Ex. 4).

statement that her "son was trying to protect himself." (Govt. Ex. 4; Govt. Ex. 6 at 2).[10] By the time the two officers were arriving at the scene, dispatch informed them that (1) the mother who made the 911 calls and her son were waiting for the officers in the driveway of the residence (Tr. 57-59, Govt. Ex. 6 at 3); (2) the son was no longer in possession of the firearm involved in the incident, but that the location of the gun was unclear (Govt. Ex. 6 at 3)[11]; and (3) the father was apparently inside the house, but his condition was uncertain because the mother was too scared to go check on him (Tr. 40, 58-59, 60, 68-69; Govt. Ex. 6 at 3).

Deputies Cooper and Smith were two of the three first responders at Coach Side Lane, arriving at about 6:25 p.m. (Tr. at 29-30, 51-52, 59, 70, 73, 90). It was snowing heavily and the neighborhood was "fairly dark." (Tr. 31, 59, 69, 74). The officers parked several doors down from 37 Coach Side Lane and approached the house quickly because there were no trees or other cover, and they were concerned about being vulnerable if there was gunfire from the house (Tr. at 32, 71). With their guns drawn, the officers encountered a male (later identified as the Defendant, Charles Tan) coming down the driveway towards them. (Tr. 32-33, 73, 75-76).[12] Based on the information previously received from dispatch, Deputies

---

[10] The quote is from Govt. Ex. 4, the recording of the police radio traffic. The written summaries of the police communications in Govt. Ex. 6 did not include the complete quote.

[11] The summary on Govt. Ex. 6 states that the 911 caller did not know where the gun is, but "thinks he put the gun . . . ." The recording of the radio traffic in Govt. Ex. 4 reflects that the 911 caller had advised that her son may have put the gun "on the front porch."

[12] During this encounter, Deputy Baker, the other first responder to the scene, was at the top of the driveway near the garage monitoring a woman, later identified as the 911 caller and Defendant's mother, Jean Tan. (Tr. 42, 74-75).

Cooper and Smith believed that the Defendant was a suspect in a shooting. So, they pointed their firearms at the Defendant, ordered that he show his hands to confirm that he had no weapons, and ordered him to go to the ground so that he could be handcuffed. (Tr. at 33, 34-35, 36-37, 76-78).

Deputies Cooper and Smith testified that, at the time they restrained the Defendant, they did not know the whereabouts or condition of Defendant's father, who had reportedly been shot, or the location of the firearm. They were concerned that the father could be in the house and might be able to shoot at them with the firearm, or that he was injured and required prompt medical attention. (Tr. at 34-36, 37-38, 40-41, 79-81).

Deputy Cooper testified that he asked the Defendant two times "who else was in the house" and Defendant replied "nobody." (Tr. at 38-39; Govt. Ex. 7). Because at least Defendant's father was unaccounted for, Deputy Cooper then asked the Defendant "where his dad was." According to Deputy Cooper, the Defendant replied that "he was upstairs and that he was dead and that he had to do it because his dad was going to kill his mom." (Tr. at 39-40; Govt. Ex. 7). Deputy Smith testified that he asked the Defendant "where his father was" so that first aid could be rendered to the reported victim, and Defendant replied that his father was "upstairs dead." (Tr. at 79-81; Govt. Ex. 8).[13]

Deputy Smith also asked the Defendant "where the gun was." The Defendant

---

[13] Deputy Smith's police report did not specify which officer asked Defendant about the location of his father. (Govt. Ex. 8). At the hearing, defense counsel did not explore any inconsistencies between the officers' testimony about the questions posed to Defendant or his alleged responses. As noted earlier, the Defendant did not testify at the hearing regarding his recollection of his communications with Deputies Cooper and Smith on February 9, 2015.

responded that it was in the garage. (T. 42-43, 79-80; Govt. Ex. 8). Deputies Cooper and Smith acknowledge that they did not advise Defendant of his *Miranda* rights before asking the questions regarding who else was in the house, the location of Defendant's father, and the location of the firearm. (Tr. 41, 78, 81, 86). They estimated that their encounter with Defendant in the driveway lasted a minute or two. (Tr. 43, 82) They did not attempt to question Defendant beyond the three questions discussed above. (Tr. 43, 44, 47, 81, 86).

After this encounter with the two officers, Defendant was secured in the back of Deputy Smith's police vehicle, and was eventually transported back to the Sheriff's Office. (Tr. 82-83, 84-85; Govt. Ex. 8). Deputy Cooper and others officers did a protective sweep of the residence and found Defendant's father, Liang "Jim" Tan, dead. (Tr. 47-49; Govt. Ex. 7). Other deputies searched for and located the missing firearm. (Tr. 48; Govt. Ex. 6 at 3).

