# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHARLES TAN,<br><br>               Defendant. | Criminal Action No. 5:17-CR-228 (FJS)<br><br>**TRIAL MEMORANDUM OF THE UNITED STATES** |

Dated: June 5, 2018

Respectfully submitted,

GRANT C. JAQUITH
UNITED STATES ATTORNEY

*/s/ Lisa M. Fletcher*
Lisa M. Fletcher
Assistant United States Attorney
Bar Roll No. 510187

**I.    STATEMENT OF THE CASE**

    **a.**  Jury selection is scheduled to commence at the discretion of Senior United States District Frederick J. Scullin on June 25, 2018 in Syracuse, New York.

    **b.**  Defendant Charles Tan is detained pending trial.

    **c.**  A jury trial has not been waived.

    **d.**  The estimated duration of trial is approximately six days.

    **e.**  The defendant is represented by attorneys James Nobles and Brian DeCarolis.

    **f.**  The three-count Indictment in Case No. 5:17-CR-228 (FJS) charges the defendant with: Receiving a Firearm with Intent to Commit an Offense, in violation of Title 18, United States Code, Sections 924(b) and (2)(b); False Statement During Purchase of a Firearm, in violation of Title 18, United States Code, Sections 922(a)(6), 924(a)(2), and 2(a) and (b); False Statement During the Purchase of a Firearm, in violation of Title 18, United States Code, Sections 924(a)(1)(A) and 2(a) and (b).

**II.    RECPRICROCAL DISCOVERY AND AFFIRMATIVE DEFENSES**

The government has requested reciprocal discovery from the defense.  No such discovery has been produced.

The defendant has not given notice of his intent to rely on any defense of entrapment, mental incapacity, duress, or alibi.  Therefore, to the extent the defendant may attempt to rely on any such defense, the Government reserves the right to object and to seek to have the defendant precluded from asserting such defenses.

### III.  STATEMENT OF FACTS

In February 2015, defendant Charles J. Tan was 19 years old, a resident of Pittsford, New York (a suburb of Rochester), and a sophomore at Cornell University in Ithaca. He was a member of the Chi Phi fraternity, Xi Chapter, and on the Cornell sprint football team.

Reports from Monroe County Sheriff's Office show that on January 28, 2015 at 10:41 pm, the defendant's mother Qing (Jean) Tan made a 911 call to report that she had been assaulted by her husband. Officers responded to the Tan's Pittsford residence as a result of the call, stayed at the location for approximately 30 minutes, determined that no felony offense had been committed, and gave Qing Tan the option of having her husband arrested for a misdemeanor. Qing Tan declined to have her husband arrested, and Liang Tan agreed to leave the home for the night. Following this incident, call detail records show a call between the defendant and his mother at 12:09 am on January 29, 2015, lasting just over 18 minutes, and a call between the defendant and his father at approximately 12:28 am, lasting over 9 minutes. Call records also show a 5-minute call between the defendant and his mother on February 1, 2015, and another call between the two, for 7 minutes, at 9:44 pm on February 4, 2015.

On the morning of February 5, 2015, the defendant emptied the contents of his M & T bank account (just over $1,000), and went to see his sprint football coach. The defendant told the coach that he (Tan) would not be at the team's workout session the following day. The defendant was visibly upset, and told the coach he had to return home due to family problems. The coach offered to drive the defendant home, but the defendant declined the offer.

After this meeting, the defendant attempted to purchase a shotgun at the Walmart store in Cortland, New York, a 20 – 25 minute drive from the Cornell campus. This Walmart location is

a federally licensed firearms dealer. Surveillance video confirms that the defendant entered the Walmart store at approximately 12:02 pm. In attempting the purchase of a shotgun, the defendant filled out an ATF form 4473 for a background check and approval to purchase the firearm. In filling out the form, the defendant certified, under the penalty of perjury, that he was the actual buyer of the firearm. After some trouble submitting the defendant's 4473 by computer, Walmart called for approval of the sale, and was informed that the defendant's purchase of the firearm was delayed. The defendant left the store, without making a purchase, at approximately 12:46 pm.

