IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

UNITED STATES OF AMERICA

                                  Case No.     5:17-CR-228 (FJS)

v.                                 GOVERNMENT'S SENTENCING
                                                    MEMORANDUM

CHARLES TAN,

                Defendant.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

       The United States of America, by and through its counsel of record, the United States Attorney for the Northern District of New York, hereby files its sentencing memorandum requesting, for the reasons set forth below, that the Court impose a Guidelines sentence.

## INTRODUCTION

       On June 22, 2018, defendant Charles Tan pled guilty to all three counts of Indictment 17-CR-228, charging him with (1) receiving a firearm with intent to commit an offense, in violation of Title 18, United States Code, Sections 924(b) and 2(b); (2) inducing, procuring, and causing another to knowingly make a false statement during the purchase of a firearm, in violation of Title 18, United States Code, Sections 924(a)(2), 2(a) and 2(b); and (3) inducing, procuring, and causing another to knowingly make a false statement during the purchase of a firearm, in violation of Title 18, United States Code, Sections 924(a)(1)(A), 2(a) and 2(b).

       Tan is scheduled to be sentenced on November 19, 2018.

## APPLICABLE STATUTORY AND GUIDELINES PROVISIONS

**1.**    **Statutory Maximum and Minimum Sentences**

       The defendant's convictions on Counts 1 and 2 subject him to statutory maximum terms of 10 years of imprisonment per count. 18 U.S.C. §§ 924(b) and 924 (a)(2); PSR ¶ 101. His

conviction on Count 3 subjects him to a statutory maximum term of 5 years imprisonment. 18 U.S.C. § 924(b) and 924 (a)(1); PSR ¶ 101. In addition, the Court may require the defendant to serve a term of supervised release of up to 3 years, 18 U.S.C. § 3583(b)(2); PSR ¶ 107.

The defendant must pay a special assessment of $300, 18 U.S.C. § 3103; PSR ¶ 114, and the Court may order him to pay a fine of up to $250,000. 18 U.S.C. § 3571; PSR ¶ 113. The Government agrees with the assessment of the Probation Officer that the defendant appears to have the ability to pay a fine. PSR ¶¶ 95 - 100. Accordingly, unless he proves otherwise, one must be assessed. U.S.S.G. § 5E1.2(a).

2. **Guidelines Provisions**

   a. **Offense Level**

   The Government adopts, without qualification, the Guidelines calculation set forth in the PSR, resulting in a Total Offense Level of 41. PSR ¶¶ 58 - 69.

   b. **Acceptance of Responsibility**

   While the defendant continues to remain silent in respect to relevant conduct (i.e., that he is the person who shot his father), because he has truthfully admitted conduct comprising the offenses of conviction, he is entitled to the 2-level reduction for acceptance of responsibility. U.S.S.G. § 3E1.1 (a), and Commentary, n. 1(A); PSR ¶ 67. However, going forward, if the defendant "falsely denies or frivolously contests relevant conduct that the court determines to be true," he will have "acted in a manner inconsistent with acceptance of responsibility," and the Government will object to this reduction in his offense level. U.S.S.G. § 3E1.1 Commentary, n. 1(A).

As the defendant pled guilty just four days before trial was scheduled to commence, his plea was not timely within the meaning of U.S.S.G § 3E1.1(b), and there is no Government application for an additional 1-level reduction.

### c. Criminal History Category

According to the presentence report, the defendant's Criminal History Category is I. PSR ¶¶ 70 - 71. The Government agrees with the Probation Office's determination of the defendant's criminal history category.

### d. Guidelines Range and Sentence

As described above, the defendant's Total Offense Level is 41 and his Criminal History Category is I. As a result, the Sentencing Guidelines advise that the defendant receive a sentence of 324 to 405 months. PSR ¶ 102. However, as the combined statutory maximum sentences on each count of conviction are less than the minimum applicable Guidelines range, the Guidelines term of imprisonment becomes 300 months, or 25 years. *Id.*; U.S.S.G. § 5G1.2(b) and (d).

The Guidelines term of supervised release is 1 – 3 years. PSR ¶ 109; U.S.S.G. § 5D1.2(a)(2).

The Guidelines fine range is $25,000 - $250,000. PSR ¶ 115; U.S.S.G. § 5E1.2(c)(3) and (h)(1).