## III. Generally Applicable Law

It is well settled that police may not interrogate a suspect who has been taken into custody without first advising him of his *Miranda* rights. *United State v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004). A law enforcement interaction is custodial when "a reasonable person in the suspect's position would have understood herself to be subjected to restraints comparable to those associated with a formal arrest." *United States v. Yilmaz*, 508 F. App'x 49, 51 (2d Cir. 2013) (quoting *United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011)). *See also United States v. Newton*, 369 F.3d at 673, 677 ("a reasonable person [subject to investigative detention] would . . . have understood that as long as . . . handcuffs remained in place, his freedom of movement, even within his home, would be restricted to a degree

comparable to that of an individual placed under formal arrest").

"[T]he term 'interrogation' under *Miranda* refers not only to express questioning," but also its "functional equivalent," *i.e.*, "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). "Volunteered statements of any kind are not barred by the Fifth Amendment." *Miranda*, 384 U.S. at 478. And, some categories of questioning of a suspect by the police, such as "questions necessary to secure their own safety or the safety of the public" do not amount to interrogation." *United States v. Familetti*, 878 F.3d 53, 57 (2d Cir. 2017) (quoting *New York v. Quarles*, 467 U.S. at 658-59).

In *Quarles*, the Supreme Court carved out a narrow "public safety" exception to *Miranda.* The exception permits pre-*Miranda* inquiries of defendants that are "reasonably prompted by a concern" for public safety, but are to be "circumscribed by the exigency which justifies it." *Quarles*, 467 U.S. at 656, 658. *United States v. Estrada*, 430 F.3d 606 (2d Cir. 2005) distilled three principles from the Second Circuit's application of the public safety exception:

> First, . . . *Miranda* warnings need not precede questions reasonably prompted by a concern for the public safety or for the safety of arresting officers, so long as the questioning relates to an objectively reasonable need to protect the police or the public from an immediate danger. . . . Second, the exception is limited by the fact that pre-*Miranda* questions, while framed spontaneously in dangerous situations, may not be investigatory in nature or designed solely to elicit testimonial evidence from a suspect. . . . [However], a question that plainly encompasses safety concerns, but is broad enough to elicit other information, does not necessarily prevent application of the public safety exception when safety is at issue and context makes clear that the question primarily involves safety. Third, we expressly have not condoned the

> pre-*Miranda* questioning of suspects as a routine matter. Rather, recognizing the need for flexibility in situations where the safety of the public and the officers are at risk, we have described the public safety exception as a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of the circumstances in a given case.

*Id.* at 612 (internal citations, quotation marks, and alterations omitted).

## IV. Recommendations

Based on the credible evidence presented during the suppression hearing, this Court concludes that the questions posed by the officers who restrained the Defendant on February 9, 2015, fell within the public safety exception to the *Miranda* doctrine. Accordingly, this Court recommends that the motion to suppress the Defendant's responses to those question (Dkt. No. 21) be denied.

During the suppression hearing, the government emphasized what motivated the two Deputy Sheriffs to briefly question the Defendant after he was handcuffed on February 9, 2015. Deputies Cooper and Smith testified that they attempted to address a serious and immediate perceived risk to their safety and the safety of others in the vicinity. They were seeking to discover the location of the firearm that was reportedly somewhere on the scene, and the whereabouts of Defendant's father, who may have been in a position to shoot at his family members and/or the officers, or who may have required urgent medical attention. In his cross-examination of the testifying officers, defense counsel tried to suggest that the officers knew that they were not in serious danger, and that their questions to Defendant were motivated by a desire to locate critical evidence implicating him in the shooting of his father. (See, e.g., Tr. at 91-95).

As noted above, "[t]he public safety exception to *Miranda* does not depend upon the subjective motivation of the questioning officer. . . . Rather, it applies so long as the questioning 'relate[s] to an objectively reasonable need to protect the police or the public from any immediate danger.'" *United States v. Newton*, 369 F.3d at 677-78 (citations omitted). This Court finds that the testimony of Deputies Cooper and Smith about their motivation in questioning the Defendant to be credible. However, this Court must focus on whether, given the particular circumstances of their encounter with the Defendant, it was objectively reasonable for the responding officers to perceive an immediate danger, and to question the Defendant as they did, in an attempt to mitigate that danger.

In his post-hearing papers, defense counsel argues that, as a result of the various communications from police dispatch, the responding officers would have known enough about the situation at 37 Coach Side Lane to realize that the Defendant's father and the un-recovered firearm posed no significant threat to them. (Dkt. No. 37 at 1). Defense counsel contends that the officers had enough information to already know the answer to the questions they posed to the Defendant after he was handcuffed. (Dkt. No. 37 at 2). The information transmitted to the officers arguably suggested that the Defendant's father was likely severely wounded or dead, and that the firearm was out of the reach of the other civilians on the scene.