At 12:48 pm, the defendant placed a phone call to Jacob Grossman, a friend from home. The defendant made arrangements to see Grossman at Grossman's Pittsford residence at 10:00 pm that same evening, and asked Grossman how much money he had. Grossman told the defendant he had about $300.00. Shortly thereafter, the defendant made a number of other telephone calls, including one to Whitney Knickerbocker.

Knickerbocker, also from Pittsford, NY was a freshman at Cornell, and fraternity brother of the defendant. At the time of the defendant's call, Knickerbocker was in class. He did not take the call, but did text with the defendant, who told Knickerbocker, by text, that he needed his help. The defendant was waiting in his car for Knickerbocker immediately after his class let out. He asked Knickerbocker to purchase a shotgun for him, and offered to pay Knickerbocker $100. The defendant told Knickerbocker that he had attempted to purchase the firearm himself earlier that day, but the sale was delayed due to his Canadian citizenship. The defendant told Knickerbocker that he needed the firearm immediately for a hunting trip, and that he had tried to get a friend from Michigan to buy the firearm for him, but that because of his Michigan residency that person could not make the purchase.

The defendant then drove Knickerbocker to the same Walmart in Cortland where he had already attempted to purchase a shotgun.  The defendant gave Knickerbocker $800 in cash, and waited in the car.  Surveillance records confirm that Knickerbocker walked alone into the Walmart in Cortland at 2:40 pm.  When Knickerbocker presented his identification for the purchase, the Walmart employee told Knickerbocker that because he was currently living in Ithaca (at Cornell) Walmart could not accept his driver's license, which listed his home address in Pittsford, as proper identification.  The employee told Knickerbocker that he could obtain a change of address sticker from the Department of Motor Vehicles (DMV) if he wanted to purchase the firearm.  Knickerbocker left Walmart at 2:48 pm without the firearm.

When Knickerbocker told the defendant what happened, the defendant drove Knickerbocker to the DMV in Cortland, approximately a 12-minute drive from Walmart, where Knickerbocker obtained the change of address required to make the firearms purchase.  The defendant then drove Knickerbocker back to the same Walmart, parked some distance away from the entrance, and again waited in the car for Knickerbocker to make the shotgun purchase.

Knickerbocker returned to the Cortland Walmart at 3:32 pm, and purchased a Remington, Model 870 Express, 12-gauge caliber shotgun, Serial Number RS50700V and two (2) boxes of ammunition. Walmart records confirm that Knickerbocker purchased the same firearm that Tan had attempted to buy earlier that day.  In order to obtain the firearm, Knickerbocker filled out an ATF form 4473, and falsely certified, under the penalty of perjury, that he was the actual buyer of the firearm.

Knickerbocker left the Walmart with the firearm and ammunition at 3:54 pm.  Pursuant to Walmart policy, an employee escorted Knickerbocker from the store with the firearm, and handed

the firearm to Knickerbocker outside the store entrance. Knickerbocker then returned to the defendant's vehicle, placed the shotgun and ammunition in the back seat, returned the change from the transaction to the defendant and the two then returned to Cornell, where the defendant dropped Knickerbocker off at his dorm. The defendant did not pay Knickerbocker for the transaction, but instead gave him a case of beer. Thereafter, the defendant drove to Rochester, NY.

Surveillance footage from Wegman's at Calkins Road in Rochester, NY, shows the defendant and another male entering the store at 7:58 pm on February 5, 2015. The two are on surveillance video shopping in the store. They each purchased items, and left the store at 8:08 pm.

The defendant's father, Liang Tan, left his place of employment in Canandaigua, New York at approximately 8:40 pm. Travel time from Liang Tan's office to his residence is approximately 25 minutes.

At approximately 10:00 pm, the defendant arrived at Jacob Grossman's house, a very short distance from the Tan residence. The defendant was very upset, but would not tell Grossman what was going on with him. The two talked and watched television for about one hour. During their conversation, the defendant talked about leaving the country. The defendant left the Grossman house still visibly distressed. As a result, Grossman attempted to call the defendant several times but the defendant did not answer the phone.