## 3. Facts Set Forth in the PSR

The Government has provided the Probation Officer with some clarifications on certain factual allegations that we expect to be addressed in a revised report, but otherwise agree with the facts as set forth in the PSR.

4. **Forfeiture**

As set forth in the Forfeiture Allegation of the Indictment, the defendant shall forfeit to the United States all of his right, title and interest of any nature in any and all assets that are subject to forfeiture, pursuant to 18 U.S.C. § 924(d)(1), including a Remington, Model 870, 12 Gauge shotgun, serial number RS50700V. PSR ¶ 4.

## GOVERNMENT'S SENTENCING RECOMMENDATION[1]

Perhaps the most significant fact reported in the PSR is the statement by Charles Tan "that there were a million other ways to handle the situation." PSR ¶ 57. There may never be clarity into the home life of the Tan family, but this one truth is unassailable. There were a million ways to handle it. Pre-meditated murder was not one of them.

While his attorneys stopped the defendant from telling the Probation Officer what happened in the Tan residence after he arrived home on February 5, 2015, *id.*, the time for charade has passed. The only reasonable view of the evidence is that Tan, and Tan alone, conceived and carried out a plan to murder his father - a pre-meditated plan which included emptying his bank accounts, enlisting friends to help him purchase a shotgun by lying to them about why he needed it, visiting friends to say good bye, executing his father by shooting him three times as he sat

---

[1] The Government reserves the right to respond to defense arguments raised after the filing of this memorandum. Similarly, if the Court is considering a *sua sponte* departure from the applicable sentencing guidelines range on a ground not previously identified by the parties or in the Presentence Investigation Report, the parties are entitled to notice and an opportunity to respond. *See* Fed R. Crim. P. 32(i)(1)(c), 32 (h).

Further, the United States respectfully requests that the Court provide the parties with any *ex parte* communications received by the Court in connection with sentencing, with the exception of the confidential sentencing recommendations submitted by the United States Probation Office.

4

behind a desk in his slippers, and then fleeing the United States.

Despite the public narrative first put out by the defense at the defendant's state trial, as Tan's brother emphatically states, Jean Tan "is not the killer." PSR ¶ 80. Instead, Jean Tan was actively exploring divorce, and is said to have "always preached the sanctity of life even down to the smallest bug." PSR ¶¶ 12, 80.

On January 28, 2015, Jean Tan called 911 and reported that her husband had choked her. After responding to the Tan residence, Monroe County Sheriff's deputies found Jean upset, with a red mark on her neck. Jim Tan admitted the two had argued, but denied having touched his wife. After deputies explained all of her options to her, Jean Tan told the police she did not wish to have her husband arrested, but for him to simply leave home for the night - which he did. PSR ¶ 11.

After the police left, phone records show an 18 minute phone call between Tan and his mother, followed by a 9 minute call between Tan and his father. Records show several more calls between Tan and his mother over the next several days, including on February 4, 2015. PSR ¶¶ 12 - 13. There were no additional calls with his father. The defendant's recollection of calling his father a few days after the incident, PSR ¶ 56, is not corroborated by the phone records. This one call from Tan to his father during the early morning hours of January 29, 2015, shortly after the police left the residence, is the only one between the defendant and any phone number associated with Jim Tan from that date forward.

The evidence in the case makes it clear that after the January 29th phone calls with his parents, the defendant resolved to leave school, purchase a shotgun, kill his father, and flee the country. PSR ¶¶ 13 – 35, 56. It is similarly without doubt that the defendant was specifically

determined to carry out his plan on February 5, 2015.

Beginning on February 4, 2015, Tan began to communicate to friends that he needed to leave school because there was "a lot going on at home," telling two of them that he "needed to go home and to get his mom out of the situation." PSR ¶¶ 13, 43. That same day, Tan texted a Cornell friend, D.B., and said that he may need his help with "a purchase." PSR ¶ 14.

While Tan now says that he "knew he had to get his mother out of there and maybe take her to a family friend in Canada," PSR ¶ 56, his actions show, beyond doubt, that removing his mother from the home was not his only plan. As he said to the Probation Officer: "He knew he would protect his mother even if it meant killing his father." *Id.* And so, on February 5th, Tan set on a deadly mission to remove his *father*, permanently, from the situation.