However, this Court concludes it was objectively reasonable, under the circumstances, for the officers to perceive an immediate danger to the themselves and others believed to be on the scene. The primary source of the information transmitted to the responding officers was Jean Tan. As the mother of the reported shooter and the wife of the reported victim, she

was involved in an apparently violent domestic dispute. Moreover, Mrs. Tan was described by the dispatcher as "hysterical," and she had a heavy accent that was extremely difficult to understand. It was entirely reasonable for the responding officers not to stake their safety on the reliability of the information provided by Jean Tan, to the extent the dispatcher was able to understand it and pass it along to the responding officers.

In any event, the information provided to the responding officers was not definitive with respect to the whereabouts of the firearm or the location and condition of Defendant's father. While the Deputy Sheriffs were able to confirm that the Defendant was not armed when they first encountered him, the report from dispatch that Mrs. Tan stated the firearm was on the front porch was not verified, and ultimately proved to be inaccurate. As noted above, the condition of the Defendant's father was not clear because Mrs. Tan was too scared to check on her husband. Based on the available information, the officers had reason to believe that the Defendant had direct knowledge of critical information relating to an immediate threat to their safety–the location of the firearm and his father.

There were a few discrepancies in the accounts of Deputy Cooper and Deputy Smith about the questions they asked and the responses Defendant provided. However, the credible evidence indicates that the questions were brief and were focused on the two sources of greatest danger to the responding officers and others on the scene–the unaccounted-for firearm and the whereabouts of the Defendant's father or others who might have access to the firearm. The officers' questions "were limited in scope and were not posed to elicit incriminating evidence." *United States v. Reyes*, 353 F.3d 148, 154 (2d Cir. 2003).

As in *Reyes*, the officers' questions in this case were directed at identifying sources of possible safety threats and posed only a limited risk of incrimination because subsequent searches would have likely led to the discovery of the firearm or any other people on the premises. *Id*. at 153, 154 (police questions about the presence of guns or other dangerous objects involved "little risk of incrimination because the officers would have inevitably recovered any firearms or drug paraphernalia during a search incident to his arrest "). The officers did not ask more pointed questions that an investigator focused on building a criminal case against the Defendant certainly would have asked. (*See, e.g.,* Tr. at 40 (officers did not ask Defendant who shot his father), 81, 99-100).

When asked where his father was, the Defendant volunteered non-responsive and incriminating information–that his father was dead and that the Defendant had to do it because his father was going to kill his mother. However, as the Supreme Court held, "since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. at 301-02. See also *Reyes*, 353 F.3d at 154 (denying suppression, under the public safety exception, of defendant's non-responsive and incriminating answer to the officer's questions about the presence of dangerous objects on Reyes' person) (citing *United States v. Lackey*, 334 F.3d 1224, 1227-28 (10th Cir. 2003) (where questions address a "real and substantial risk to the safety of the officers[,]" "[t]he risk of incrimination is limited to non-responsive answers")).

Defense counsel argues that officers' question about the location of the missing firearm did not fall within the public safety exception. Counsel distinguishes the seminal Supreme Court case, *Quarles*, which involved police trying to locate a firearm concealed in a public place, and argues that the incident in the instant case occurred in a private dwelling where police could have secured any gun without danger. (Dkt. No. 37 at 2). However, other cases have applied the public safety exception to police questioning about the location of a suspected firearm in the setting of a private home, in circumstances similar to this case, where persons in the home might be able to access the firearm and endanger the officers.

For example, in *United States v. Newton*, police officers went to Newton's apartment to conduct a parole search after receiving a report that a he had threatened to kill his mother and her husband, and that Newton kept a gun in a shoe box by the door. 369 F.3d at 663. Arriving at the apartment, the officers handcuffed Newton, and without advising him of his *Miranda* rights, asked whether Newton had any "contraband" in the apartment. Newton replied "only what is in the box"– where a .22 caliber automatic firearm was recovered. *Id*. at 663-64. The Second Circuit held that the question fell within the public safety exception and that Newton's statement was thus properly admitted at trial. *Id*. at 678-79. Although Newton was in handcuffs when the officer posed the question, the Second Circuit considered the presence of others in the apartment who were involved in a volatile domestic dispute in concluding, even with Newton restrained, that the unlocated gun posed "a deadly risk to

everyone on the premises." *Id*. at 678.[14]