Due to Tan's demeanor while at their house, Grossman and his mother drove to the area of the Tan house and called 911 to ask the police to do a welfare check on the defendant. At approximately 11:46 pm, MCSO Deputy William Connell made contact with the defendant in the driveway of 37 Coach Side Lane. The defendant assured the deputy he was fine. Dep. Connell did

not go inside the house, or encounter anyone else at the location.  He then went to speak with Grossman and his mother, and assured them that Tan was fine.

Financial records show that on February 6, 2015, at approximately 12:46 am, a debit card issued to the defendant was used at a Sunoco gas station in or near LeRoy, New York, a town west of Pittsford, NY.  There is a Sunoco Station at the Ontario Travel Plaza on the New York State Thruway in LeRoy.  Border crossing records obtained from the Canadian Border Services Agency show that at approximately 1:50 am on February 6, 2015, Charles and Qing Tan entered Canada via the Niagara Falls International Rainbow Bridge.

U.S. crossing records show that on February 7, 2015, the defendant's brother, Jeffery Tan, flew out of the United States to Toronto, Canada, and that on Monday, February 9, 2015, the defendant, his mother, and Jeffrey Tan, entered the United States together via the Niagara Falls International Rainbow Bridge, Niagara Falls, NY at approximately 3:15 pm.

On February 9, 2015, Cornell students reported to the Cornell Police Department that they had received an email from the defendant.  A copy of that email was turned over to Cornell Police.  In the email, sent at 5:13 pm on February 9, 2015, to his Chi Phi, Xi Chapter, fraternity brothers, with the subject line "Showtime," the defendant warned the recipients to disregard stories they would be hearing about him in the coming days, and to be prepared for visits from the authorities.

At 6:09 pm on February 9, 2015, Qing Tan called 911 from the Coach Side Lane residence, and reported to the 911 operator that her son had shot her husband.  911 records show that police were dispatched to the Tan home at 6:12 pm, and were on scene at 6:23 pm.  Upon arrival, the first responders asked the defendant where his father was.  The defendant stated that he was upstairs,

that he was dead, and, "I had to do it, he was going to kill my mom." He also told police that the gun was in the garage.

Liang Tan was found by police in a chair behind a desk in an upstairs office at the house. He had been dead for a period of time, and had suffered multiple gunshot wounds, including at close range to his face. The firearm purchased on February 5, 2015 by Whitney Knickerbocker was found hidden in the garage at the Tan residence, and the ammunition purchased by Knickerbocker was found in the back of the car Tan had been driving when they went to Walmart to make the purchase. The defendant's fingerprints were recovered from the box of Winchester slugs, and on spent shell casings. Ballistics testing confirmed that this was the weapon and ammunition used to kill Liang Tan.

## IV.   THE CHARGES

### A.   False Statements In Acquisition Of A Firearm

In *Abramski v. United States*, 134 S.Ct. 2259 (2014), the Supreme Court held that straw purchases (purchases by persons who buy guns on someone else's behalf while falsely claiming to be the actual buyer) are unlawful under "whether or not the true buyer could have purchased the gun without the straw." 134 S. Ct. at 2263. It further held that a misrepresentation about the identity of the actual buyer is both material to the lawfulness of the sale, and "information required by [Title 18, Chapter 44] to be kept" in the dealer's records, and consequently violates both 18 U.S.C. §§ 922(a)(6) and 924(a)(1)(A). *Id*. at 2274 - 75.

Federal firearms licensees (FFLs) are required to keep the "Firearms Transaction Record," ATF Form 4473 completed by the purchaser, which includes information regarding the name, age, and place of residence of the purchaser (or transferee), and the purchaser's certification that he or

she is not prohibited from possessing firearms. An individual who seeks to purchase a firearm must fill out ATF Form 4473, and a person who makes a false statement on ATF Form 4473 has potentially violated 18 U.S.C. § 924(a)(1)(A) or 18 U.S.C.§ 922(a)(6), and both may have been violated.[1] The gravamen of the offense under both § 922(a)(6) and § 924(a)(1)(A) is the making of the false statement. Therefore, a violation results whether or not the defendant successfully acquires the firearm. *See United States v. Gardner*, 579 F.2d 474, 476-77 (8th Cir. 1978); *United States v. Brozyna*, 571 F.2d 742, 745 (2d Cir. 1978).