At 10 a.m. on February 5th, Tan went to the M&T Bank in Ithaca and emptied both of his bank accounts, telling the bank manager that he was leaving school. PSR ¶ 15. He then visited his football coach, and told him he would miss the team workout the next day because he had to go home due to a family situation. Notably, the coach emailed Student Services to tell them that Tan was returning home due to family issues, and an email was sent to his professors indicating that Tan would be away from campus for an undetermined amount of time. PSR ¶ 15. Tan turned down offers of assistance from the coach, and instead left the coach's office on a quest to purchase a shotgun. PSR ¶¶ 15-21.

After leaving his coach, Tan placed a call to Osgood's Guns and Ammo in Groton, NY (a 17 minute drive from Cornell). Cell tower records place Tan in the vicinity of the shop at the time of the call, 11:24 a.m. Next, surveillance video from the Walmart Supercenter in Cortland shows Tan entering that store at 12:02 p.m. The Walmart is a 16 minute drive from Groton, NY.

Less than 45 minutes later, Tan left the Walmart, having been unsuccessful in his attempt to purchase a Remington 12 gauge shotgun. While in the store, Tan chose the weapon he wished to purchase, and filled out the required background check form, ATF form 4473. He had to fill out the form multiple times due to a malfunction in the computer system, and each time Tan affirmed under penalty of perjury that he was the actual purchaser of the firearm. His background check was delayed. He was told to check back in a few days. PSR ¶ 16.

Two minutes after leaving the Walmart, Tan called Jacob Grossman, a friend from Pittsford, NY, and arranged to meet at Grossman's house at 10 p.m. that same night. Tan asked Grossman for money. Grossman told him he had $300. PSR ¶ 17.

Tan then spent the next several hours in a determined effort to obtain a shotgun *that day*. First, he contacted D.B., and enlisted his assistance. He drove D.B. to the Dicks' Sporting Goods in Ithaca, and gave him cash, asking D.B. to purchase a shotgun for him. Tan's false explanation to D.B. was that he needed the shotgun for a hunting trip in Pennsylvania that weekend. D.B. was unable to make the purchase because his only form of identification was an out-of-state driver's license. PSR ¶ 18.

Undeterred, Tan immediately contacted another Cornell friend, Whitney Knickerbocker, who he also knew from home. He texted Knickerbocker and asked if he wanted to make a "quick $100." PSR ¶ 19. Again, Tan falsely represented that he needed a shotgun for a hunting trip to Pennsylvania. He picked Knickerbocker up on campus and drove him to the Cortland Walmart. There, he gave Knickerbocker $800 in cash, and waited in his car in the parking lot. At 2:40 p.m. Knickerbocker entered the Walmart. Knickerbocker's attempt to purchase the shotgun was denied because his driver's license did not list his current, school, address. Knickerbocker was

told that in order to make the purchase he would need an official change of address to his driver's license indicating his local residence. *Id.* In response, Tan drove Knickerbocker to the Cortland Department of Motor Vehicles, where Knickerbocker obtained the required markings on his license, and then he drove Knickerbocker back to the Walmart. Tan again waited in the parking lot while he let his friend unwittingly purchase a murder weapon, knowing that in order to do so 18-year-old Knickerbocker would be committing a federal crime by lying about the identity of the actual purchaser of the shotgun. PSR ¶ 19 – 20. At 3:54 p.m. Knickerbocker left the Walmart with a Remington 12 gauge shotgun and two boxes of ammunition. He put them into the back of Tan's car, and the two returned to Cornell. Tan dropped Knickerbocker off on campus, gave him a case of beer, and drove to Rochester. PSR ¶¶ 21-22. Cell site records put Tan in Rochester by 7:00 p.m.

Jim Tan was at work in Canandaigua, NY until 8:40 p.m., approximately a 25 minute drive from the Tan residence in Pittsford. PSR ¶ 23.

Upon arriving in Rochester, Tan did not immediately go home, pack up his mother, and leave the country. Nor did he do so at any time in the hours before his father returned home from work. Instead, he visited friends. Tan was captured on surveillance video entering the Calkins Road Wegmans with one of those friends at 7:58 p.m. They purchased food, and left the store at 8:08 p.m. PSR ¶ 22. Still, his father was not home. Tan spent time with two friends before going to see Jacob Grossman. PSR ¶¶ 22, 25. He arrived at the Grossmans' house at approximately 10 p.m. He appeared visibly distressed, and talked about leaving the country. Tan left the Grossmans at approximately 10:50 p.m. PSR ¶ 25. The Tan residence is approximately a 6 minute drive from the Grossman house.