Similarly, *United States v. Estrada*, provides support for the application of the public safety exception to the officers' question in this case about the location of the missing firearm. The law enforcement officers in *Estrada* went to defendant DeJesus's home to execute an arrest warrant. 430 F.3d at 608. The officers knew that DeJesus had two prior assault convictions and, before arriving at the his home, they learned from a confidential informant that DeJesus kept drugs there. *Id*. at 608, 613. When officers arrested the defendant, a woman was present in the apartment. *Id*. at 613. One officer asked DeJesus whether there were any weapons in the apartment. *Id*. at 608-09. In response, the defendant indicated that there was a gun in the pocket of a jacket that lay on a nearby chair. *Id*. at 608. The Second Circuit affirmed the district court's denial of DeJesus's motion to suppress both his statement and the firearm, finding that the public safety exception applied to the officer's questions. *Id*. at 613. The Second Circuit held that, in light of the defendant's prior assault convictions and the information officers had received about his possession of drugs, the officers had "an objectively reasonable need to protect themselves from immediate danger." *Id*. "[T]he fact that another person was present in the apartment at the time of DeJesus's arrest contributed to and compounded the threat the officers faced, making their concern for their safety objectively reasonable." *Id*.

Although the public safety exception is most often applied to questions about the

[14] The Second Circuit found unconvincing Newton's argument that the public safety exception should not apply because the officers knew the location of the gun when they entered the apartment, based upon information earlier provided by Newton's mother. *Id*. at 678. Defense counsel made the same argument in this case (Dkt. No. 37 at 2), and it is similarly unconvincing.

location of a firearm or other dangerous object or person, there is authority supporting the application of the exception to questions about the location of an individual who may have been injured and who might require urgent medical attention. *See What Circumstances Fall Within Public Safety Exception* . . ., 142 A.L.R. Fed. 229 § 15 (and cases cited therein) (1997). Based on such authority, this Court finds that the Sheriffs Deputies also had an objectively reasonable basis, consistent with the public safety exception, to question the Defendant about the status of his father because of the father's likely need for urgent medical attention.

For example, in *United States v Padilla,* 819 F2d 952, 960-61 (10th Cir. 1987), the police had received a report of someone firing shots at the defendant's residence. Upon arriving, the police disarmed and restrained Padilla. One officer, observing bullet holes in a window, ascertained that the defendant was unharmed, and then asked, without providing *Miranda* warnings, "How about inside the house?" Padilla replied, "I shot someone inside the house." Two officers entered the apartment in search of an injured person, and discovered weapons, ammunition, drugs, and drug paraphernalia. *Id*. at 960. On appeal of his conviction on weapons charges, the defendant argued that the weapons should have been suppressed, since they had been discovered based on interrogation in violation of *Miranda*. The Tenth Circuit held that the public safety exception applied, finding that the officer's question was necessary to protect the safety of police and the public by determining whether or not someone inside the house was "injured, armed, or both." *Id*. at 960-61.

Similarly, *Wilcox v. Warren*, No. CV 13-3524, 2015 WL 8780331 (D.N.J. Dec. 15,

2015), *aff'd sub nom. Wilcox v. Warden New Jersey State Prison*, No. 16-1024, 2018 WL 317264 (3d Cir. Jan. 8, 2018) validated the application of the public safety exception to police questioning, without prior *Miranda* warnings, focused on locating the victim of a crime who may be injured. In *Wilcox*, a State Trooper responded to a call from the turnpike official who reported that Wilcox had admitted to a stabbing. When Trooper Doyle arrived at the scene, he handcuffed Wilcox, who immediately volunteered that he had stabbed his girlfriend. The Trooper asked where the girlfriend was and, after calling for an ambulance and providing directions, read the defendant his *Miranda* rights. 2015 WL 8780331, at *2. Wilcox was prosecuted at the state level, and the state appellate court found that the public safety exception applied to the officer's pre-*Miranda* questioning. In denying defendant's petition for habeas relief under 28 U.S.C. § 2254, the District Court in New Jersey stated "[t]he facts found by the Appellate Division in this case are consistent with application of the public safety exception set forth in *Quarles*, *i.e.*, Trooper Doyle questioned Wilcox because there was an objectively reasonable basis for Doyle to conclude that the victim may need emergency medical care." *Id*. at *7 ("Wilcox has not shown that the Appellate Division's determination that Wilcox's statement to Trooper Doyle was admissible under the public safety exception was contrary to, or an unreasonable application of, *Quarles* or other Supreme Court holdings.").

## V. Conclusions

This Court has carefully considered the evidence adduced at the suppression hearing, the post-hearing submissions of the parties, and the legal authority outlined above. Based on

the findings above, this Court concludes that the government has met its burden to establish, by a preponderance of the credible evidence, that the questions posed to the Defendant by Deputies Cooper and Smith on February 9, 2015, came with the public safety exception and did not violate Defendant's *Miranda* rights.

**WHEREFORE**, it is

**RECOMMENDED**, that Defendant's motion to suppress his statements to law enforcement officers on February 9, 2015 (Dkt. No. 21 at 15-16) be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: April 30, 2018

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**