In contrast with § 922(a)(6), § 924(a)(1)(A) is violated when an individual knowingly makes any false statement or representation with respect to the information required to be kept in the records of a federal firearms dealer. In proving a violation of § 924(a)(1)(A), the Government is not required to prove that the defendant knew that the FFL was required to maintain such information. *See United States v. McCord*, 904 F.Supp. 1029, 1037 (D. Neb. 1995). The statement need not be "intended or likely to deceive" the firearms dealer nor "material to the lawfulness of the sale." *See United States v. Johnson*, 680 F.3d 1140, 1144-45 (9th Cir. 2012) (citing *United States v. Sullivan*, 459 F.2d 993, 994 (8th Cir. 1972) (rejecting defendant's argument that element of materiality must be read into § 924(a)(1)(A)); *United States v. Johnson*, 60 Fed.Appx. 260, 262 (10th Cir. 2003) (unpublished) (rejecting defendant's argument that government must prove intent to deceive in § 924(a)(1)(A) prosecution).

---

[1] Although located within the section which provides the penalty provisions for firearms offenses, 18 U.S.C. § 924(a)(1)(A) defines a substantive offense. *See United States v. Al-Muqsit*, 191 F.3d 928, 935-36 (8th Cir. 1999), vacated in part on other grounds, *United States v. Logan*, 210 F.3d 820 (8th Cir. 2000) (en banc); *United States v. Langley*, 62 F.3d 602, 611 n.9 (4th Cir. 1995); *United States v. Howell*, 37 F.3d 1197, 1200 n.4 (7th Cir. 1994); *United States. v. Buck*, 548 F.2d 871, 876-77 (9th Cir. 1977).

The identity of actual buyer is among information referred to in § 924(a)(1)(A). *United States v. Nelson*, 221 F.3d 1206, 1209 (11th Cir. 2000). Where the false statement concerns the identity of the actual buyer, or other information material to the lawfulness of the firearm sale, courts that have addressed the issue have found that it is permissible to charge violations of both § 922(a)(6) and § 924(a)(1)(A) for the same conduct. *See*, e.g., *Buck*, 548 F.2d at 876-77 (not duplicitous to charge both violations); *United States v. Evans*, 848 F.2d 1352 (not multiplicitous to charge both violations), modified on reh'g, 854 F.2d 56 (5th Cir. 1988); *United States v. Hawkins*, 794 F.2d 589, 590-91 (11th Cir. 1986) (double jeopardy clause not violated by convicting defendant of both offenses based on same false information); *United States v. Anaya*, 615 F.Supp. 823 (N.D. Ill. 1985) (same).

Moreover, the courts have concluded that Congress intended to reach transactions covered by § 922(a)(6) that are wholly intrastate, on the theory that such transactions affect interstate commerce. *See Huddleston v. United States*, 415 U.S. 814, 833 (1974) (holding that § 922(a)(6) "encompass[es] a pawnshop redemption"); *United States v. Andrino*, 497 F.2d 1103, 1105-06 (9th Cir. 1974); *United States v. Green*, 471 F.2d 775, 776-77 (7th Cir. 1972). Accordingly, it is not necessary to allege or prove a nexus with interstate commerce to establish a violation of § 922(a)(6). The same rationale applies to § 924(a)(1)(A). *See United States v. Bacon*, No. 05-CR-333-BR 2007 WL 543439, at *3 (D. Or. Feb. 15, 2007) (citing *United States v. Crandall*, 453 F.2d 1216, 1217 (1st Cir. 1972) ("licensed dealers['] general involvement with interstate commerce is ample to justify federal regulation of even their intrastate sales")).

    **B.**    **Accomplice Liability**

Here, while the defendant did not personally make the false statement in the acquisition of the firearm, because he procured the commission of the offense, and willfully caused it to be done, he is liable as a principal.  Title 18, United States Code, Section 2 (a) provides: "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal," and Section 2 (b) provides: "Whoever willfully causes an act to be done which, if directly performed by him, would be an offense against the United States, is punishable as a principal."  "[W]hen the evidence shows that a defendant acted through a guilty intermediary, the jury may properly be instructed under either section 2(b) or 2(a). However, when the evidence shows that the defendant acted through an innocent intermediary, the jury should be instructed under section 2(b) alone." L. Sand, J. Siffert, W. Loughlin, S. Reiss, S. Allen, & J. Rakoff, *Modern Federal Jury Instructions* (2012), Instruction 11-3, Commentary.