Jim Tan was home by this time, and working in his home office. He sent a business email at 10:40 p.m. Sometime after leaving the Grossmans, the defendant returned home and shot his father to death with the shotgun purchased for him by Knickerbocker. *See* PSR ¶ 26.

Jim Tan was seated behind the desk in his home office at the time he was murdered. Two of the three shots produced three serious wounds: one to Jim Tan's upper chest, one to the center of his chest, and one, believed to be a defensive wound, to his forearm. The shot to his upper chest exited Jim Tan's body and went through the back of the chair where he was seated. The other lodged in his back. While not immediately lethal, any one of these three wounds, if untreated, would have caused him to bleed to death. The final shot, however, was immediately lethal. Fired at close range, it blew off half of Jim Tan's face. PSR ¶ 26.[2]

There were no signs of struggle, nor was there any evidence that Jim Tan had a weapon. The killing was clearly not in response to any imminent threat of physical force, much less deadly physical force. Instead, it was a calculated, intentional, and pre-meditated murder. When Jim Tan was found, days later, he was slumped in his chair, still wearing his slippers.

Perhaps the most prescient statement in all of the case came during this timeframe. So concerned about the defendant's behavior and statements he made at their home, and after repeatedly trying and failing to get Tan to answer his cellphone, the Grossmans called 911 to ask for an officer to check on him. When asked about the nature of the emergency, Mrs. Grossman explained that "they had a bad feeling and [were] worried that he might do something at his house." PSR ¶¶ 27, 29. Jacob Grossman told the dispatcher that he was really worried because Tan told

---

[2] The nature and gravity of what was done to Jim Tan cannot be fully appreciated without reference to the photos of the scene and of his wounds. A small sampling of these images will be provided and marked as Exhibit A to the Court, with copies to counsel.

9

him that he might be leaving the country, and because Tan was not answering Grossman's calls. *Id.*

Thereafter, between 11:46 p.m. on February 5th and 1:50 a.m. on February 6th, the following events took place: At 11:46 p.m. Tan met with a Sheriff's deputy in his driveway, falsely told him that all was fine, and that his parents were in bed asleep. He also falsely told the deputy that he was home for a few days because of stress at school, and that the Grossmans had taken his comments about leaving the country out of context. When the deputy "asked if he planned on hurting himself or anyone else, [Tan] stated: 'No, I love my mom and dad.'" PSR ¶ 30. Immediately thereafter, at 11:56 p.m. on February 5th, two calls were made from the landline in the Tan residence to Jean Tan's cell phone (the defendant had earlier indicated to Grossman that his cell phone was about to die). PSR ¶¶ 27, 31. Exactly 50 minutes later, Tan and his mother were purchasing gas at the LeRoy rest stop, westbound on the Thruway, a location about 40 minutes from their home. At 1:50 a.m. on February 6th, the two crossed into Canada at the Niagara Falls Port of Entry. PSR ¶ 32.

The Tans spent the next several days in Toronto, planning how to deal with these events. On the morning of February 6, 2015, Jean Tan purchased two one-way tickets to Shanghai, China for herself and the defendant. They were to fly out of Toronto on February 9th. PSR ¶ 33. The defendant's brother then flew from his home in Denver, and landed in Toronto on February 7th. *Id.* That same day, Jean Tan began searching the Internet for information about such things as "what happens to a business after the sudden death of its owner," and whether a wife "gets everything" if a husband dies without a will. PSR ¶ 34. On February 8th, she started searching the Internet for criminal lawyers, and specifically "criminal lawyers for youthful defense in

10

Rochester." PSR ¶ 35. The Tans then abandoned their plan to fly to China, and at 3:15 p.m. on February 9, 2015, the defendant, his mother, and his brother all re-entered the United States through the Niagara Falls Port of Entry. PSR ¶ 36. Instead of fleeing, the Tans chose to return home to Jim Tan's lucrative business, and to claim that the defendant's actions were justified. *See* PSR ¶ 94.