Here, while Knickerbocker knew that he was falsely representing himself to be the actual buyer in the purchase of the shotgun (Counts 2 and 3), he did not receive that firearm from Walmart with intent or knowledge or reasonable cause to believe that it would be used to commit a felony (Count 1).  Accordingly, the indictment properly alleges liability under both §§ 2(a) and 2(b) as alternative theories for Counts 2 and 3, while alleging only § 2(b) liability for Count 1.

V.     **EVIDENTIARY ISSUES**

    A.     **Testimony Regarding Certain Examinations**

The Government anticipates calling as a witness Forensic Analyst Andrew Wilkerson who performed a forensic examination on a laptop computer recovered from the Tan residence, and Intelligence Analyst Kellen Crouse who will testify about cell site data provided to law enforcement by Verizon.  As such, Mr. Wilkerson and Mr. Crouse will not be called as "expert"

11

witnesses within the traditional meaning of that phrase, but instead, will be called upon to testify to facts. The testimony Mr. Wilkerson will focus on on evidence found on the laptop computer after retrieving it through forensic tools, and Mr. Crouse will testify about cell site locations derived from raw data provided by Verizon.

Such testimony is akin to the testimony of any other witness who finds evidence pursuant to a search warrant. All of the recovered evidence has been available to the defendant throughout the pendency of the case, has been turned over to counsel. Out of an abundance of caution, the Government provided "expert" notice with respect to the testimony of these witnesses.[2]

The Government anticipates that Mr. Wilkerson will discuss certain information derived during the forensic examination process. He will be prepared to authenticate any relevant documents and describe the process by which they were created. Such documents are not hearsay

---

[2] While the Government maintains that these witnesses are fact witnesses, to the extent the defendant may argue that they should be considered experts, Federal Rule of Evidence 702 governs the admissibility of expert witness testimony, providing:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

A trial judge has broad discretion to admit or excuse expert testimony under this Rule. *United States v. Aminy*, 15 F.3d 258, 261 (2d Cir. 1994); *United States v. Tutino*, 883 F.2d 1125, 1134 (2d Cir. 1989); *United States v. Diaz*, 878 F.2d 608, 616 (2d Cir. 1989). A judge's determination to admit such evidence will be overturned only if "manifestly erroneous" or an "abuse of discretion." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *Tutino*, 883 F.2d at 1134; *United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985).

because "nothing 'said' by a machine is hearsay." *United States v. Washington*, 498 F.3d 225, 231 (4th Cir. 2007) (quoting 4 Mueller Kirkpatrick, Federal Evidence § 380 at 65 (2d ed. 1994)) (citing cases). Moreover, they are admissible as original documents. *See* Fed. R. Evid. 1001(d) ("For electronically stored information, 'original' means any printout – or other output readable by sight – if it accurately reflects the information.").

In regard to Mr. Crouse's testimony, counsel for the defendant has indicated that the defense is willing to stipulate to the raw data provided by Verizon, as authenticated business records. Mr. Crouse's testimony will focus on facts determined from this raw data.

### B. Chain of Custody

An uninterrupted chain of custody is not a prerequisite to admissibility of an exhibit. *United States v. Jackson*, 345 F.3d 59, 65 (2d Cir. 2003). "Breaks in the chain of custody do not bear upon the admissibility of evidence, only the weight of the evidence." *Id.* citing *United States v. Morrison*, 153 F.3d 34, 57 (2d Cir. 1998) (internal citations omitted). "If the trial judge is satisfied that in reasonable probability the evidence has not been altered in any material respect, he may permit its introduction." *United States v. Olson*, 846 F.2d 1103, 1116 (7th Cir. 1998) (quoting *United States v. Aviles*, 623 F.2d 1192, 1198 (7th Cir. 1980)).