Once home, the defendant reached out to his fraternity brothers by email, and to other people by text. PSR ¶¶ 37, 39. His mother, in turn, called 911 and reported the crime as if it had just occurred. She told the operator that she heard an argument between her husband and son, that she heard a shot, that her son had a gun, that he was trying to protect her, and that her husband was dead. PSR ¶ 38. When police arrived, the defendant told them "I had to do it, he was going to kill my mom." PSR ¶ 40. Upon entering the scene, it was readily apparent to officers that the homicide had not just occurred, but instead was several days old. PSR ¶ 41.

The brutal death of Jim Tan was not the only consequence of the defendant's single-minded actions. The aftermath has been devastating to Tan's mother, Tan's brother, and many in the Pittsford community, including the Grossmans. PSR ¶ 80 – 82. For doing an ill-advised favor for a trusted friend, Whitney Knickerbocker bears the life-long weight of having purchased a murder weapon. At 18 years old, Knickerbocker was duped into being an accessory to murder. Video of his purchase of the murder weapon was used in a very public murder trial, and his name and image have been the subject of local and national press reports.

There were a million other ways Charles Tan could have handled the issues at home. His mother and brother were actively doing just that. PSR ¶ 80. No one but Tan leapt to murder as

a solution, much less a first resort. A bright Cornell student with overwhelming support from friends, other parents, and coaches, both in Pittsford and at Cornell, Tan had a million other resources available to him, and he was, and is, smart enough to know that. Instead, he purposefully set out on a plan to murder his father, and committed the instant offenses in order to take that plan to fruition. He ignored the fact that he could not lawfully purchase the shotgun on February 5th, and instead did whatever he could to get his hands on it, lying to two friends and getting one to commit a crime for him in the process. Perhaps the few days' delay in his background investigation would have put enough time between Tan and his ill-conceived plan that he would have abandoned it. Instead, he persisted. And persisted. And persisted – until he achieved his goal.

## CONCLUSION

A sentence should be reasonably designed to achieve the total punishment, taking into account the nature and seriousness of the defendant's crimes, the harm done to the victims, and each of the other relevant considerations required under 18 U.S.C. § 3553(a).

Murder is the most serious of crimes; premeditated murder even more so. While the defendant may argue that he is not before this Court to be sentenced for murder, his sentencing guidelines are driven by that crime – as he set out not to just purchase a shotgun, but to obtain a murder weapon. U.S.S.G. §§ 2K2.1(c)(1)(B), and 2A1.1. Tan had decided that taking his father's life was justified, and then he lied to everyone around him to make it happen.

Whether Jim Tan was the abusive person he has been portrayed to be will never be truly known. He has no other family here, no relative or friend able to explain or offer any counter-point to the narrative that has been put out since the Tans returned from four days together in

Toronto deciding how to deal with the fallout from the homicide. While Jean Tan may well have wanted the divorce she was seeking, accounts about the family's history and Jim Tan's past are, at best, inconsistent. Even so, there is nothing in any of the reporting that explains, much less justifies, taking his life.

In mitigation of sentencing, the defendant will surely point to his strong community support, including glowing statements from those who knew him well, and regarded him as someone who "always seemed to do the right thing." *See* e.g., PSR ¶ 81. But that cuts both ways. The defendant had available to him all of the support needed to ask for help, get advice, and put a reasonable plan into action. He was not alone. He visited many of these people in the hours, even minutes, before he killed his father. He had the resources, the brains, and the ability to find another way. Instead, he chose the most destructive path available to him. And a man lost his life as a result.

For all of the reasons set forth above, the Government maintains that a Guidelines sentence (which is statutorily capped below his otherwise applicable range) is neither greater than necessary, nor unwarranted, for the defendant's crimes.

Respectfully submitted this 26th day of October, 2018,

GRANT C. JAQUITH
United States Attorney

/s/ *Lisa M. Fletcher*
Lisa M. Fletcher
Assistant United States Attorney
Bar Roll No. 510187

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

*******************************

UNITED STATES OF AMERICA

                              Case No.:    5:17-CR-228 (FJS)

v.

CHARLES TAN,

                Defendant.

*******************************

**CERTIFICATE OF SERVICE**

I hereby certify that on October 26, 2018 I filed the **Government's Sentencing Memorandum** with the Clerk of the District Court and sent copies of said documents via ECF to the following:

Brian C. DeCarolis, Esq.
James L. Nobles, Esq.

                                                      /s/

                                               Paula Briggs

# EXHIBIT A

# FILED UNDER SEAL