Federal Rule of Evidence 901(a) provides that:

The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

Proof of the connection of an exhibit to the defendant may be made by circumstantial evidence. *United States v. Mendel*, 746 F.2d 155, 167 (2d Cir. 1984); *United States v. Howard-Arias*, 679 F.2d 363, 366 (4th Cir. 1982); *United States v. Natale*, 526 F.2d 1160, 1173 (2d Cir.

1975). *See United States v. Kubiak*, 704 F.2d 1545, 1552 (11th Cir. 1983) ("[T]he prosecution need only prove a rational basis from which to conclude that the exhibit did in fact belong to the [defendant]."); *Mendel*, 746 F.2d at 167; *Natale*, 526 F.2d at 1173. "The ultimate question is whether the authentication testimony is sufficiently complete so as to convince the court of the improbability that the original item had been exchanged with another or otherwise tampered with." *Mendel*, 746 F.2d at 167; *Howard-Arias*, 679 F.2d at 366; *United States v. Grant*, 967 F.2d 81, 83 (2d Cir. 1992).

### C. Arguing Penalties

Absent extraordinary statutes requiring the jury to participate in sentencing determinations, the *sole* function of the jury is to determine guilt or innocence. Punishment is within the exclusive province of the Court. *United States v. Del Toro*, 426 F.2d 181, 184 (5th Cir. 1970); *Chapman v. United States*, 443 F.2d 917, 920 (10th Cir. 1971).

As such, it is improper for a party to elicit evidence that would allow the jury to speculate as to the punishment a defendant faces if convicted. *United States v. Feuer*, 403 F. App'x 538, 540 (2d Cir. 2010)(summary order)(absent exceptional circumstances,[3] "a defendant has no legal right to introduce evidence or argument regarding sentencing consequences"); *United States v. Cook*, 776 F. Supp. 755, 756-57 (S.D.N.Y. 1991) ("The function of the jury in a criminal trial is

---

[3] The Court of Appeals in *Feuer* cites to *Shannon v. United States*, 512 U.S. 573, 579 (1994), for an explanation of what "exceptional circumstances" would be. *Shannon*'s holding was that there is no requirement to give a jury instruction about the consequences of a not guilty by reason of insanity verdict. In so holding, however, the Supreme Court recognized that "an instruction of some form may be necessary under certain limited circumstances. If, for example, a witness or prosecutor states in the presence of the jury that a particular defendant would 'go free' if found [not guilty by reason of insanity], it may be necessary for the district court to intervene with an instruction to counter such a misstatement." 512 U.S. at 579.

to determine guilt or innocence based upon an impartial consideration of the evidence, unswayed by emotion, fear or prejudice. Where the jury is permitted to speculate concerning a defendant's possible punishment, a jury cannot properly perform that function.")(citations omitted). *See also United States v. Pabon-Cruz,* 391 F.3d 86 (2d Cir. 2004).

It is proper for the court to interrupt any arguments relating to punishment or appeals for mercy, *see United States v. Wilson*, 439 F.2d 1081, 1082 (5th Cir.1971), *Gretter v. United States*, 422 F.2d 315, 319 (10th Cir. 1970), and some cases have held that the Court is required to do so. *See United States v. Ramantanin*, 452 F.2d 670, 672 (4th Cir. 1971); *May v. United States*, 175 F.2d 994, 1010 (D.C. Cir. 1949); *see also United States v. Young*, 470 U.S. 1, 13 (1985)(stating that the "better course" would have been for the trial judge to interrupt defense counsel's improper argument rather than leaving it for the prosecutor to address on rebuttal).

To allow the jury to be swayed by arguments regarding possible punishment would be to permit them to violate their oath not to allow their verdict to be affected by sympathy. *See Del Toro*, 426 F.2d at 184 ("'To inform the jury (concerning) matters relating to disposition of the defendant, tend to draw the attention of the jury away from their chief function as sole judges of the facts, open the door to compromise verdicts and to confuse the issue or issues to be decided.'") (quoting *Pope v. United States*, 298 F.2d 507 (5th Cir. 1962)).

In short, counsel may not seek to inflame the prejudices of the jury or conjure up sympathy for the defendant by referring to the potential sentences and collateral consequences the defendant would face upon conviction.

**V.     FORFEITURE**

In the event the defendant is found guilty of one or more counts in Superseding Indictment 5:17-CR-228 (FJS), the government will seek the forfeiture of the following:

1. A Remington, Model 870, 12 Gauge Shotgun, with serial number RS50700V.

Forfeiture issues will not be considered until and unless the jury returns a guilty verdict as to one or more counts; all counts against the defendant giving rise to the forfeiture. *See* Fed. R. Crim. P. 32.2(b)(1). In that event, the Court must determine whether the government has established the requisite nexus between the property subject to forfeiture and the offenses of conviction. Fed. R. Crim. P. 32.2(b)(1)(A). The Court's determination may be based on evidence already in the record and on any additional evidence or information submitted by the parties. Fed. R. Crim. P. 32.2(b)(1)(B). The Federal Rules of Evidence do not apply in the forfeiture phase of the trial. *See* Fed. R. Evid. 1101(d)(3) (the federal evidentiary rules, except for those on privilege, do not apply to sentencing proceedings); *United States v. Ali*, 619 F.3d 713, 720 (7th Cir. 2010) (because forfeiture is part of sentencing, less stringent evidentiary standards apply in the forfeiture phase of the trial; the evidence need only be "reliable"); *United States v. Capoccia*, 503 F.3d 103, 109 (2d Cir. 2007) (Fed. R. Crim. P. 32.2(b)(1) allows the court to consider "evidence or information," making it clear that the court may consider hearsay; this is consistent with forfeiture being part of the sentencing process where hearsay is admissible).

The government's burden is to establish the forfeitability of the property by a preponderance of the evidence. *See United States v. Martin*, 662 F.3d 301, 307 (4th Cir. 2011) (the government must establish a nexus between the property for which it is seeking forfeiture and the crime by a preponderance of the evidence.); *United States v. Bellomo*, 176 F.3d 580, 595 (2d

Cir. 1999) (because forfeiture is part of sentencing, and fact-finding at sentencing is established by a preponderance of the evidence, the preponderance standard applies to criminal forfeiture); *see also United States v. Gaskin*, 354 F.3d 438, 461-62 (2d Cir. 2004) (following *Bellomo*).

Generally, the forfeiture determination is made by the court, not the jury. *See* Fed. R. Crim. P. 32.2(b)(1)(A). The rule, however, gives defendants the right to have the jury retained to determine the forfeiture to the extent that the government is seeking the forfeiture of specific assets on the theory that they were directly involved in, or traceable to, the offense of conviction. Fed. R. Crim. P. Rule 32.2(b)(5). The court must determine before the jury begins deliberating whether either party requests that the jury be retained to determine the forfeitability of specific property if it returns a guilty verdict. Fed. R. Crim. P. 32.2(b)(5)(A). The purpose of that provision, which was added to Rule 32.2 in 2009, is to allow the court and the jurors to plan their calendars, and to allow the government time to prepare special verdict forms and jury instructions, or conversely, to save the court and the government the judicial resources that would be wasted making such preparations if the defendants intend to waive the jury. *See* Advisory Committee Note to 2009 Amendment to Subdivision (b)(5)(A)[4]. If defendants fail to make a timely request to have the jury retained, their right to do so is waived. *See United States v. Nichols*, 429 Fed. Appx. 355, 356 (4th Cir. 2011) ("although a defendant has a right to have a jury decide a forfeiture issue, the defendant must affirmatively assert that right," citing Fed. R. Crim. P. 32.2(b)(5)).

---

[4] The Advisory Committee Note provides, in pertinent part:

> Although the rule permits a party to make this request just before the jury retires, it is desirable, when possible, to make the request earlier, at the time when the jury is empaneled. This allows the court to plan, and also allows the court to tell potential jurors what to expect in terms of service.

17

Accordingly, in this case, the government will be asking the court to enter an order of forfeiture for the asset listed above and will be prepared to establish the forfeitability of the listed asset by a preponderance of the evidence. The government also respectfully requests that the court inquire of the defendant, at the time the jury is empaneled, whether he will be invoking his limited right under Rule 32.2(b)(5) to have the jury retained.