UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

CHARLES TAN,

Defendant.

5:17-CR-228 (FJS)

DEFENDANT'S SENTENCING
STATEMENT AND REQUEST
FOR A NON-GUIDELINE
SENTENCE

---

BRIAN DECAROLIS, ESQ., and JAMES NOBLES, ESQ., affirm as follows:

I.      We are attorneys licensed to practice law in the State of New York and the United States District Court for the Northern District of New York, and we represent **Charles Tan**.

2.      We make this affirmation pursuant to the requirements of Section 6A1.2 of the Sentencing Guidelines and Rule 32(f) of the Federal Rules of Criminal Procedure.

3.      In accordance with those rules, we have reviewed the Pre-sentence Investigation Report dated **October 4, 2018** (hereinafter the "PSR"), and have discussed it with our client.

4.      The representations made in this Sentencing Memorandum are based on the PSR, conversations with Charlie and others, and the following exhibits:

> **Exhibit A:**   Statement of Charlie Tan;
>
> **Exhibits B:**  Letters from:
>
>> **1.** Qing (Jean) Tan, mother of Charlie Tan, dated August 30, 2018;
>>
>> **2.** Mary Barnard, former neighbor on Coach Side Lane, dated September 4, 2018;

3. Kelly Klovstad, former neighbor on Coach Side Lane, dated August 31, 2018;

4. David R. Testa, parent of a long-time friend, dated August 14, 2018;

5. Gordon and Maureen Valentine, parents of a friend, dated August 23, 2018;

6. Sandra A. Testa, parent of a close friend, dated August 29, 2018;

7. Connor R. McMann, close friend since high school, undated;

8. Suzanne McMann, aunt of a friend, dated September 5, 2018;

9. Tracy and Chris Flynn, parents of a long-time friend, dated August 13, 2018;

10. Christopher Andolina, Cornell friend, fraternity brother, and former roommate, undated;

11. Lucy Shephard, best friend from Cornell, dated August 31, 2018;

12. Adam W. Shelepak, friend from Cornell, undated;

13. Russell E. Browning, Jr., friend and fraternity brother, dated September 3, 2018;

14. Robert Pannullo, friend from Cornell, dated August 21, 2018;

15. Caleb J. Minsky, Cornell friend, dated August 28, 2016;

16. Kelsey Mapstone, friend and Cornell classmate, undated;

17. Pat Curran, Cornell friend and teammate, undated;

18. Benjamin Greenberg, Cornell teammate, dated August 25, 2018;

19. Grace A. Vetromile, friend from Cornell, dated August 27, 2018;

20. Ryan Jackson, friend from Cornell, undated;

21. Raymond Reed Brewer, Cornell friend, undated;

22. Matt Bruhn, Cornell teammate, dated August 28, 2018;

23. Chris D'Ambrosio, Cornell friend and teammate, undated;

24. Ben Kroll, friend for more than 12 years, undated;

25. Noah T. Shephard, Cornell teammate and fraternity brother, dated August 31, 2018;

26. Lauren D'Hont, friend since elementary school, undated;

27. Sean Flynn, longtime friend, dated September 7, 2018;

28. Anna Valentine, longtime friend, undated;

29. Jacob Grossman, friend for over a decade, undated;

30. Courtney Case, high school friend, undated;

31. Maggie McMahon, close high school friend, dated September 9, 2018;

32. Alison and Greg Sample, friends from Atlanta, dated August 21, 2018;

33. Melissa A. Cocola, supervisor, dated September 9, 2018;

34. Lisa Beemsterboer, former neighbor in Chicago, dated September 6, 2018;

35. Nola O'Keefe, former neighbor in Chicago, undated;

36. Vanja Misimovic, former girlfriend, dated August 18, 2018;

37. Matthew G. Burke, Esq., former neighbor, dated September 7, 2018;

**Exhibit C:**   911 call, January 28, 2015 (PSR ¶ 10-11);

**Exhibit D:**   Excerpt of testimony of Michael Sullivan, Dynamax employee, September 25, 2015.

## INTRODUCTION

5.     Charlie Tan pled guilty to a three-count Superseding Indictment, charging 18 U.S.C. § 924(b); 2(b), Receiving Firearm with Intent to Commit an Offense; 18 U.S.C. §§922(a)(6) and 924(a)(2); 2(a) & (b), False Statement During Purchase of a Firearm; and 18 U.S.C. §§ 924(a)(1)(A); 2(a) & (b), False Statement During Purchase of a Firearm.

6.     Sentencing is currently scheduled for Monday, November 19, 2018, at 2 p.m.

## SENTENCING STATEMENT

7.     Charlie Tan has no criminal history outside of the related state case. His criminal history score is zero, establishing a criminal history category of I. Not only does he have no law enforcement contact, but he has an extensive history of community service, going out of his way to help others, supporting those in need, leading by example, and building community wherever he goes. See the numerous character letters attached hereto as Exhibit B.

8.     Charlie pleaded guilty and has accepted responsibility for his conduct. Pursuant to U.S.S.G. §3E1.1(a), the offense level is decreased by 2 levels, resulting in a total offense level of 41.

9.     Paragraph 68 of the PSR states the offense level will not be reduced by an additional one level pursuant to U.S.S.G. §3E1.1(b) because the defendant pled

guilty on the eve of trial. The defense will argue the defendant should receive this additional reduction.

10.     The defendant has a CD with a value of $21,081 as of August 2018. PSR ¶ 97. He also owns stock in Know Foods. PSR ¶ 95. While valued at $100,000, it is a venture capital investment. It currently has no cash value and is not publicly traded.

11.     Under 18 U.S.C. § 3553(a), federal sentencing courts must impose a sentence that is **sufficient, but not greater than necessary,** to meet the purposes of sentencing.[1] This includes the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid sentencing disparities between defendants with comparable criminal records who have been convicted of similar crimes, and the Guidelines themselves. See *United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010).

12.     The "sufficient, but not greater than necessary" language of § 3553 is commonly referred to as the "parsimony clause." See *United States v. Williams*, 475 F. 3d 468, 476 (2d Cir. 2007), cert. denied, 552 U.S. 1105 (2008). When imposing sentence, the district court must consider the factors mentioned in § 3553(a), including the requirements of the parsimony clause. *Id.* **Simply stated, if the district court concludes that either of two sentences would properly serve the statutory**

---

[1] The purposes of sentencing are identified as:
The need for the sentence imposed -
    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B)    to afford adequate deterrence to criminal conduct;
    (C)    to protect the public from further crimes of the defendant; and
    (D)    to provide the defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

    18 U.S.C. § 3553(a)(2).

**purposes of § 3553(a), application of the parsimony clause compels imposition of the lesser sentence**. See *United States v. Ministro-Tapia*, 470 F.3d 137,142 (2d Cir. 2006).

13.     The sentencing court must also consider the advisory Sentencing Guidelines. *United States v. Booker*, 543 U.S. 220,245-246 (2005). However, "[e]ven where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the § 3553(a) sentencing factors." *United States v. Dorvee*, 616 F.3d at 182 (citing *United States v. Cavera*, 550 F.3d 180,189 (2d Cir. 2008), cert. denied 129 S. Ct. 2735 (2009)).

14.     The importance of individualized sentencing is a central theme in federal criminal law:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, and sometimes magnify, the crime and the punishment to ensue.
>
> *Koon v. United States*, 518 U.S. 81,113 (1996).

15.     In *Kimbrough v. United States*, the Supreme Court reminded the district courts that:

> The sentencing judge ... has greater familiarity with ... the individual case and the individual defendant before him than the Commission or the appeals court. . .. He is therefore in a superior position to find facts and judge their import under § [3553(a)] in each particular case.

*Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (internal quotations omitted).

## DEFENDANT'S BACKGROUND

16.     Although much of this information is contained in Charlie's letter to the Court and the PSR, the information in this section of the Memorandum is based upon the Defense's review of the discovery and independent investigation of the facts and circumstances of this case.

17.     Charlie Tan was born in Ottawa, Canada to Liang (Jim) Tan and Qing (Jean) Tan. His father was the sole proprietor of Dynamax Imaging, LLC prior to his death in February 2015. His mother had little education and stayed home with the children, Charlie and Jeff.

18.     Jim and Jean were raised in China. As was tradition, their marriage was arranged. Once married, their goal was to move to the United States after Jim had finished his degree and found employment. The Tans had two sons, Jeff and Charlie. They lived in Corning, then moved to Pittsford when Charlie was in the second grade. In 2012, Jim started his own business, Dynamax Imaging.

19.     Charlie graduated from Pittsford Mendon High School in June 2013. He was student council president and a member of the school's football and wrestling teams. A bright student, he graduated high school with enough AP credits that would have allowed him to graduate college one year early. Charlie attended Cornell University in Ithaca, N.Y. from August 2013 through February 2015. In January 2015, Charlie was a 19 year old sophomore at Cornell University, where he was a member of the Chi Phi fraternity and played on the Sprint football team.

20.      From the outside, the Tans were living the American dream. The family moved from China to Ireland, then Canada, eventually settling in the United States, on Coachside Lane in Pittsford, N.Y., an affluent suburb of Rochester, N.Y. After stints with Corning and Kodak, Jim Tan started his own company. Jean stayed home with the children, who excelled in everything they did. Their lives appeared picturesque, but nothing could be further from the truth.

21.      By culture, the family was notoriously private when it came to discussing anything personal. Few neighbors and a handful of friends got a glimpse of life inside the Tan household, as is reflected in the character letters. Notably, no one was close to Jim. He did not interact with neighbors, coworkers, or employees unless it was absolutely necessary. He was not congenial. He was an exceptionally private man, exhibiting the same controlling, abusive traits both at home and work. A picture of Jim Tan is painted through the attached letters (Exhibits B), the January 28, 2015 911 call (Exhibit C) and trial transcript (Exhibit D). They paint the profile of an abuser: quick involvement in a marital relationship, controlling behavior, jealousy, unrealistic expectations, isolation, blaming others for problems and feelings, hypersensitivity, cruelty to children, verbal abuse, dual personality, threats of violence, breaking or striking objects in anger, use of force during an argument. All of the signs were there, and largely kept behind closed doors.

## AGE AT THE TIME OF OFFENSE

22.      Charles John Tan was born on October 3, 1995. On February 5, 2015 Charlie Tan was 19 years, 4 months old.

8

## CIRCUMSTANCES LEADING UP TO THE OFFENSE

23.     On January 28, 2015, at 10:40 p.m., Jean Tan called 911 to report she'd been assaulted by her husband. Jean stated her husband had beat her up and she needed protection. The call ends when Jean hears Jim approaching and the 911 operator calls back. Jim takes over the call and downplays the incident. He can be heard telling his wife to "calm down" and "don't be childish." PSR ¶10. Audio of the call can be heard here: https://soundcloud.com/democrat-and-chronicle/128-jean-tan-911-call-he-choked-me-and-im-so-scared (See Exhibit C submitted separately). The actual audio is being included because you need to hear it: the tension, the fear, his demeanor, attitude, and responses.

24.     Approximately four hours later, Jean calls Charlie to tell him what happened between her and his father earlier in the evening, a call that lasts 18 minutes; a call that made Charlie believe "this time was different." Charlie called his father on the phone to confront him. PSR ¶12. Over the course of a 9 minute call, Charlie confronts Jim about his drinking, his violence, and his treatment of his mother. Jim responds with it's none of his business, to "stay out of it...I can do what I want...even kill her...you can't stop me," further leading Charlie to believe this time is different. PSR ¶56.

25.     Communications between Charlie and his mom continued over the next several days. PSR ¶13. As a result of these communications, and the escalating situation at home, Charlie began making plans to leave school to go home for a few days. PSR ¶¶ 13-15.

26.     Charlie believed his mom's life was in grave danger at the hands of his father. When he got home, the situation escalated. He stated to police that "I had to do it, he was going to kill my mom."

## COMMUNITY SUPPORT

27.     As evidenced in the character letters and laid out below, Charlie Tan has an enormous community providing an abundance of support. Furthermore, it is expected that the anticipated Addendum to the PSR will illustrate this support. This Addendum is expected to summarize eight interviews the probation department conducted with various people from different parts of Charlie's life.

28.     While his mistakes are acknowledged in the letters, they unanimously speak of a loyal, compassionate young man full of altruism who takes care of those around him, gives tirelessly of himself, and builds community wherever he goes. All of these sentiments are evidenced by Anna Valentine raising over $50,000 from over 600 individual donors to go toward Charlie's bail and defense of his case.

## A CHILD OF ABUSE

29.     Charlie's father was an abusive man with many flaws. His father would often beat his mother and she would take her young boys to women's shelters in Canada to stay safe from her husband. Jeff was under two years old when their mother filed for her first order of protection against their father and they went to their first shelter in Ireland. When the boys got older, their father would force them to watch him yell at and beat their mother. This went on for years; until Jeff was in middle school and could step in and fight back to protect his mother and younger brother, Charlie (PSR ¶ 80).

30.     Charlie, his mother, and brother were isolated and had no family support. They were very poor. It was normal for the boys to witness their father hitting their mother and to spend time in shelters and to receive food from food banks.

31.     Jim Tan had complete financial control over the family. Jean was completely dependent upon her husband; she did not have a penny to her name. She'd always wanted to go to school to gain education and be able to earn income, even if minimal. But Jim would not allow it. Furthermore, he would control her activities: taking her driver's license, shutting off their cell phones, shutting off the heat in their home, making her beg for money for basic necessities for their family. Additionally, Charlie's father attempted to control what was said to police when they were called to his home, thereby falsifying police reports.

32.     Jim and Jean's marriage had been arranged, as was common practice in China at that time. According to Chinese tradition, once a woman is married she essentially leaves her own family and becomes the responsibility of her husband's family. After marriage, it is expected that she will turn to her new family for help and support when necessary. Traditionally, married life consisted of a complex and rigid arrangement in which the husband was to provide for the family while the wife was charged with all domestic duties. The traditional belief system included arranged marriage, male superiority, and disregard for the interests of children. Marriage was for life; divorce was not allowed. This was common rhetoric spewed by Jim Tan to his wife and children.

33.     While the family was still living in Canada, police intervened because of the bruising Jean's doctor observed on her body. It was the longest stint she and the

boys, ages five and three, spent in a shelter. Like typical victims of domestic violence, they returned home (PSR ¶ 80). The abuse continued.

34. Approximately five years later, they moved to the United States. By now, their father had gotten smarter about the bruises he inflicted on his wife, making sure wounds were concealed (PSR paragraph 80). Most cases of domestic violence are never reported to the police (*Frieze, I.H., Browne, A. (1989) Violence in Marriage. In L.E. Ohlin & M. H. Tonry, Family Violence. Chicago, IL: University of Chicago Press*). The Tans were part of this statistic.

35. Finding themselves again in a new country, far from family, and without education, social support, basic necessities, and financial resources, they began again, at Jim's mercy. The family lived in fear. They had no other place to go.

36. Physical and psychological abuse grew into financial abuse. Everything was in Jim's name. Their mother was completely dependent on their father. Jim controlled Jean's activities by taking her driver's license, removing license plates from the car, shutting off phones, and shutting heat off in their home (PSR ¶ 80). A former neighbor recounts how Jean would purchase giftcards for grocery stores and restaurants when she was able to go to Wegman's. She'd use them when Jim refused to provide for her and the boys (Exhibit B-3).

37. As Charlie got older, he became more aware of his father's controlling and abusive ways. He recalls having friends over after school one day in elementary school and his father coming home early. Upon seeing people in the house, he became angry and began yelling for them to get out (PSR ¶ 52).

38.     Over time, Charlie began spending more and more time at friends' houses to avoid the situation at home. Sleepovers at friends' houses. Sporting events. Extracurriculars. Charlie learned to carefully tiptoe around his father, as his moods were unpredictable and easily triggered. Charlie had several close friends whose families treated him as part of their own. To keep in his father's good graces, Charlie excelled academically, athletically, and socially while his mom and brother endured the worst of his father.

39.     Despite his home environment, Charlie longed for family. The fear he experienced at the hands of his father, along with the coping he learned to avoid his wrath, he was driven to become the warm, gregarious, selfless, young man he is. He began reaching out to others and never stopped doing so. Charlie built a web of community wherever he went. He continues to do so to this day, even while incarcerated. Charlie has a unique way of bringing people together and helping them feel as if they matter and are a part of something. His warm smile and outgoing personality won the hearts of so many. Charlie succeeded in creating his own family, something he did not have at home.

40.     Charlie and Jeff were raised to keep their family life private. Their problems were theirs alone, not anyone else's (PSR ¶ 56). Coming from a cultural background and home environment that both highly value privacy, one can imagine the struggle of a young boy, hours from home, fearful for his mom's life at the hands of an abusive husband and father. It is never easy to ask for help, and even more difficult coming from that environment. It is also a well-documented stage of the cycle of violence.

41.     Jeff had always taken the brunt of the abuse from their father. And it began to take its psychological toll on him: suicide attempts, abuse of drugs and alcohol, and running away from home, all normal, documented responses of children who have suffered abuse (*see* https://socialsolutions.com/blog/domestic-violence-statistics-2018/). Charlie recollects Jeff's suicide attempt in middle school and how their father mocked him for failing to kill himself (PSR ¶ 52).

42.     After receiving messages from his brother, and speaking to both of his parents regarding the most recent incident at home, Charlie truly believed his father was capable of killing his mother and that it was imminent. With his brother in Colorado, Charlie felt it was his time to protect his mom in his brother's absence. He was a young man, unaware of the recent conversations between his mom and brother about divorce, terrified of what would come next (PSR ¶ 56).

## HISTORY AND CHARACTERISTICS OF THE DEFENDANT

43.     Charlie is thankful for the overwhelming support of his mom, brother, friends, and his extended family throughout this process and deeply regrets the distress he has caused them. Attached to this statement are multiple character letters on behalf of Charlie (**Exhibits B**), which describe a compassionate, selfless young leader, uniquely able to bring people together, who clearly is very dear to his extensive community. They attest to character, generosity, compassion, perseverance, and remorse. Everyone who wrote a letter on Charlie's behalf was aware of the charges to which he has pled guilty. They have written these letters to describe him as a young man who is more than the person who stands before the Court. He is also a son, a brother, a friend, a teacher, and an integral part of his extended community.

44. Some important descriptions of Charlie bear repeating in noting his background and character: everybody's friend (D. Testa, L. Shephard, Shelepak, Vetromile, N. Shephard); leader (D. Testa, C. McMann, Andolina, Shelepak, Browning, Greenburg, Bruhn, Kroll, A. Valentine); outward helpfulness and desire to take care of others (G. Valentine, T. & C. Flynn, Minsky); joy to have around (S. Testa, L. Shephard); selfless (S. Testa, Andolina, Pannullo, Curran, Kroll, Flynn, O'Keefe); true and loyal friend (C. McMann, Andolina, Mapstone, Greenburg, Vetromile); genuine (Jackson); sincere and honest (N. Shephard, Jackson, Sample, Cocola); role model (Curran, Shelpak, Pannullo).

45. Charlie Tan is consistently described as a "wonderful young man" (D. Testa) throughout the volumes of character letters written on his behalf. He excelled at everything he touched, and has a unique way of bringing people together, of building bridges where there wouldn't have otherwise been a connection. David Testa describes this, saying "Charlie had a unique way of leading and causing people to do the right thing just by setting an example. Connor McMann shared "Charlie often captained the team...because he led by example...and sparked a collective energy we didn't know we had." This is reiterated over and over again in the letters.

46. Gordon Scott and Maureen S. Valentine "...believe Charlie has integrity and have observed how his outward exuberance always lit up the room."

47. Gordon and Maureen Valentine share their experiences with Charlie in high school, and how he became a part of their lives through their daughter, demonstrating his true character by "giving of his time to demonstrate his appreciation

rather than just walking away to have fun." As Sandra Testa says, "That's Charlie, always trying to help others."

48.     Sandra Testa shares her family was not aware of Charlie's home life until February of 2015 and how "Charlie and Jeffery were raised in a family parented by two Chinese born parents and that ethnicity is one who protects the privacy of intra-family happenings at all costs." The Testa family in one of the families that has welcomed Charlie in; Sandra is proud of the example her husband has set for Charlie: "of how a man loves his family outwardly, how it's ok for feeling emotions and how to articulate those emotions to others." Her husband, David, reiterated this when interviewed by probation (PSR ¶ 81).

49.     Connor McMann talks about how much Charlie invested in him when he didn't have to, and of how he developed a special relationship with his cousin Dyllan, "who is on the autism spectrum and struggles with structuring many of her daily tasks." Connor and his Aunt Suzy McMann, Dyllan's mom, share the time Charlie spent with Dyllan and the difference it made in her life.

50.     The Flynn family shares how Charlie became a part of their family, too. After visiting the Tan household, their daughter shared there was always a lot of screaming and yelling. The Flynns were left with the impression that Charlie's father was demeaning to his mom and it made the kids uncomfortable. They recognized that the time Charlie would spend with their family was "symptomatic of a deeper issue at home." The Flynns describe Charlie as "one of the most generous and caring people [we] know." Their relationship with him was so strong that Charlie lived with them during his first trial.

51.     At Cornell, Charlie easily made friends and seemed to know everyone on campus, as is reflected in every letter written by his former schoolmates (Andolina, L. Shephard, Browning). Charlie was known to "lead by example" (Andolina, Shelepak, Browning). Lucy Shephard writes "[he is] one of the least judgmental people I know and always sees the best in people." Adam Shelepak comments on the noticeable gap without Charlie around and how he believes Charlie's "deep loyalty, kindness, and respect will continue to define him as a person."

52.     Russell Browning, a senior at Cornell attests to how Charlie "excelled in every aspect" his freshman year. Browning continues, expressing he'd offer Charlie "a job should he wish to pursue a financial career...[he's] extremely intelligent, bright, and promising young man whose life would be irreparably damaged by any sentence."

53.     Rob Pannullo shares how Charlie's personality and situation significantly influenced his life, inspiring him to attend law school immediately after graduating from Cornell. He writes of a lesson he learned as a 1L, from the Honorable Denny Chin of the U.S. Court of Appeals for the Second Circuit: the importance of empathy in sentencing.

54.     Benjamin Greenberg shares how Charlie supported him through adversity, crediting Charlie for helping him become the man he is today. Grace Vetromile writes of how he goes out of his way to get to know people and how he'll always have your back, being there to offer his support. Ryan Jackson describes Charlie's demeanor and sincerity, reflecting that "Charlie serves as a warmness that betters every individual around him and...society as a whole; he and his heart have a way of making the dark days seem brighter..." Raymond Reed Brewer, Matt Bruhn, and Noah Shephard echo similar sentiments.

55. When asked why he continues to support Charlie, Chris Andolina says "he is a good person and a better friend who has always put himself before others. And at the end of the day, I know that he would do the same for me if he were in my position."

56. Lauren D'Hont, Sean Flynn, Anna Valentine, Jacob Grossman, Courtney Case, and Maggie McMahon, all friends from Charlie's days at Pittsford, spoke of his friendship, his thoughtfulness, his work ethic, his motivation, altruism, and ability to lead. They, too, reflect on how Charlie was able to bring people together and would never burden anyone with his own troubles. Charlie changed his friends' lives for the better, each in their own unique way, as he encouraged them to chase their dreams and never hold back.

57. After leaving Rochester, Charlie spent time in Chicago, Atlanta, and Toronto. He was forthcoming, open, and honest about his past. Charlie persevered with energy and hope, always out to improve himself and those around him. This, along with his sincere and genuine kindness, gratitude, and humility, are described in letters from Alison and Greg Sample, Melissa Cocola, Lisa Beemsterboer, Nola O'Keefe, and Vanja Misimovic, friends he made following his 2015 trial.

58. Unanimously, Charlie Tan is a remarkable young man who wants to do good. Forcing this young man to grow up in prison would be a "great injustice," as Sandra Testa writes. Lucy Shephard expounds on this sentiment: "Charlie...has tried to do all of this on his own. Family was something that he never had...Family crafts you into the person you are and who you will become. [he] was born into a family that turned its back on him...he shouldn't be punished for that."

59.     David Testa summarizes the present situation best: "…it would be a tragedy well beyond that which has already occurred if this young man were to lose his chance to grow up, to help others and to reach [his] potential. From the time of his trial until now he has suffered a great deal – from trying to re-enter college, to finding challenging work, to establishing a "permanent" home. Resolution of his sentencing will determine just how much he is able to re-group and be a productive, contributing citizen."

60.     In his own statement (**Exhibit A**), Charlie's remorse is clear, as is his appreciation for the effect his crime has had on his family, his friends, his education, and his future.

61.     Charlie reflects on family dynamics, of growing up learning not to let anyone in, to not share personal problems, and to bottle things up. As a result, he didn't know to reach out to others when things at home felt imminently desperate. He was 19 years old, "full of fear, anxiety, anger…so desperate." Cryptic communications from his brother in Colorado left Charlie feeling it was now his duty to protect his mom from his father. His father stated that if his mom "pissed him off again he'll kill her." And his mom repeatedly reiterated her husband threatened to kill her. Something was different this time, his mom was "unusually defeated, and repeatedly told [him] that he was going to kill her." Charlie acknowledges his subsequent decisions were "immature and irrational."

62.     He goes on to talk about the collateral damages inflicted upon those he loves most, about how he "abused their blind trust" in the moment, and the predicament he unknowingly placed them in. Charlie is intimately aware of the damage he caused to

those dear to him, knowing the relationships can never be mended. In keeping his mom safe, he "hurt the ones he loves most."

63.     Charlie goes on to reflect on the second chance he was given by Judge Piampiano, describing how he kept pushing forward, despite the continuous setbacks and repeatedly being told no. He went from being an elite scholar at one of the country's most prestigious universities, to being rejected by two dozen colleges nationwide: Columbia, NYU, Duke, Michigan, University of Chicago, Wisconsin, Clemson, UC Berkeley, Indiana, Loyola, Carthage College, University of Toronto, Georgia Tech, South Carolina, Purdue, University of Illinois, Ohio State, Emory, Quinnipiac, Georgia State, University of Dayton, Michigan State, University of Kentucky, and Western Kentucky University. A big change from Cornell, Chicago State University was the only school to accept him. He has been barred from completing his education and touches on how he's grown over the past few years, discovering his direction for the future.

64.     Charlie takes responsibility for his actions. He, along with his family and friends, acknowledges the debt he must pay to society for his poor choices and requests leniency on his behalf. He is not a threat to society. He was a 19-year-old kid caught up in a bad situation. Charlie is still a young man with enormous potential for a bright, successful future. The dozens of letters written on his behalf consistently attest to this. Extensive incarceration would only add to the tragedy Charlie and his extended family continue to endure.

## DEFENSE'S REQUEST FOR A FURTHER DOWNWARD REDUCTION
## BASED UPON FACTORS OUTLINED BY PROBATION

65.     As stated above in ¶ 9, the defendant should receive the additional one level reduction pursuant to U.S.S.G. §3E1.1(b). A change of plea occurred when it became appropriate to do so; in this case, motivated by late discovery disclosure by the government. The U.S. Attorney's Office turned over tens of thousands of pages of discovery a week before the trial that heavily influenced the defendant's change of plea. Significant resources could have been saved had the government provided this discovery earlier in the process. Charlie should not be further punished for the government's delayed disclosure. As such, he should be afforded the additional one offense level reduction for Acceptance of Responsibility.

66.     At the time of the offense, Charlie was barely 19 years old. With a birthday of October 3, 1995, he was 19 years, 4 months of age.

67.     The dire circumstances leading up to the offense are chronicled in the PSR, discussed in Charlie's statement (Exhibit A), and touched on in the character letters, including that of Jean Tan (Exhibit B).

68.     Charlie Tan has the most extensive level of community support ever seen by the defense, as illustrated in the dozens of character letters received and witnessed first-hand by those present in the Court during the pendency of this matter.

69.     Furthermore, Charlie faces imminent deportation at the conclusion of this matter. He will never again be allowed to return to the United States and to the community that's stood by him for so many years.

70.    While none of these factors in isolation would warrant a significant departure from sentencing guidelines, the unique nature of how these five factors are intertwined require consideration of a significant downward departure.

## SATISFYING 18 U.S.C. § 3553 FACTORS

71.    Every federal sentencing case involves the application § 3553, and this Court has no doubt seen and recited the relevant sections of the statute hundreds of times. But it is worth emphasizing the fundamental command of the statute: the sentence imposed must be **_sufficient, but not greater than necessary_** to comply with the purposes set forth in the statute. 18 U.S.C. § 3553(a).

72.    With respect to the sentencing factors and § 3553(a)(2), if the Court is to consider those factors, it is the Defense's position that a period of 5 years of total incarceration for Charlie would reflect the seriousness of the offense, would promote respect for the law, and provide just punishment for the offense, given the lifelong stigma associated with such a conviction and the losses he has already sustained professionally and financially, along with the fact that he's facing imminent deportation at the conclusion of this matter. See _United States v. Ontiveros_, _supra_.

73.    The same factors as mentioned above would certainly apply to the purpose of sentencing to "afford adequate deterrence to criminal conduct" is also required to be considered by 18 U.S.C. § 3553, paragraph B.

74.    With regard to paragraph C of § 3553 which states, "to protect the public from further crimes," given the Defendant's lack of criminal history, the effects this has had on himself and his family, the significant level of remorse attached to this conviction, and his change in lifestyle, it appears that he is at an exceptionally low risk to re-offend.

This is not a case of cold-blooded, premeditated murder, as the government lays out in their Sentencing Memorandum. Rather it is yet another tragic situation further illustrating the cycle and dynamics of domestic violence. A young immigrant mother, trapped in an abusive marriage, struggling to provide for and protect her young boys from the wrath of their father. As they grew, the boys became protectors of their mom. A situation began building in late January, escalating in early February. As a result of communications within his family over the course of two weeks, a boy raised in an abusive environment became terrified for his mom's life at the hands of his father. He went home to finally get his mom out of the house and move her to Toronto. Feeling he had to be the man of the house in his brother's absence, he took a shotgun with him. And things went horribly wrong. There is no credible argument that any member of the public at large needs protection from Charlie Tan.

## CONCLUSION

75.     The ramifications for Charlie far exceed those of this case. Not only has his education been irreparably damaged, he continues to face ongoing obstacles. Charlie is a not a U.S. citizen; he is a Permanent Resident. Charlie's offense is a deportable offense. Once he has served his sentence in the present matter, he will be removed from the United States. He will never be allowed to return to this country, never even allowed to visit. All of his friends and family are in the United States. This is an additional significant punishment Charlie will have to live with for a lifetime.

76.     Based on all the factors of this case, the "parsimony clause," and in consideration of the §3553(a) factors, specifically, the nature and circumstances of the offense and the history and characteristics of the defendant, his remorsefulness, his

community involvement, his age, and his pending deportation, it is respectfully requested that the Court sentence Charlie to a total of 5 years incarceration, a sentence that is sufficient but not greater than necessary. Such a sentence addresses the seriousness of the offense.

Dated:     October 29, 2018
           Rochester, NY

                              Respectfully submitted,


                              */s/ Brian Decarolis*
                              Brian DeCarolis, ESQ.
                              Attorney for the Defendant
                              45 Exchange Blvd., Suite 275
                              Rochester, NY 14614
                              (585) 546-1260

TO:    Lisa Fletcher, Esq.
       *Assistant United States Attorney*

       Janna Kulakowski,
       *U.S. Probation Dept.*

# EXHIBIT A

Dear Honorable Judge Scullin,

I believe that these three questions will allow me to most efficiently express myself: How did you end up in this position? What lessons have you learned?, If/when given the opportunity, how will you proceed?

Q1) How did you end up in this position?

A1) I had just begun my fourth semester at Cornell, when my brother began hinting at another fight at home. He was living in Colorado and cryptic in his messages. I took this as a sign to call my mom, and learned that her and my father had had their worst fight yet. He choked her until she nearly lost consciousness. After talking to my father, it was clear that he was still agitated. When I told him that he couldn't put his hands on her he snapped. He told me to mind my business, and if she pissed him off again he'll kill her.

As I reflect on those few days, it is obvious that I acted on perhaps 30% knowledge of the situation. All I knew was that my mother was unusually defeated, and repeatedly told me that he was going to kill her. I felt like there was no other option, that I had to protect her. Rather than digest the situation, and any other possible alternatives, I acted on impulse, leading to my series of immature and irrational decisions.

1

Q2) What lessons have you learned?

A2) I grew up learning not to let anyone in. Physically at the house, and mentally it was never ask for help, never tell anyone about our problems. My father pressed this on me, but it was also reinforced by my brother. I recall one summer night at the town carnival when I bumped into his close friends. They asked me where Jeff was. I told them he had gotten into a fight with my parents and moved out. I actually thought he was living with them. Later that night I received furious texts from my brother. I guess he was upset that now his friends knew about our personal problems. I promised him I would never tell them again.

Looking back, its clear that bottling up these problems/emotions will only backfire. Put into my situation as a 19 year old full of fear, anxiety, anger, with no outlet and no one to talk to is a recipe for disaster. If I had taken a step back to talk to someone, and realize that there were actually many better options, I wouldn't have felt so desperate.

My singular goal was to protect my mom and make sure that she was safe. I did not, however, anticipate the amount of collateral damage inflicted on those around me. My friends know that

2

I don't often ask for anything, so when I do, they are readily willing and available. But I abused their blind trust, and put them in a predicament that has caused them tremendous stress. I know that I will never be able to mend those relationships, regardless of my profuse apologies. As for my brother, he was forced to return from Colorado, just as he was beginning to gain some momentum, to clean up the fiasco that I created. To this day I don't believe he forgives me. And finally my mother. Although she is safe and healthy, I don't think she will be happy for quite some time. She would trade places with me in a heartbeat, and couldn't give a damn about her reputation, but she sacrificed 20 years of her life to ensure that I would have the best opportunities at every turn, and I squandered it. I know that hurts her the most.

If I could talk to my 19 year old self I would tell him to breathe, that he is not alone, that he should call his football coach who doubles as a school councilor and vent, finally unload, and realize that the situation is not as dire as your fear is making it seem. I would tell him that the path he is currently on is only going to hurt the ones he loves most.

3

Q3) If/When given the opportunity, how will you proceed?

A3) I often wish that I could address the Honorable Judge Piampiano directly, to let him know exactly how I have taken full advantage of the second chance he has given me.

Immediately following the dismissal of my case, I was forced to withdraw from Cornell, so I began applying elsewhere. I promised myself that I would be enrolled by the next cycle. Meanwhile I was volunteering at the Village At Ithaca, a mentorship program for underpriviledged youth.

In the Spring of 2016 I moved to Atlanta, GA, to pursue an unsolicited interview with the Admissions Office at Emory University. I knew that there was a black cloud hanging over my transcript, so I wanted to tell them my side of the story. While I waited to hear back, I became a Certified Personal Trainer, and also certified with my one year old German Shepard for Therapy Dogs International - an emotional support volunteer organization. Although I was ultimately rejected from Emory, my momentum continued forward.

4

I moved to Chicago, IL that Fall to attend Chicago State University, the only school out of 24 to accept. Nonetheless, I was back on track. Located in the heart of Chicago's Southside, I surprisingly found myself in a beautiful neighborhood. Between 4 neighbors there were 13 children who became my little siblings. Academically I was going through the motions, but it was this new, extended family life that I became absorbed with.

My experiences these past two years have made my direction for the future clear. My strength is with working with adolescents. My dream is to open an afterschool facility for them to engage in a mixture of academic workshops and sports training. To teach them the discipline of balance. To let them dream of collegiate athletics, which guarantees they will further their education. And most importantly, to instill the theme that my mentors have taught me — to Pay it Forward, with Servant Leadership.

All I need is the opportunity to do so.

Respectfully Yours,

Charlie Tan

# EXHIBIT B

Qing Tan
37 Coach Side Lane,
Pittsford, NY 14535

Aug. 30, 2018

Re: Charles John Tan

Dear Honorable Judge Frederick J. Scullin Jr.

My name is Qing Tan, I am Charles Tan's mother. He is a good, kind, loving kid throughout his whole life, he brought joy and happiness not only my life, but also to the people around him. He is the reason I chosen to live and trying hard to survive the tragedies in my life.

I am writing to you in support of Charlie. We had been abused by my husband Liang Tan for many years: I have been suffered 25 years of my marriage life and my kids had been since their birth. Nobody should lived the life like we did, I plea and wish you consider lenient sentences to Charlie.

I was born in China, a very poor village. When I was 22, the marriage proposal came to my family that agreed for me to marry and to travel abroad meeting my future husband Liang Tan. I barely can speak, read or write in English at that time and was looking forward to my new life. But he started physical abuse me shortly after it, we lived in Ireland for 3 years. When my son Jeff was one years old, friends found out the abuse and took me to family court filed my first protection order against my husband..after that he decided to move to Canada then US, Liang Tan lived in a double standard life: one is with us like a family, when he bored of it, he would get mad with anything, beaten me up, so he had a perfect reason to abandon us, as a part of his punishment, he left us with no money to live, many times he turned off the phone/ internet service, no A/C, no washing machine ( took the hose off it), smashing the things whatever he can find ...then disappeared, he checked in hotel and spent sizable money on himself, he enjoyed his exciting luxury moments: drinking, gambling and women.

He never been a good role model to his kids, never took time or spent times to be a father to them. Instead, He treated them like as part of me, make them suffer physically, mentally and psychological traumatized them. Many times, for my kids, I had to beg him came home ...so he can brought some normal living conditions back to our life. He can't hold on his job for long, he had been fired from Corning and Kodak in the past, I remembered that his manager stopped by the house to talk to us afterward, he felt sorry for me and my little kids only as he stated, told him he needed to control his temperament at work, and that was the reason they had to fire him from Corning Inc.. He never has any friends and always blamed me or kids for causing his anger and stress, through out the years, when he physically violating me, he would hid all the phones, so it's almost impossible for us to call for help, he also threaten the kids not to get involved it, but every time, my son Jeff and Charlie would woke up in horror and came over as fast as they could to protect me and prevented him to continue the beating...most of the time they would get in trouble afterwards.

One time my family doctor called on him because he beaten me up in the parking lot just before my sick kid's appointment, we lived in the shelter for months in Canada...at the time, I was young, very scared, confused and don't know what to do ...My family told me that after the daughter's marriage, I am the member of his family, I need to do better: obey, respect and honor my husband. This is the old Chinese tradition: marriage is for lifelong, no permission to divorce. He also promised many times he'll change, but nothing really changed for better, he started to control more and more: not allowed to have friends, anyone knows about his

violence would prohibit in my life, talking to my family on the phone needs permission and under his supervision.

Over the years, I tried my best to be a good wife, mother. I understood he may not have good income or work stress.. so I saves every penny from grocery to kids clothing, school supplies, took care all the at home working responsibility, so he won't be bothered...But still he had every possible way to abuse me: mentally, physically and financially. Sometime he would hid my keys or purse and blamed me had no brain of lost them, after he satisfied my anxiety actions, he'll make it magically appear again. He always blamed me cause his anger: if I'm sick, he would be mad because the virus may pass it to him. It made me very scared around him, I tried my best not to cause trouble but somehow he always has a reason to beat me up periodically. He won't allow me to have friends, even like simply say Hi to neighbors or kid's friend parents would get me in trouble. Many times, I wished to go to school to get educated or get a job to support family but he wouldn't allowed. He only give me weekly minimal money to buy grocery, I'll need to constantly beg for more money to cover the family groceries, kids clothing, shoes and school activities..mostly for the basic living essentials .. He do not give me credit card, any big purchase like car, house etc. solely is on his name only, I am simply his house slave and punching bag, for littlest things like: dinner was not ready when he arrived home or accidentally saw me talk to neighbors which he did not approve it, he will beaten me up, withdrew my only joined debit card to zero dollars, shut off the phone line, AC, and even took out the license plates so I couldn't drive for weeks..many nights when he beat me up, my kids woke up frightened and crying... I thought many times of ran away, the reality with two little kids in the foreign county, no work permit, no money, no family support, I thought it was very difficult, beside that he repeated told me that he will kill me and my kids if I do things "stupid ", every time when there's news report on mass shooting, he'll be announce his comment on': if You try to leave, I'll do it just like that. So where can we hide??

Over the past 25 years, we always dreadful towards weekend and holidays, whenever he is around at home, the kids hid away in their rooms or stayed at friends house as much as possible. Many our holiday memories are destroyed by his drunken unlawful actions, he enjoyed beating and torturing me as a part of his regular recreation, the 25 years we lived together, he also brain washed me and the made me believed that there's no way for me to ran away from him, he has rights to decide when I could live or die. When he attacked me and chocked me until I blacked out, unconscious ...he enjoyed his dominant, and after that he told me that I needed to be good, if he "over reacted", he really don't know how to control his action, anytime I could end up dead... I beg him to seek medical help, he refused it. I knew that he has mental illness and he will choke me dead and dumping my body somewhere in the woods soon. At the Christmas 2014, most family happily celebrated the holidays, I said my goodbyes to my children. I told them how much I love them and how proud I am to be their mother. I accepted it is my destiny... I can't escape from him.

Today, I plea to you, dear Judge, please consider that what happened to me, my kids in the past 25 years is like living in hell, my husband was a monster! I have no family, my kids Jeff and Charlie are the only ones I have, we love, care for each other very much, when I got hurt, they felt pain..they are so innocent, they didn't choose to born to this abusive family, they shouldn't live in this horrific environment, scared, worried and traumatized at their young age.

Many times, after stormy night ended, my kids gather around me, we cried together.. they saw me struggled, they tried to comfort me, I kept told them to remember how wrong and hurtful it was, and made them promise me not to learn it from their father. I tried my best to guide my kids to be a kind, loving, good people, instructed them study hard in school, so one day they could get a good job and be independent. So they will break free from him. Both of my kids are grow up with good, kind heart. Jeff graduated from college, he is working hard and has a charitable heart in education. Charlie is an excellent student in school, hard worker, love to

volunteers in the community, he enjoys to help others and has been a very positive role model. He was elected the volunteers of the year at YMCA in 2013 and also served as the youngest board member at the local YMCA as youth group leader, At school, he's honor role students, has been a student leader served as school student treasury, VP of school president and later all school president in Pittsford Mendon middle and high school. Elite football athlete in high school and college,

I wanted to sincerely thanks to the communities pouring supports toward us after my family tragic incident. I am a good, kind person, I should be alive with my loving kids and continue be a good mother to them. I was stupid and wrong to accept the abuse, and because of what I chosen this wrong path in life caused all or did my husband has the rights to abuse us ?? If we are your daughter, mother and sons, do we has the rights to live? He It broken my heart facing recent case against my son Charlie, deeply sorry for the pain, trauma and agony we- our family will continue to cope for many years and sorry to the disturbing peace in the society. As Charlie has ready to accept his responsibility for his action, I believe that as we move forward, he will emerge a better person.

It is my sincere hope that the court take this letter into consideration at the time of the sentencing, desperate the current case, I still believe Charlie to be an honorable individual, a good human being and a valuable member in the community. All of you wishes my family could move on and live in a normal life. We can't move on without my dearest son Charlie with us, we had already suffered so much from years abuse and torture.. it will be a long recovery road for all of us. Charlie has many challenges ahead of him, need to recovery from years of mental traumatized. it will benefit his rehabilitation with love, care from family, friend and community more than in the institution, Our family cannot moving on our lives without him, I cannot move on my days without him. Charlie is a great human being, please help my family recovery, please save Charles Tan.


Sincerely,

Qing Tan

1164 RidgeCrest Dr
Victor, N.Y. 14564
Sept. 4, 2018

"Hon. Frederick, J. Scullin Jr."

The Tan family moved to 37 Coach Side Lane in 2003 which was across the street from my home. I moved to Victor 2½ years later in 2005.

Jean & I became friends and I got to know Charlie & Jeff well and enjoyed their many activities. They are wonderful kids.

I became aware of the disturbing violence soon after they moved in. It was shocking to discover Jean with a black eye as she mowed the lawn. She confided that her husband had punched her and had been abusive for many years. She also told me that she, Charlie & Jeff had taken refuge in a womans shelter in Canada when Charlie was just a baby.

We went to see a divorce attorney, Stephen Jacobstein & found out Jean would be deported if divorced. She decided against the divorce as she wanted to raise the boys in America. They were doing so well in the schools here, first in Corning then in Pittsford.

I saw damages from time to time & bruises. Tiang would go on rampages and throw & break things & leave it all for Jean to clean up and fix. Broken dishes with food would be all over the place, walls would have holes & dents as well as the floor! He banged up Jean's car with a golf club & he also broke the sliding back door! There were bruises on Jean arms sometimes.

Tiang would cancel her phone and credit cards when he was angry. Jean had no credit cards

in her name and even their home had only his name on it. He was very controlling and sometimes Jean would have to make & eat two dinners because first she had to cook for the kids & Ziang would want her to eat with him, too.

Jean, Jeff & Charlie never wanted to go to restaurants with him as Ziang would be rude & condecending to the servers. He would freak out if the meal wasn't cooked to his satisfaction.

I felt frightened and sorry for Jean, Charlie & Jeff to live in such a unpredictable and scarry environment and always took them in when they needed a place to stay.

The police removed Ziang from their house in handcuffs one evening and the arrest was listed in the Pittsford Post.

Charlie worked briefly for his father at Dynamax. It ended when Ziang went into a rage over Charlie being friendly & talking to the employees. Charlie was just being Charlie & just getting to know them & there wasn't any work to be done at the time he was engaging with them.

The Christmas before this horrible event, Jean tried to leave Ziang by moving in with Jeff in Colorado. Both kids needed help financially one with rent & a class and the other college so she had to return. Once again Jean confided that Ziang frightened her when he choked her. The last time he choked her he revived her with water and said they needed to stop. Before that happened, I do remember a bruise on her jaw.

Charlie has always been such a good kid. I can't remember any time that his mother needed to correct him. Charlie has always been polite, respectful, generous, grateful, intelligent as well as very articulate. He always addressed me as Mrs. Barnard. He helped me with my phone. He and his mother came to the hospital to cheer me up with their visit & beautiful flowers. Charlie would always compliment me on my cooking & send thank you notes. I believe Charlie to be a born leader as he was voted school president in his senior year.

When Charlie was probably in middle school, he surprised his mother and me with his practice presentation of being Bill Gates. He was all dressed up wearing slacks, shirt nectie & glasses. He was awesome.

Charlie was doing so well in Cornell when his very young life was so badly interrupted.

Please consider giving Charlie a lenient sentence so he can get on with his life & become the person he was meant to be.

Sincerely,
Mary Barnard

3

### KELLY KLOVSTAD

#### 9 Sugarland Ridge Rd  Fairview, NC  28730

August 31, 2018


Hon. Frederick J. Scullin Jr.
Re: Tan Family

Dear Judge Scullin:

My name is Kelly Klovstad.  I lived across the street from The Tan Family at 34 Coach Side Lane from May 2003 to September 2009. Jean and I spent many days together walking our dogs, running errands, shopping, cooking, taking day trips and going to the YMCA. Neither of us had family near us. We could count on each other. I engaged with Jim Tan only a hand full of times.

As the months and years went by, I began to notice stress in the family.  Jean was always anxious to get home before her husband so that she could have the house cleaned and dinner ready.
When we shopped at Wegman's, Jean would always buy several gift cards for restaurants and retail stores.  Later, I found out that these gift cards were used as her safety net after Jim would cancel her bank cards, credit cards, cell phones, and cable TV. Jean told me that he would get mad at the family and this is what he would do to get their attention.  It became a common occurrence.  Police cars would show up at their home but Jean never wanted me to know what happened. Several times I heard glass breaking on the walls of the house along with Jim and Jean arguing.  Many times I saw bruises on Jean's arms.  The only time things were calm was when Jim was out of the country.

One incident I was involved in occurred when I spent several days visiting at Jean's home.  This was July 29 - July 31, 2012.  One day, Jean cooked a meal and invited girl friends to her home. Jim became very cold and distant.  We did our best to stay out of his way.   His actions were those of someone that was very jealous and controlling.  We would wait for him to leave before coming back into their home. While we were gone one day, Jim took apart the air conditioner so that it no longer worked.  He cancelled Jean's bank card, cell phone and the

cable. That night we were all nervous and slept with our bedroom doors locked. He did not return until after my visit ended.

I wanted to add Jean to my cell phone plan and give her money but she would not take any help. Jean's cultural differences got in the way of her ability to accept help. All I have ever been able to do to help Jean is to spend safe quiet time with her.

In high school, the boys kept up very good grades and stayed active in sports. High expectations were put upon them by their father. Once the boys were on their own, Jean decided to leave Jim and move in with Jeffery in Denver. Jim became so furious that he cut off the boys tuition payments, rent and cell phones until Jean would agree to return to Pittsford. The boys begged their mother to be obedient so that they could continue receiving funds from their father. Jean eventually returned to her home. Jean, Jeff, and Charlie tried to keep up a good face thru all their mistreatment from Jim. No one ever really knew how difficult it was for them or how much this family has suffered.

Best Regards,

*Kelly Klovstad*

Kelly Klovstad

Cell 585-899-9435

August 14, 2018

TO: Hon. Frederick J. Scullin, Jr.

FROM: David R. Testa

SUBJECT: Charles Tan

Dear Judge Scullin:

This letter is written to give support to Charles Tan, a defendant soon to come before your court for sentencing.

My relationship with Charles (Charlie):

My wife and children and I have known Charlie since about 2005, almost 14 years. Our daughter Samantha was in Charlie's class in school since 6th grade and our son Rich was two years ahead of Charlie in school. Over the course of those years, I had several interactions with the young man at our home, at sporting events and at school functions. Charlie and I came to be very close friends – as are my children and he - and had many conversations about business, college, sports, and general "life issues". In fact, Charlie was driving from Toronto to Rochester last September for our son's wedding when he was arrested crossing the border. Immediately after his arrest, Charlie asked me to hold Power of Attorney on his behalf and I, or course, accepted. I point out these facts to illustrate that I believe I am as close to Charlie as anybody and I believe I know him as well as anybody does.

Personal point of view:

It is my unequivocal opinion that Charlie is a wonderful young man and an example of how a young person can excel scholastically, excel at extracurricular activities and still be considered "everybody's friend". Charlie is extremely popular in his community but to him (and to his credit), popularity was not a goal. His popularity came not from following trends or fads but by being kind to everyone he dealt with, youngsters and adults alike. I've observed many examples of Charlie's kindness and largess over the years and it is why my wife and I felt 100% good about our children counting him among their group of friends. Rather than follow peer pressure, Charlie had a very unique way of leading and causing people to do the right thing just by setting an example. Charlie demonstrated that it was "cool" to do the right thing and to think for yourself, rather than doing wrong just to "get along" – a very rare quality in our world. That attitude continues into his adulthood. Some very random examples:

- For a school project, Charlie made a video called "Random Acts of Kindness" in which he is seen presenting a beautiful rose to people in very different circumstances: kids sitting at a sidewalk ice cream stand; a police officer sitting in his car; firefighters at the fire station; senior citizens walking down a sidewalk; a clerk at a grocery store; a very young child walking with his mother hand-in-hand; etc. It was not only well done, it sent a message we all need to hear.

- Charlie wanted to volunteer at the local YMCA. He went to the facility, told them his thoughts and was accepted as a volunteer working with all clients. His relationship-building was so remarkable, he was asked to sit on the board – he was the first young person invited to participate at that level and I am told his thoughts and behavior were highly regarded by other board members.

- Charlie voluntarily tutored children who, for whatever reason, were struggling with school. One special needs child in particular responded so positively to his visits that her mother has become one of Charlie's greatest supporters and has said that if she could choose, he would be the son she wants.

The stories and examples are many and their common theme is that this young man wants to do good and help others. He never was looking for compensation or recognition in any of his acts of kindness, many of which are known, but many others of which are known only to Charlie and one or two others. I told Charlie a George Steinbrenner quote he credits to his father, and that is, "If you do something nice for somebody and more than two people know about it, you're doing it for the wrong reason" and I told him he fits that nicely.

In sum, Your Honor, I believe it would be a tragedy well beyond that which has already occurred if this young man were to lose his chance to grow up, to help others and to reach potential. From the time of his trial until now he has suffered a great deal – from trying to re-enter college, to finding challenging work, to establishing a "permanent" home. Resolution of his sentencing will determine just how much he is able to re-group and be a productive, contributing citizen.

<u>Who am I?</u>
To put my comments in perspective, I offer a bit of background, for no reason other than to point out that I guess I would be considered a "solid citizen". I am now 70 years old, worked at a high level in a large corporation, founded and owned a successful company; I have been a Deacon in my church and am an Elder in that church; I watched my four children complete college and I feel blessed with a great family and great friends.

David R. Testa
8/15/18

August 23, 2018

Honorable Frederick J. Scullin Jr.
Senior US District Judge
Northern District of New York Federal Court

Dear Judge Scullin,

My wife and I would like to provide a character letter on behalf of Charlie Tan. As introduction, I am
Gordon Scott Valentine, Operations Manager and Ethics Officer at Lockheed Martin, and a graduate of
the US Naval Academy and the University of Rochester. My wife is Maureen S. Valentine, PE, professor
and department chair at the Rochester Institute of Technology, graduate of Tufts University and Virginia
Tech. We have known Charlie since 2011, when he became one of our daughter's friends at Pittsford
Mendon High school. We have had the opportunity to see Charlie interact with our daughter, her
friends and our family in multiple roles over the years; such as an athlete for Pittsford Mendon, as the
Student Council President and as a friend. In each case, he has presented himself in a polite, respectful
manner showing maturity and a caring nature for those around him.

We still recall the first time we met Charlie. We were watching our daughter play softball and Charlie
was present to support her and the team. He had the self-confidence and communication skills to
engage a number of parents, including ourselves, in a mature conversation lasting 10 or 15 minutes.
This type of interaction is atypical of a high school student and stood out in our minds as we realized
that he had the character to succeed in the business world in the future. This was one of many times
that Charlie extended himself to support his friends at their activities. His presence was constant at
friends' sporting events throughout the school year, after finishing his own varsity football obligations,
demonstrating his caring nature to his friends and classmates. One notable example was when he made
the effort to ride with us to Albany, NY to cheer on the Mendon's women's basketball team at the state
championships, demonstrating his continued commitment to supporting his friends.

Charlie impressed us as a high school student to the point that we trusted him to come into our home
many times and become a part of our lives. Charlie was one member of a larger group of friends that
often spent time at our home. Reflecting back on those events, Charlie stands out as the one teenager
who took the time to come speak with us directly. He would spend a few minutes chatting, telling us
about events at school, asking us about our plans and thanking us for hosting. Beyond showing his
maturity by talking with us, as adults, he demonstrated an outward helpfulness. Looking back on a
summer celebration at our cottage, we hosted a rather large lunchtime gathering with many family and
friends. After the meal, most people ventured off to the water to enjoy the day. But as was typical for
Charlie, he had his good friend Josh stayed back to assist us with the cleanup of the meal without being
asked. Teenagers are not known for these types of actions and his willingness to help demonstrated to
us his character.....giving of his time to demonstrate his appreciation rather than just walking away to
have fun.

Charlie often demonstrated his desire to take care of others. In January of 2014, my wife was diagnosed
with breast cancer. Our daughter shared the news with a few friends as some of them had similar

experiences with their own mothers. Charlie was one of the few that took the time to visit while he was on break from Cornell, bringing flowers and spending a few minutes with her to brighten her day. He knew there was no way to improve the situation but demonstrated his caring nature by sharing of his time.

Clearly, we believe Charlie has integrity and have observed how his outward exuberance always lit up the room. We will stand by his side as we recognize the character of the young man we knew over the past seven years.

Sincerely,

Gordon Scott Valentine and Maureen S. Valentine
11 Squire Lane
Pittsford, NY 14534







August 29, 2018

TO: Hon. Frederick J. Scullin, Jr.

FROM: Sandra A. Testa

SUBJECT: Charles Tan

Dear Judge Scullin:

This letter is written to give support to Charles Tan, a defendant soon to come before your court for sentencing. I would like to share with you some of my thoughts, feelings, and impressions during your consideration.

Our family has known Charlie for almost 10 years now. Our son (Richie) played football on the same high school team, they enjoy playing video games together and enjoyed just hanging out from middle school through high school (our son is two years Charlie's senior).
Our daughter (Samantha) and Charlie are part of the same circle of friends from 6th grade to present. Charlie was President of their senior class and a very popular kid. Charlie is such a joy to have around. He is very polite, intelligent, witty, kind and selfless.

The Charlie that my children and we are familiar with is one of kindness, well mannered, and always wearing a great big contagious smile.

Charlie has always been popular with children. In his neighborhood on Coach Side Drive one would often see Charlie playing with younger kids in the neighborhood. He volunteered at the YMCA because he liked coaching children. After Charlie's original trial in 2015 was deemed a mistrial, Charlie lived in Chicago and often baby sat for his neighbor's children.

The day before Charlie voiced the guilty pleas in Federal Court House in Syracuse, Charlie asked me to send a birthday card and gift to his twin God-daughters who were turning 1 year old the next day. That selfless act brought the girl's mother and me to tears. With all that he had on his mind, and all that he was facing, he wanted the girls to have something for their birthday from their God father.

We (Charlie's friends and their parents) were not aware of the home life that Charlie and his brother Jeffery endured, until February of 2015. Charlie and Jeffery were raised in a family parented by two Chinese born parents and that ethnicity is one who protects the privacy of intra-family happenings at all costs.

Since learning of the facts behind many calls to 911 from the Tan home over the course of years, and hearing the testimony of many witnesses during Charlie's first trial, it has been my desire that Charlie feel loved and be part of a tight knit and loving family unit. We have included Charlie in our family activities so that he feels a part of something special. Every child deserves to be loved, nurtured, protected, inspired and celebrated.

Over the last couple of years, Charlie has grown to rely more on our family. It has always been hard for him to ask for anything. My husband David seems to have become Charlie's surrogate father. I am so proud of the example that my husband plays in Charlie's life and I am happy for Charlie because he recognizes this too. David provides the example of how a man loves his family outwardly, how it's ok for feeling emotions and how to articulate those emotions to others.

Even though my husband and I try to visit Charlie often, Charlie and we exchange letters. Charlie sends us cards on our birthdays, Mothers Day, Father's Day and thank you notes in between holidays. And, the letters that we get back from Charlie are filled with words of appreciation. Charlie has written more than a handful of times, "One day I am going to make you proud of me." The most recent card read in part, "Thanks for always thinking of me, everything from inspirational quotes, advice, books, sermons from your church, and your constant love and support. No one else in here has someone like you, and I'm grateful for you every day. I love you." This young man has a lot of heart. And he shares the inspirational quotes with his prison mates who, too, have come to look forward to my letters to Charlie. That's Charlie, always trying to help others.

In November of 2016 I met Charlie for dinner one evening and he was excited that he felt he found a niche. He wanted to work with troubled youth. He express to me that helping youth who have had a brush with the law was an opportunity for him to do some good and mentor young adults of all races. Because he is not white or black it would allow him to connect with all races, for them to see him as their equal, Charlie feels confident that they would open up to him and quite possibly listen to his (Charlie's) life lessons learned.

It is a shame that he has not been able to complete his bachelor's degree. He has so much potential, and he could do great things for the community if given the chance. He had a second chance in October 2015, but that chance was stripped from him on September 22nd 2017, at the Canadian border while on his way home for our son's wedding.

I believe in my heart that Charlie is not a threat to society. It is important to remember that this all occurred when Charlie was only 19 years old. It is equally important to consider that Charlie, who is now only 23 year old, has a brain that is still developing.

As I mentioned earlier in my letter, Charlie has a lot of heart. It is my greatest concern that a long term of incarceration might produce a much different Charlie. An excessive amount of time served by Charlie in federal prison and forcing him to grow up in prison would be a great injustice. That concerns me very much. Your leniency is what I hope for.

Thank you for your consideration, for receiving this note and for the time your office is taking during this very important determination.

I pray for you, as I pray for Charlie.


Sincerely,

Sandra A. Testa

Hon. Frederick J. Scullin Jr.,

To sufficiently convey the enormous impact that Charlie has had on me – and to do so in a concise way – is a difficult task. Charlie and I have been extremely close friends since junior year of high school. We were frequently classmates, demanding of ourselves high success in honors and AP courses. Charlie had a contagious academic spirit, confident that any class, assignment, or problem could be conquered with perseverance. We were teammates, playing on the same soccer club team for two summers in a row. Charlie often captained the team not because he was the best player (he *really* wasn't) but because he led by example, put his body on the line for the team, and sparked a collective energy we didn't know we had.

And yet, perhaps the most telling relationship we shared is that of workout partners. More accurately, Charlie was my pro bono fitness trainer. We saw each other all the time at the YMCA during our senior year of high school, often working out (he would coach me) or playing basketball (I would coach him) together. Following my freshman year of college, Charlie saw that I had fallen out of my routine and asked if I'd like to be his workout partner all summer. I had no idea what I was getting into, but I agreed.

During the summers after our freshman and sophomore years of college, Charlie would drive to my house at 8 AM every day to pick me up on the way to the YMCA. A welcomed presence in the McMann family household at any time or day, Charlie would walk in and spur me out of my bed on those days where I slept too deeply to wake up to my alarm or his phone calls. "No days off," he would say as I reticently climbed into his car. Even when I lived in Boston for two months for a research internship at Harvard during the summer of 2015, Charlie would text me every day to make sure I never skipped a workout.

Charlie once joked that if he bothered to charge me for the personal training and encouragement he provided me, I'd owe him hundreds, if not thousands, of dollars. With time I've realized he's right. He saw that I had struggled with self-confidence issues and had failed to turn my workouts into a steady routine. He embraced these challenges, and in a way, he made them his own. He taught me how to workout effectively and motivated me to become more disciplined. He would tell me that it only takes 30 days for you to look and feel better, 60 days for others to notice, and 90 days to get yourself in great shape. I've never bothered to research these claims, because I never had to – they *worked*. He knew how to get me to cut through excuses and make progress. Charlie invested a lot in me when he didn't have to. Even better, he got me to invest in myself. As my confidence grew and Charlie realized the immensely positive impact he came to have on me, we grew to be closer friends than ever. Since my summers working out with Charlie, I have kept up with my healthy habits, too.

Charlie and I have been close friends for years, but the positive impact he has on people is not something that I uniquely experienced. I truly believe that Charlie views everybody as having some kind of untapped value, and accordingly treats each new encounter with an interest and curiosity that draws people in. He epitomizes the spirit of the phrase "a stranger is a friend you haven't met yet." His friendship is not difficult to attain. At the gym, Charlie knew *everybody*. A few years prior, Charlie had volunteered for an entire summer at the very same YMCA, so he would start off by saying hello to everybody in the office and at the front desks. It would

sometimes take us 20-30 minutes to actually start a workout because Charlie would greet all of the trainers and staff, say hello to the parent of a classmate he'd see on the elliptical, spot somebody's squat or bench press, maybe even recommend new workout music to somebody he had talked to once before. Everybody he met became a branch of a larger tree, and Charlie sought to spread these branches far and wide.

Since we became friends, Charlie developed unique and special friendships with my brother, sister, mother, father, aunt, and cousin. Into each, he invested time, effort, and thought. He would ask my brother if he could try skateboarding with him sometime when I wasn't around. He asked my sister if he could see her graphic design portfolio, towards which he heaped immeasurable praise. When I was away, he would go over to my house to watch Michigan football games with my dad and help my mom clean or do yard work. He even developed a close friendship with my aunt Suzy and young cousin Dyllan. Dyllan is on the autism spectrum and struggles with structuring many of her daily tasks, so Charlie took it upon himself to buy her some school supplies and show her how to pack and organize her backpack. When Dyllan failed to realize the generosity behind Charlie buying her folders because she preferred purple, Charlie went back to the store and got her the right colors. The most telling part of this, I think, is that I didn't know that any of this happened until my aunt told me the story. That's just the kind of person that Charlie is – your relationship with him is personal, intimate, and rooted in a deep respect and kindness that you don't often find in a person.

For everybody Charlie knows, there's a similar story. I'm sure you'll read several more of them. He has been a true and loyal friend to me for as long as I've known him, so much so that I will never cease to support him in return. He would do the same for me, as he would for so many others that he has come in contact with him. When I think of Charlie, as I often do, I think mostly about how Charlie is capable of bringing so much love and positivity into this world, and I hope that my perspective serves to illuminate this fact in advance of his sentencing.


Sincerely,
Connor R. McMann

September 5th, 2018

Dear Honorable Frederick J. Scullin Jr.,

My name is Suzanne McMann, or Suzy to my family & close friends. I am 61 years old, I am a single mother with a 16 year old daughter adopted while married to her father from Columbia. Dyllan has Aspergers, she was she was ours at birth, and spent six weeks in Bogota for our adoption. Thank you for allowing me to provide insight to how Charlie is an important part of our family, and how he always will be.

In 2012, Dyllan and I met Charlie while he was in high school when children become young adults. Charlie is my nephew Connors very good friend. We got to know each other at many dinners over a sports event, Michigan football or basketball, Super Bowl, playoffs, or a Birthday dinner, he was my favorite to sit by and to converse with.

Charlie was quiet, polite, and seemed to be interested in engaging Dyllan in conversation. As a mom, we really needed that kind of person in that part of our life, not knowing of her spectrum issues. Every time we were over my brother's house, and Charlie was there at the dinner table, it was fun for Dyllan and she was part of the conversation with her new friend. Mind you her cousins are terrific with her. But Charlie was different.

Charlie asked if he could come over to the house and help Dyllan with her school studies. Spanish, Global, and Math. And organizing her homework projects, which impacted her studying habits like never before, and helped her see a brighter future as well. Dyllan didn't socialize, with much of her peers, as she was only interested in electronics or any other screens. Charlie talked to her, and he got her to engage in multiple conversations about bullying, school classes, and she was enjoying everything at the time! I would sit and even listen to the two talk Spanish to one another! I wished he was her older brother not once, but every time we were together. I then realized if I were to have Charlie as my son, he would be a gift from god.

We bonded, Charlie came over to our house, and he would help Dyllan prepare from school from 7th to 9th grade. He tutored her, he brought school supplies to her, helped her navigate classes, and he secretly returned the original black binder that he got her for school to the color purple which was her favorite, as a surprise for her. Charlie would come to the kitchen and take over cutting vegetables, set the table, and we would catch up about where we both were at with regards to nutrition, school, and exercise. We are a health-conscious family with our diet in foods, and he fit in perfectly.

If miracles were available to me, I would give mine to Charlie. He's one of a kind young man, and I am proud to know and love him. Please take care of him, he's so very young and been through so much.

Sincerely,

Suzanne McMann

August 13, 2018

Tracy and Chris Flynn
6713 Pine Bank Drive
Naples, NY 14512

Hon. Frederick J. Scullin Jr.:

Charlie Tan was a very close friend of our son, Sean, starting in Middle School and hence became a part of our family as well. For many years, he and Sean would go back and forth to each other's houses. They played football together in Middle School. Charlie would spend the night at our house frequently. They went together to school events, dances, etc.

Our oldest daughter grew up with Charlie's brother Jeff. She told us some stories about going over to the house and there was always a lot of yelling and screaming going on. We got the impression that Charlie's father was very demeaning to Charlie's mother and it made the kids uncomfortable. We would later hear about other incidents that were even more concerning that we were not aware of at the time.

Sean and Charlie continued their friendship throughout their high school years and we saw Charlie frequently. There was a whole group of kids who hung out together often at our home.

As Charlie grew older, he would come over sometimes and just hang out with my husband, Chris, and me even if Sean was not home. I remember one time that was so incredibly sweet when Charlie asked my husband to please teach him how to cook dinner for a new girlfriend. I thought it was somewhat odd at the time that he did not go to his own father or mother but I also thought it was sweet that he asked my husband. Moreover, I realized that it was symptomatic of a deeper issue at home. He bought all the food and came over, they cooked together, and then Charlie brought it to his girlfriend's house. He was truly appreciative and had a lot of fun cooking with Chris. The first time he brought her over to meet us, he was so excited. It felt like he was bringing her home to meet his own parents. I can still picture the huge beaming smile on his face. When Sean was away at college, Charlie still stayed in touch with our whole family. For example, he came to my daughter's High School play and brought her flowers or he would come over and watch football with us.

He is one of the most generous and caring people that I know. He would literally give you the shirt off his back if you needed it. He always greets you with a giant smile and a hug. He brings me flowers, sends me cards and always lends a helpful hand. From the day of his release from the Monroe County Jail and all during the first trial in Rochester, Charlie lived with us. There was no one more willing to help around the house. If I drove up the driveway with groceries, he was the first one out the door to come help me bring them into the house. He insisted on doing the dishes after I made dinner. He always told us how much he loved us and appreciated everything we did for him. He became like a brother to all of our children.

Charlie is also one of the most dedicated and committed student and athletes that I know. When he set his mind on something, he got it done. He had amazing grades and everyone in school liked him. He exercises religiously and eats extremely healthy to stay in shape. He has a tremendous amount of willpower. He is extremely supportive of my own efforts to work out, encourages, and now trains others to be healthy as well.

We continue to stay in touch while he is in the Cayuga County Jail. We have visited many times and we send cards and notes to one another. He calls every couple of weeks. Every time we talk, he wants to know how everyone else in the family is doing and never talks about himself. He does not complain at all (except maybe for the lack of vegetables).

I sincerely hope that the Court can show some leniency on Charlie's sentencing based upon his character. I know in my heart that Charlie will continue to be the person that he is and will be a strong contributing member of society.

Sincerely,

Tracy and Chris Flynn

Honorable Frederick J. Scullin Jr,

My name is Chris Andolina and I am a friend, fraternity brother, and former roommate of Charlie Tan. I wanted to write to you today to tell you about the Charlie Tan that I know and the type of friend that he has been to me over the years.

I first met Charlie in the winter of 2014, right after we both joined Chi Phi at Cornell. As the pledge class president, he was a leading presence for us as we went through the new member education process, always leading by example. I remember when there was a prank played on the class and I was very uncomfortable with the position we were put in. In the end it was all a joke and no one was forced to do anything, but in that moment we exchanged a look that eased my mind conveying that we saw eye to eye and he had my back if we needed to stand up against the brotherhood. Admittedly, I didn't have the easiest time after entering the public school system in Ithaca in the 7th grade and I struggled all the way through high school to make friends. Cornell was a fresh start and finding a friend like Charlie was an important thing for me.

Charlie was often occupied by Sprint football and school work, but he always made time to hang out with us, whether that be at parties or just dropping by our room for a few minutes before he went to the library. I always admired the way that he conducted himself, being able to balance a thriving social life with athletics and strong academics. He always put his friends first and was very loyal to all of us. He always tried to emphasize not worrying so much about the material substance of things, instead focusing on relationships and insisting that what goes around comes around and that you get what you give.

After his departure from the house I remained close with Charlie and every time I got to hang out with him after was a cherished memory. When he wasn't allowed back to Cornell he moved to a house in college town and we hung out regularly, which was awesome because when everything happened in February I was crushed because I had no idea if or when I'd get to see him again. But thankfully, despite all that's gone on, I've been able to maintain a good relationship with him and looked forward to every opportunity I had to hang out again like we still in school.

One of my favorite memories with Charlie is when he called me up out of the blue on a Sunday and invited me to come down to Atlanta to go see the Falcons play the Seahawks in the NFL divisional playoffs. He had invited a small group of us to come down and we spent the weekend meeting his friends, eating great food, and watching the Falcons pummel the Seahawks. We offered to reimburse him but he flatly refused saying that he wanted to thank us for always sticking by him and supporting him through all that he had been through. It meant so much to me that he thought of me as a close friend and wanted to share such an awesome experience.

The last time I saw Charlie was in the spring of 2017. He came to Cornell for slope day and surprised all of us in the process. As was almost customary, we went and worked out together and then joined up with a larger group of friends for lunch where he said "through thick and

thin, you all have been there. When I come visit, this is all I really need." That meant more to me than I can put in words.

People sometimes ask me why I continue to support Charlie in the midst of all these allegations. For me the answer is simple: the Charlie that I know is a good person and a better friend who has always put himself before others. And at the end of the day, I know that he would do the same for me if he were in my position.

With this, I hope I have conveyed my experiences with and feelings about Charlie as best that I can, and I hope that this helps you with your decision.

Sincerely,

Christopher Andolina

To: The Honorable Frederick J. Scullin Jr.
From: Lucy Shephard
Date: August 31, 2018
Subject: Remarks on Charlie Tan

Dear Hon. Frederick J. Scullin Jr.,

My name is Lucy Shephard and I am best friends with Charlie Tan. I know Charlie from attending Cornell University. I met Charlie the first week of freshman year in 2013. I can remember exactly how we met. I was walking out of my dorm building heading to Sprint Football practice and heard someone call out to me from behind. Charlie was leading a group and saw that I was wearing a Sprint t-shirt; he asked what my affiliation was. I was going to be a manager for the team and I was headed to practice. He, as well as the group, were also going to join the team. He said, "Well now that we've all met and we're going to be on Sprint together, we have to be friends." And from then on, we've done just that. For the past 5 years, I have been best friends with Charlie Tan.

I don't use the term "best friends" lightly. Defined by the Merriam-Webster dictionary, the term best friend is "ones closest and dearest friend." My relationship with Charlie consists of that, but it is also so much more. To me, a best friend is someone who you admire. Someone who you look up to and respect. Someone who encourages you to be the best version of yourself. A best friend is someone who makes you laugh and knows how to make you smile no matter what the situation is. A best friend is someone that would do anything for you and who you would want to do anything in return for; anything in your power. Through this letter, I hope to paint a picture of the real Charlie Tan, my best friend. The extremely kind, loving, compassionate, intelligent individual who is so young and has the potential to live a full life ahead of him.

I admire Charlie because of his intelligence. Charlie was an Applied Economics and Management (AEM) major within the College of Agriculture and Life Sciences (CALS) at Cornell University. Before attending Cornell, Charlie graduated at the top of his class at Pittsford Mendon High School. He took many AP, college credit classes while in high school and came into Cornell with requirements already completed. While at Cornell, Charlie maintained a 4.0 GPA throughout a majority of his semesters. He obtained such high grades as a Division I athlete and active member of his fraternity, Chi Phi. Although I was in a different major than Charlie, he always helped me with my schoolwork. I attempted to take a calculus course and he always came to my dorm room to help me with my problem sets. He would never do the work for me no matter how hard I pleaded and was always patient in helping me come up with the answer. Charlie was so disappointed when I dropped the class, but he continued to give me old textbooks for my other classes and recommendations for books to read in my free time. Charlie has read through most of the books available to him at the Cayuga County Jail. I send him news articles to keep him updated on what is happening in the world; to keep his mind active. Charlie was unable to complete his degree. Cornell would not admit him back in as a student and despite applying to other colleges across the country, he was denied by almost everyone. Charlie was finally

admitted to a small college in Chicago, but he decided not to graduate. Neither the students nor the professors took the education offered seriously; he was too smart for it. Charlie had aspirations of becoming a businessman and owning his own business. Despite his intelligence, he will never be able to accomplish this on his own if he is never given a chance.

I admire Charlie for having the largest and strongest support system that I've ever seen. Everyone wants to be Charlie's friend. He gives off such positive energy and is so likeable. As soon as you meet him, you immediately want to be friends with him. Walking around Cornell's campus with Charlie used to be like walking around with a celebrity. Even as a freshman, he knew everyone and they all knew him; upperclassmen included. Charlie is also one of the least judgmental people I know and always sees the best in people. While he has been at Cayuga County Jail, I have visited him and written him letters. He always tells me stories about the other inmates. He tells me their nicknames and how most people cannot read or write; most never attended high school. Instead of turning his back on these people, Charlie befriends them. Known as "Chuck," Charlie has helped one of the inmates write a book. He has also organized groups to play card games and to exercise; they play basketball and do push-ups with each other on their backs since few weights and equipment are provided. When society has turned its back on these inmates, Charlie has welcomed them. He has given them a chance and shown them that they are worth something. I'm so honored to know Charlie and to be a member of his support system.

I look up to Charlie and respect him for all of the hardship that he has endured, that he was born into. He has bottled all of it up for so many years and you would never know. You will always find Charlie with a smile on his face and finding something to laugh about. Charlie is one of the strongest people I know and he has tried to do all of it on his own. Family was something that he never had. Charlie had the institution, but not one that fully supported him. Family is everything. Family crafts you into the person you are and who you will become. Unfortunately, Charlie was born into a family that turned its back on him. His family has and will continue to negatively impact him for the rest of his life. He shouldn't be punished for that; something that he could never control. Despite having grown up in a broken family, Charlie always talks about how he wants to get married and have at least 5 kids. He wants to provide for a family that was never able to provide for him. He wants to love and be loved in return.

I hope you have seen the shape and colors of Charlie Tan. Your decision impacts Charlie's future, whether he is given the opportunity to shine brighter or whether his already flickering lights blow out. Charlie has the potential to add so much value to society. He deserves a chance.

Sincerely,

Lucy Shephard

Honorable Frederick J. Scullin, Jr.
Federal Building and U.S. Courthouse
P.O. Box 7336
Syracuse, NY 13261-7336


Your Honor,


I am writing to you to attest to the character of Charlie Tan. I realize the gravity of the situation that Charlie is currently in, and I wanted to provide my thoughts regarding Charlie from a personal perspective that may not have been immediately evident in court proceedings. Over the course of nearly the last five years, I have known Charlie to be a good man who looks to go out of his way to help others. Charlie has helped me feel comfortable in tough times. Charlie was a leader in his communities. As you consider all relevant information over the course of Charlie Tan's sentencing, I want you to know that Charlie was kind, respectful, and looked to as a leader among his peers. I am sure that these traits will continue to run through Charlie regardless of what happens next in his life.

Cornell can be a tough place, and nineteen can be a tough age. This is when I met Charlie Tan. We immediately connected upon joining the same fraternity at school. In a place that can often seem more designed for the social elite of New York City and the rest of the world, Charlie was markedly different. Charlie is friendly and immediately makes connections with many of those around him. Also being from Upstate New York and a former high school football player, Charlie and I were on common ground.

As many second semester freshmen, Charlie established himself as a leader in our fraternity. He would often take on necessary, but undesirable jobs of the benefit of those around him. He would coordinate logistics and manage people. He would ensure safety and responsible activity at social events. He was a leader in my class when we joined. Charlie did all of this with the utmost respect for others. This fact made those around him to have deep trust in him.

The summer following the summer, I visited Ithaca from my hometown of Endwell, near Binghamton. My parents and a few other relatives were with me. We unintentionally ran into Charlie. Charlie was so outgoing and friendly to my family. He greeted my family with a glowing smile and warm introduction. It was a welcoming and warm sight. Charlie helped make me feel at home at Cornell. In the following months when Charlie's legal proceedings began. My parents assumed they had never met my friend when they heard the news. When I informed them that it was the nice man that greeted them on Edgemoor Lane in Ithaca on a beautiful summer day, there was a true dissonance in their heads between the Charlie they met and the Charlie in the news.

The following year, Charlie and I decided to be roommates. Charlie, myself, and Chris—a third friend from Upstate New York—all lived a large roommate in our second year at school. Charlie was a model roommate. He lived a clean lifestyle and was extremely courteous as a roommate. Again, Charlie was a good friend through these situations. Admittedly, around this time, I distanced myself from the fraternity and spent much time that year focusing on academics. As such, I was not around our room as much as others that year. Charlie would check in with me to ensure I was doing alright. He was there for me, and though we were not the most vocal friends, I knew Charlie was

there to support me and others around us. This added a layer of comfort to what was a challenging year.

Over the winter and when incident in question occurred, I was shocked and confused. I did not engage with the news very much. I withdrew, and I struggled to comprehend the situation. There was a palpable change in my friend group and a notable gap without Charlie.

I am not sure if my thoughts on my friendship with Charlie shed any new light on him as a person. However, I am sure that you will receive many letters like this. I felt compelled to share these thoughts with you today, and I am sure many others will feel just like I do. Charlie is a loyal friend. Charlie is a deeply respectful person. Charlie was a role model for those around him. There are many factors that you will consider in Charlie Tan's case, but I want you to consider these letters as well. Whatever comes next for Charlie, these things about Charlie will remain true. I hope that you can appreciate the support and love for Charlie among his friends; this should reflect on the character of Charlie Tan. I realize that the decision around what is next for Charlie will be hard, but know he has positively touched those around him. His deep loyalty, kindness, and respect will continue to define him as a person.

I hope that you thoughtfully consider this letter and the other letters you receive relating to this case. I am happy to answer further questions relating to this or provide more detail relating to these ideas as needed.


Sincerely,

Adam W. Shelepak
301 East 90th Street, Apartment 4C
New York, NY 10128



**KBS** | Capital Markets Group

September 3th, 2018

Honorable Frederick J. Scullin Jr.
Senior United States District Judge for the Northern District of New York
Federal Building and U.S. Courthouse
P.O. Box 7336
Syracuse, NY 13261-7336

RE: Charlie Tan

Your Honor,

My name is Russell E. Browning Jr., a Regional Vice President with KBS Capital Markets Group in San Francisco and responsible for the capital raise of our various real estate and private equity investment funds throughout Northern California, Nevada, and Hawaii. I have been a friend of Charlie Tan since he first set foot on Cornell's campus and have welcomed him as a brother through our fraternal organization. As a senior, my time spent with Charlie while he was a freshman was admittedly short. However, we share a unique bond that brought us together closer than any other member of his freshman class — we both were elected to lead our incoming pledge classes as president, competed in sports, and shared the same Applied Economics & Management major.

It's a daunting task to navigate the challenging course load of a first-year Ivy League student, maintain the responsibilities of a varsity athlete, and lead a class of young men through a fraternity, but Charlie excelled in every aspect. He is a hardworking, efficient at managing his time, never stressed, and was well-liked by anyone who met him. He is fiercely loyal and brought a smile to every person he met. His laugh was infectious and he loved his friends. He asked a lot questions, and was always quick to reach out for support. We spent many hours discussing how to balance college-life and he was a great listening when seeking advice from me.

I understand the trouble Charlie Tan is in, because I have stayed connected through email and heard updates from those immediately surrounding him. After his legal troubles are over, I am confident Charlie has a successful future ahead of him and I would even offer him a job should he wish to pursue a financial career.

He certainly understands the trouble he is in and he would like to learn from this experience to grow and move forward with his life in a positive direction. I believe that any prison sentence will serve as an incredible hardship on himself, his family, and his friends. Charlie is an extremely intelligent, bright, and promising young man whose life would be irreparably damaged by any sentence. Your honor, please contemplate my testament to Charlie's character and consider leniency. Charlie is a gift to this world and we must allow him and more like him to walk the Earth and bring harmony to his community.

Thank you in advance for your help and support to Charlie Tan in this critical time.

Respectfully yours,

Russell E. Browning Jr.

**KBS CAPITAL MARKETS GROUP**
660 Newport Center Dr., Suite 1200 • Newport Beach, CA 92660
TOLL FREE: 866.KBS.4CMG • TEL: 949.717.6200 • FAX: 949.717.6201
*Securities offered through KBS Capital Markets Group, LLC., a Registered Broker Dealer, Member FINRA & SIPC*

To:     Hon. Federick J. Scullin Jr.

From:  Robert Pannullo

Date:   August 21, 2018

Re:     Charlie Tan

Dear Judge Scullin,

Every day that Charlie Tan remains incarcerated is a day that his communities are deprived of a special person who changes lives for the better. With this letter, I respectfully ask that in your sentencing decision you consider the person Charlie is as well as what he means to his communities.

Charlie was my first friend at Cornell. It was August of 2013 and I had just been dropped off at the Varsity Sprint Football locker room to receive my assigned my locker. Without my friends and family beside me, I was nervous and anxious about the unknown years ahead. That was when I met Charlie, my new teammate. I could tell he was special within seconds. He made me feel important, something I later would learn he has a natural gift of doing to people. Over the next few years I watched his interactions with others, each time astounded by the specific details he would remember about any conversation. On my 20th birthday, Charlie gifted me a football signed by Tim Tebow, the player I had told him was my favorite months before. He didn't just remember because he is smart. He remembered because he cares. That is who Charlie Tan is. Thoughtful.

Over the next year and a half, I watched Charlie excel inside and outside of the classroom. He truly was a star, positioned to graduate from Cornell a full year early if he chose to do so. Unfortunately, after the trial of his first case concluded, Charlie was not allowed to return to Cornell. It pained me to see my friend in this situation. After applying to various colleges, he would report back that his efforts continued to be fruitless. Yet any time I would ask how I could help, he would refocus the conversation to how he could help me or anyone else. Again, that is who Charlie Tan is. Selfless.

Although I wasn't sure how I could help Charlie then, I am sure now. I can encourage you to consider what he means to me. What he means to us. I can help you see the kind of person he is with the hope that you will consider this in your sentencing decision.

Charlie's personality and the situation he is in have significantly influenced my own life. Observing what has happened to Charlie inspired me to attend law school immediately after graduating from Cornell. One particularly applicable lesson I learned in my first year came from my legal writing professor, the Honorable Denny Chin of the U.S. Courts of Appeals for the Second Circuit. Judge Chin stressed to us the importance of empathy in sentencing for a judge. You have the opportunity to exercise empathy when sentencing Charlie. The people he has impacted for the better need him back in their lives. Phone calls and visits temporarily satiate the yearnings for his positive influence in our communities. They do not, however, compensate for the lives he can change of those he knows as well as those he does not.

Charlie has served time for what he has done. It is time we ask that you consider the person he is, the people he influences, and whether this world is better with Charlie incarcerated or in the community making a difference. The answer is clear. Thank you for your consideration of this letter and the letters of others in your decision.

Respectfully,

*RPannullo*

Rob Pannullo

August 28, 2018

To Hon. Frederick J. Scullin Jr.,

My name is Caleb Minsky. We have never met, and likely never will, but I write to you on this day to beg for your clemency. I went to college with Charles Tan for two years, and for that time was lucky enough to call him a friend. I ask for forgiveness on behalf of not just my friend Charlie, but also to the benefit of my generation, one popularly characterized by laziness, carelessness and selfishness. I do not dispute these generalizations, for through my own extensive interaction with our peers I have, in many cases, come to a similar conclusion. However, among an era of newly minted adults who value appearance above action, Charlie has always stood apart.

I haven't seen him for several years, for our college expelled him, and I have done a poor job of staying in contact, but Charlie is a tough man to forget. His easy smile, sincere eyes and warm voice still stick in my mind as I cobble together these feeble words in an attempt to describe my friend. It is my intention, Judge Scullin, to provide whatever shred of human depth I can, to the extensive legal arguments you have likely heard. I am far from a legal expert, so I will make no attempt to add to these. From what little I do know about our judicial system, I realize that you are one of its stewards, charged with determining the best course for society, when presented with those that have crossed the law. After hearing what I am sure is a deluge of personal statements about Charlie Tan, I hope you will conclusion will be the same is ours: that our generation and country are far better off with Charlie than without him.

I got to meet Charlie within my first few days of arriving at college, because we both joined the Sprint Football team. For the next two years we would become teammates, but the sole story I will present you with comes from a computer lab rather than a locker room or practice field. I was not in the same school as Charlie, but at one point during the spring of our freshman year we happened to be working in the same place. Let me correct that, I was working, Charlie had already finished the project his fellow business students were struggling to complete correctly. Initially I wondered why Charlie was still in the lab, with his feet up, smiling as we chatted briefly before I began to work on a separate assignment. It became clear when I heard someone call his name, and saw him stand, his smile never wavering, then proceed to help his classmate.

He continued like this for the entire time I spent in the computer lab that Thursday night. Most of our peers were out at parties, besides those of us stuck trying to meet our academic obligations. And in a curved class where his classmates failing would only benefit him, Charlie spent his night helping them succeed. He did so regardless of their status on campus, or background, providing aid to all who asked. At this point in my time there I had realized that our university was filled with people obsessed with wealth and status, but that fact that people like Charlie also called it home made me feel better about attending. Looking back on it my friendships with Charlie and our other teammates helped carry me through that first year, and I owe the fact that I have a diploma in part to him.

I will not burden your time any further with more examples of Charlie's generosity and kindness, for I am sure this is one letter from many written by others whose lives were positively impacted by him. Judge Scullin, we ask for your lenience not only because we love Charlie, but because we know he is capable of greatness, that our generation needs more men and women like him. He now stands at a crossroads in his life, and I ask that along with whatever punishment your experience deems is necessary, that you provide guidance to a young man born onto an abusive father. Hopefully with your help, along with our support, he can work to overcome his circumstance, pay his debt to society, and eventually thrive and help others thrive once again. What happens next in Charlie's life is on his shoulders alone, but I plead to you, Judge Scullin, to help lighten the load. I greatly appreciate you taking the time to read this letter and others like it, I hope you find that it wasn't wasted.

Sincerely,

Caleb J. Minsky

Hon. Frederick J. Scullin Jr.,

As you make your final decision regarding this case, I hope you take some of these words into consideration. My name is Kelsey Mapstone, I grew up on a dairy farm in Central New York and attended Cornell University. I am writing this letter on behalf of Charles Tan. I know him better as Charlie; a hardworking, ambitious, and caring friend. As with many of the others who write letters, mine will encompass a relationship that was made and strengthened throughout the years at college Charlie was able to complete, and even more so the years that followed. Starting as a college friendship, Charlie and I still write many letters while he waits, and while I have been able to visit him in jail only a few times, I am glad to be a friendly face that can give him a big hug when I do.

I met Charlie on the first day of school at Cornell in an introductory biology section. Seeing that Charlie was wearing a sprint football jersey, I knew we would click automatically. Having family members play in the past, I ended up joining the role as a team manager. Starting out having just one class together grew into much more. As a manager of the football team I was required to go to all team practices and travel to all games. Clearly spending an abundant amount of time with the players I was able to share in the emotional wins and losses, Charlie of course being among that. Right off the bat Charlie showed himself as a loyal and caring friend. With many mutual friends and even more common interests, our friendship grew throughout the rest of the year and of course into the next, up until Charlie left. Though those years Charlie would be one of few that cheered me on in person at my gymnastics meets. Many late nights of heartfelt talks about the typical college transition turned into talks about family, life and everything in between. At this point I would trust Charlie with anything.

I think the bigger challenge of a friendship was tested in the years post Cornell; where our friendship wasn't based on the classes we shared, the friends we had in common or various Greek-life based events attended. After Charlie left Ithaca, I was lucky enough to get Charlie's new phone number and from there we kept in touch. I visited Charlie in his home town, and he was able to visit mine. While I was down south for a summer working I spoke to Charlie weekly, if not daily, on the phone. Any amount of time between seemed to dissolve as we could pick up right where we left off. Always able to make me smile and laugh, Charlie was able to keep a challenging past from polluting his interactions with myself and others. While in Florida, I was able to visit Charlie for an extended weekend at his residence down south. Over two months I spent away from family and friends, not knowing anyone. Being able to see Charlie was just like home. I truly care for him and it saddens me to see the continued strain this case has brought to his life. I was able to see a part of Charlie's life that not many others did. I saw who I knew in college, the football player and ambitious Cornell student. But I also saw the foundation of new friendships made and the hope of a life away from such a weighted past.

Someone as strong as Charlie is can teach incomparable amounts of lessons learned, and I was lucky enough to be a recipient of just a few. I could speak of a singular incident where Charlie showcased loyalty, love, dependability. However, those traits encompass not just one, but each and every interaction we continue to have. I will continue to write letters to Charlie, and although we have only known each other for six years, I am glad to have such a lifelong friend.

Thank you for your time in reading these letters.
From a dear friend,

*Kelsey Mapstone*

Kelsey Mapstone

Dear Hon. Frederick J. Scullin Jr.,

I met Charlie Tan during my very first day at Cornell University. I was a member of the Cornell University Sprint Football team, and when we all arrived on campus we were required to go to our locker room to receive our pads and equipment for the season. As a transfer student and someone who was overwhelmed by all of the new experiences, I was nervous and somewhat intimidated as I walked into the locker room to meet my coaches and teammates. A few minutes went by without speaking to any of my teammates as I was setting up my locker, until Charlie approached me. He was the first person in a locker room of about 50 people to go out of his way to introduce himself and learn more about me. We talked about how I was a transfer student from Ithaca College and how we shared some mutual friends who went to IC. He immediately made me feel comfortable and welcome in this new environment, and his conversation not only quelled my nerves but also allowed me to begin to open up to my teammates; people who would go on to become some of the best friends that I would make during my college experience.

Throughout the sprint football season, my friendship with Charlie continually grew due to the fact that I was on the defensive line and he was a middle linebacker, which required us to work together and be on the same page while playing defense. What I remember most about Charlie during our season together was how often he would smile and truly seem to be enjoying his experience with our teammates. Although we were the same age, and neither of us were big stars on the team at the time, Charlie was an individual that I came to admire and look up to. Everyone on the team unanimously liked him, and I aspired to be viewed by my teammates as everyone viewed him.

My friendship with Charlie continued into fraternity recruitment. I had wanted to join a fraternity at Cornell because Greek Life was such a big part of life at Cornell. However prior to fraternity "rush week" I was very unfamiliar with the process of joining a fraternity and Greek Life in general. Chi Phi was one of the first and only houses that I visited during recruitment week because so many of my teammates and friends were already brothers in the house. From the moment that I stepped foot in Chi Phi, Charlie seemed to take me under his wing and made me feel comfortable in the house and around all the brothers. He led me around this house, which would soon become my home, with confidence, kindness and a persona that made me want to be involved with this organization. Needless to say, I felt right at home at Chi Phi and became a brother that year, mostly thanks to Charlie.

Charlie truly had a very big impact on me during my experience at Cornell. He was kind, welcoming, funny, generous and put others ahead of himself. He was an individual whom you really wanted to be around and spend time with, and I'm very grateful that I was able to do that. Charlie became my teammate, my brother, and my true friend, and I may have had a very different experience in college without him.

Sincerely,
Pat Curran
Cornell '17

Benjamin Greenberg
11077 Grande Pines Cir. Apt. 6133
Orlando, FL 32821

August 25, 2018

Hon. Frederick J. Scullin Jr.

I first met Charlie Tan in August of 2013 when he became my teammate on the Cornell University Varsity Sprint Football Team. Charlie was an exemplary teammate and it was a privilege being able to play with him for two seasons. Charlie was loyal, diligent, kind, caring, and supportive. Charlie was a responsible teammate and always put the team before himself. He always worked very hard and never slacked off, whether at practice or working out in the offseason. Not only did Charlie meet and exceed his personal responsibilities, he made it a priority to make sure all his teammates made it through their own challenges on the field and off. I can distinctly remember that during one offseason workout, we had to continuously run up the steepest slope on Cornell's campus while carrying our teammates on our backs, piggyback style. As many of us struggled, including myself, Charlie not only met this physical challenge with endurance and athleticism, he encouraged all his teammates with enthusiasm, energy, and unmatched positivity as we fought through extreme mental and physical fatigue. Not only did he literally carry his teammates, he metaphorically carried us to the finish line by encouraging us and demanding us to be our best selves. I personally learnt more about my will power and grew as a person that day, because Charlie Tan supported me through adversity.

Charlie's leadership skills, especially as an underclassmen, were extraordinary. As someone who didn't play football in High School, as my school didn't have a team, it was very easy to get down on myself and frustrated. Picking up a new sport, at 18, that my teammates had played their entire lives was an incredible challenge. Every day in practice I would be overpowered by a stronger teammate, or miss a block due to speed and athleticism; and every day I would get down on myself and discouraged sitting by my locker for hours. Yet everyday Charlie Tan would tell me the things I did well, was improving on, or an ability or skill that only I brought to the team, to pick me up and get me enthusiastic to continue playing this sport that I love so much. Each time that I thought I would get benched or cut, Charlie picked up my spirits by complimenting me, telling a joke, or sharing a piece of knowledge that would help me improve my awareness and technique as a player. I might've been a year older than Charlie, but I certainly often looked up to him as both an athlete and as a leader and teammate. I wouldn't have met my goals in football as a student athlete, and ultimately in my professional experiences in the Jacksonville Jaguars and Cleveland Browns scouting departments, without the support of Charlie Tan while he was my teammate. No human is perfect, and Charlie has made mistakes, but I hope that you consider the positive impact that Charlie has made on the lives of the people that he has touched. I know I would not be the man I am today if I wasn't blessed enough to have met Charlie Tan, and been impacted by the loyalty, love, and support that he showed to me as his teammate.

With greatest respect,

Benjamin Greenberg

# Grace A. Vetromile

120 Main St, Unit J
Tuckahoe NY, 10707
grace.a.vetromile@gmail.com

August 27, 2018

Dear Hon. Frederick J. Scullin Jr.,

I am writing to you because I am a friend of Charlie Tan. I am currently a teacher in a New York City public school, where I teach 8th graders who are aged out compared to the rest of their peers. I had the privilege to get to know Charlie while we were both students at Cornell University. In light of the charges Charlie faces, I am happy to write this letter regarding Charlie's strong character. I hope my letter is helpful to you in your determination of his sentence in October

I've known Charlie for exactly 4 years now, as I met him in August of 2013. I met him on the first day of our freshmen year at Cornell University. He lived in the same dorm as me, the Low Rises, and his room was one floor exactly above mine.

Charlie was one of my first friends at Cornell. When I first met him, he went out of his way to get to know me and my roommate. I remember sitting in the lounge of our dorm for a session with our RA. He sat right next to my roommate and me and immediately introduced himself and asked us questions about ourselves. As someone coming from a small high school, I was intimidated by the prospect of having to introduce myself to new people. Charlie took that fear away when he took the initiative to get to know me. Charlie was like that with everyone. He was so gregarious and knew so many people around campus, that when I would walk with him to class, we would stop so many times to say hi to other people he knew. He went out of his way to get to know all sorts of people at Cornell.

Charlie has always been an incredibly loyal friend to me. He is one of those friends where no matter what the issue is, he will always have your back and be there to support you. My freshmen year I had to spend the night in the hospital. When I came back to the dorm, he was one of the first people to come to my room to check in on how I was doing and see if I needed anything. I had no doubt that he would go out of his way to get whatever I needed. Whenever he knew something was going on with me, he always reached out to see how I was doing and to make sure I was okay.

These are just a few examples of Charlie's strong character. He has always been there for me, and so when I was presented with the opportunity to write this letter to you, I knew this was my opportunity to be there for him. While Charlie admits to this federal charge, I believe he deserves leniency in his sentencing because of his strong character. Thank you for your time.

Best Regards,
Grace A. Vetromile

Honorable Frederick J. Scullin Jr.

Your Honor,

My first interaction with Charlie was on our very first day of college. In fact he was the first classmate that I had the chance to meet that day. We were meeting with our football coach and gathering our equipment for the season. After a quick introduction it felt as if we'd been friends for a long time already.

That friendship only grew as time passed. We played the same position so we remained together through practices and weight lifting sessions. All those hours, every day, pushing each other physically and mentally; it created a connection that can only be forged between those who have been through those tough moments together.

Charlie's one of those people who makes those around him smile, no matter what kind of mood they are in or how their day has gone. Despite its overuse, he's the type of person whose smile invokes others to smile as well. It's as if he brings about an aura of sheer happiness with his presence and demeanor. And if I may be candid for a moment, he's truly, **truly**, one of the most genuine people I've met. Most people will put on some sort of front in the majority of their social interactions. It may be slight or it may be drastic. Regardless, Charlie is not one of those; his sincerity and heart are real, and that makes every interaction you have with him feel like you matter and that he cares. He makes you feel valued. He makes you feel that you do matter.

In a world where coldness and hardness are in abundance, Charlie serves as a warmness that betters every individual around him and, in general, society as a whole; he and his heart have a way of making the dark days seem brighter which is something everyone needs in their lives. I am forever grateful that our paths crossed when they did for I can wholeheartedly say Charlie was my best friend during our time at Cornell and our continued friendship has undoubtedly made me a better person.

Thank you for your consideration of my words during this process.


Sincerely,

Ryan Jackson

The Honorable Frederick J. Scullin, Jr.

Dear Judge Scullin,

I met Charlie Tan my first week at Cornell University and just like most people I was immediately won over by his cool demeanor, undeniable charisma and huge smile. Charlie joined Chi Phi Fraternity with many of my other friends; that, coupled with the fact that we were both athletes meant that Charlie and I spent a lot of time together in his first short stint at Cornell.

Like most, I was devastated when I found out Charlie had been arrested, but was determined to remained friends. When Charlie returned to Ithaca our Junior year Cornell told him he wasn't allowed on campus or near the fraternity house so he rented a place next door to where I lived. I was also going through difficult times so Charlie and I spent almost every day that semester playing cards, working out or doing anything to distract from the looming problems at hand. Charlie was one of the few friends I had that was there every single day, not always to ask how I was doing, but just to hang out.

We continued our friendship when Charlie was no longer permitted near campus, and I invited him to spend Thanksgiving in Kentucky with my family and me. Every year we have a "country style" Thanksgiving with around 40 people in and out of our house for the entire week; which, can be very difficult for someone not used to that, especially if they come from a difficult home. Charlie fit right in winning the hearts of every family member and friend that stopped by or stayed over that week, prompting my grandmother to even offer to adopt him. I would like to point out that if I felt even the slightest bit uncomfortable with Charlie staying at my house with my family, I never would have asked him to come.

Even since the trial process started, Charlie and I have remained in close contact., writing letters when we can't get the phone call timing quite right. I have seen Charlie as part of my family ever since that Thanksgiving. However, it wasn't until my mother asked if she could send him some homemade meatballs and sauce while he was awaiting his sentencing date, that I knew Charlie had made his way into all of our hearts.

I, just like my family, friends, and nearly everyone else that interacted with him at Cornell, miss Charlie Tan for his constant support, kindness, friendship and of course, his smile.

Sincerely,
Raymond Reed Brewer

Matt Bruhn

410 Kelleher Dr.

Landenberg, PA 19350

August 28th, 2018

Hon. Frederick J. Scullin Jr.,

I'm writing on behalf of my friend Charlie Tan, who I believe is coming up on his sentencing soon. I want to try to help make as obvious as possible that he's a good man who deserves some mercy.

I've known Charlie since his first days at Cornell; we played Sprint Football together, both on the defensive side of the ball. Even just through interacting with him in team sports, I knew this kid had a great heart, was dedicated, and knew how to lead. He was always the one pushing us on in the drills, pushing us in the weight room trying to make everyone better, make *the team* better. It seemed he always had an innate sense that leading by anger, by yelling, doesn't do anything but make you resented. It seemed he knew the best way to lead was by example, that's why he always worked so damn hard. Even besides that, he's just a great guy to be around. He makes you laugh, he'll tease you, he'll help you out, he's just a good, good friend. There's few people that I think would have any reason to say otherwise.

I also had the privilege of getting to know Charlie even better through our fraternity Chi Phi. Again, he arose as a natural leader in his pledge class, elected among them to be the Pledge Class President. That might've been maybe under a week of knowing the other 18 guys in his class, and even that quickly they all knew he was best suited for it. I don't think it ever crossed anyone's mind that it was a poor choice, once again he led by example, he worked the hardest, and he picked everyone around him up, elevating the entire house. That's one of the reasons why so many people are drawn to him, why so many people like him: he brings out the best in you when you spend time around him. He doesn't settle, he has a strong sense of what's right and what needs to be done. It's why I'm damn proud to have him as my Little in the house. You know how hard it is to try to be a role model, the "Big Brother", for someone like Charlie? He basically eclipsed me as the role model in our relationship by the beginning of sophomore year. It's unbelievable, humbling, inspiring being able to see him grow beyond me and become such an incredible young man.

Your honor, I'm only asking that you be thoughtful in your consideration of Charlie, and be thoughtful in how through Charlie, this effects all of us: his friends, his family, and his brothers.

Best Regards,

*Matt Bruhn*

Matt Bruhn

Hon. Frederick J. Scullin Jr.,

To be completely honest, I do not even know where to start when talking about Charlie Tan. Charlie was and is the most entertaining, fun-loving, charismatic, interesting, feel-good person I have ever met. He had an aura around him that said "I can go to him for anything, and I know he will deliver." He was someone you know you can trust, someone you know that would drop anything to help you out, and someone you just wanted to be around. He was one of my closest friends going into the incident, and I couldn't believe what happened when I saw the news.

I played football with Charlie, lived next door, was in the same major, and was in the same friend group, so safe to say, I was around Charlie a lot. There are three things that stand out that make Charlie extremely unique, first, is that he brought people together. In our first semester, one of Charlie's friends sang in an A Capella group. Before college, I never thought I would ever go to an A Capella concert. I did not know the person performing and I don't enjoy A Capella music all that much, but Charlie inspired 10 of his friends to drop their plans on a Friday night and go to this concert. The ten of us didn't really know each other either, but Charlie brought us together, and we all had a blast. When I hung out with Charlie, I never knew who was going to be there, kids from football, fraternity members, class mates, but it didn't matter. Charlie was incredible at melded groups of friends together.

The next quality is his humor. Not only is Charlie a clever and funny individual, but his laugh is contagious. I remember hearing him in both sides of the locker room and just laughing to myself hearing it. One story that always makes me laugh is the time I got volunteered by our coach for an article in the sun. Along with the article came a picture, and I wanted my teammates to be surrounding me in the photo. They made us take a few pictures, some serious, some humorous. In the serious photo, I remember there were 6 of us, five standing up, one person on a knee. I was in the middle with two people on either side. All six of us were stone faced and serious. Taking a closer look, you will see Charlie, all the way on my left, with a serious look on his face, but sniffing a stick of deodorant, and I just laugh hysterically whenever I see it.

The last thing that made him special was his memory. I am not talking about simple memorization or classwork related. I am talking about his memory when it came to people. You never had to introduce him to someone twice. You never had to tell him your brother's name or age a second time. He always remembered the tiny details you told him, because he actually cared about people and getting to know them. This is why people were attracted to him like a magnet. It is why you never saw him alone.

Charlie is a great person and a wonderful friend. It is incredible to see and hear how strong he is been throughout this entire process. When I talk to him, he seems in good spirits as if we were on the football field just messing around. I miss him a lot and am very excited for the next time I see him.

Sincerely,

Chris D'Ambrosio

Hon. Frederick J. Scullin Jr.,

My name is Ben Kroll and I am writing to you on behalf of my classmate, teammate, and friend Charlie Tan. I have been lucky enough to know Charlie since his very first day as a second grader at Mendon Center Elementary. We were classmates in Ms. Bellisario's class that day in 2002 until Professor Poczter's class at Cornell University in 2014. 12 years of classes, school lunches, after school play dates, sleepovers, football practices, and just plain 'old hanging out. The point I am trying to make your Honor is that Charlie and I have spent a lot of time together in many of different settings with many of different people. In these experiences, you are able to see and learn a lot about a person, directly and indirectly. You learn their strengths, their weaknesses, their passions and even their fears. I am not going to tell you Charlie is a perfect person, not deserving of any punishment you may bestow on him. Charlie Tan is just as guilty of the crime he admitted to as any other person to have committed that act. To say anything to the contrary would be wrong, insincere, and do nothing for you to understand the message I would like to deliver on his behalf.

The message that I would like you to receive, and a message I feel like I am qualified to deliver, is that I know that any environment that Charlie enters is a better place for it. I have seen it repeatedly, both being a part of it and watching from a far. For some reason or another when you are around Charlie Tan, no matter the situation, you want to be better. Whether it be a better student, a better football player, a better friend, or just an overall better person, there is something about Charlie that brings out the best in yourself. He is a servant leader in every sense of the definition and displays selflessness that is rarely seen these days. I know it is your duty to deliver a punishment worthy of the crime and I know that Charlie needs to atone for his crimes, but I also know that there are people everywhere that could use a man like Charlie Tan in their lives. He is a special type of person that does not come around often, and I believe that our communities are a better place with him than with him confined behind a prison's wall. I appreciate you taking the time to read my message, and hope you take what I have written into consideration.

Best,

Ben Kroll

Noah Travis Shephard
1101 S. Kings St ▪ Stillwater, OK 74074
315.380.2530 ▪ noahtshephard@gmail.com

August 31, 2018

Hon. Fredrick J. Scullin Jr,

I am writing in regard to the sentencing of Charles Tan. I had the privilege of knowing Charlie during my undergraduate career at Cornell University, specifically within the realm of the Sprint Football program and the Chi Phi fraternity. During out time together, Charlie expressed nothing but love, admiration, and comradery in our affiliations, but more paramount, in our personal friendship. In writing to you, I wish to unveil the personal connection I had with Charlie and his importance in my life, through a few small, but significant instances. I hope you can keep my personal experiences with Charlie in your mind while you contemplate his sentencing.

I first met Charlie through the Sprint Football program when Charlie was a freshman and I was a junior; we were both on the defense, Charlie a defensive back, and I a linebacker. During the first practice, despite the psychological and social barriers that often bar freshman from early interaction with upperclassmen, Charlie introduced himself to me with a smile on his face and began questioning me on defensive schematics. Initially I was taken aback, "Who is this guy? Why is he asking me all these questions? Does he realize that he is a FRESHMAN?!" were all thoughts pumping through my mind. I soon realized that his interest and demeanor were sincere and honest. As a quiet and reserved person, I rarely pursue dialogue with someone I don't know,

and much less a new freshman on the football team! Charlie's gregarious manner and extension of friendship meant a lot to me during our first interaction and still does to this day. He helped me understand that he was a special individual who strived to be your friend - independent of how long he knew for or differences that separated you.

Later on Charlie became a brother in my fraternity, and soon we became close friends, bonding over the sacrifices made to play football and academic struggles at Cornell. During a brief break from practice and school, a group of teammates and brothers decided to hike Mt Marcy (NY's highest peak) to escape campus, convincing Charlie and I to tag along. Unfortunately, my grandfather died a few days before, and I was attending the memorial service before our big hike. Emotionally, I was a wreck on the inside, and struggled to keep my composure as my friends picked me up from the service to trek our way up to the mountain. As the car rolled up to me, I took a big breath to summon some testosterone and prevent an embarrassment from happening in front of my buddies. I threw my bag into the trunk and opened up the back door, and there was Charlie with a huge grin, "Hey whattup, Shep?? Good to see ya! Ready to hike a mountain?" he said with warmth. I soon realized I was right where I needed to be, within the comfort of a resolute friend, displaying the unyielding love that only happens once a lifetime.

I hope this letter find you in a good place and aids you in your decision.

Respectfully,

Noah T. Shephard

Hon. Frederick J. Scullin Jr.,

My name is Lauren D'Hont and I have been friends with Charlie Tan for a long time. I first met Charlie at Mendon Center Elementary when he moved into the Pittsford School District. He quickly fit in with my friend group and played all the recess games with us. Our all-time favorite was "Cops and Robbers," which is essentially a glorified version of freeze tag. Charlie didn't have any problem making friends with not only the other students, but the teachers as well. Charlie is ridiculously smart, very athletic, and above all, Charlie is probably the most thoughtful person I know.

Fast forward 7 years of school and Charlie and I are as good of friends as ever. Throughout high school he went above and beyond to build friendships with just about everybody. Him and I were two people among a tight group of friends that hung out every weekend and supported each other through every step in our journey through high school. At my softball games you could find Charlie in the stands. But before every game he would come over to the bench with a massive tub of Double Bubble bubble gum for the whole team. Each piece of gum only lasts about half an inning so he was there at every game with a brand new tub.

When a close friend in our class passed away suddenly from a lethal disease, Charlie was the emotional rock that we all leaned on for support. He wasn't particularly close with the girl who passed away, but he did everything he could to make sure that those who were close, including myself, had all the support we needed to get through the tough time.

During high school, Charlie got really invested in his health. He started going to the gym a lot and eating right. This work ethic of his is what got him a spot on the high school football team as a safety. While I was an athlete in my own right, I was no where close to the fitness level that Charlie was. But even so, he would go out of his way to make time for us to go to the YMCA together. He knew I had a highly competitive mindset and he would use that to push me in the weight room. I owe a lot of my workout regimen to Charlie.

Out of all the incredible things that Charlie did as my friend there was one that really stuck out to me. In June 2013, the Miami Heat were up against the San Antonio Spurs in one of the most highly anticipated NBA Finals of our generation. Charlie, knowing how big of a basketball junkie I am, asked if he could watch the games with me. It sounds kind of lame, but a tradition of mine is to watch the games with my parents. As my mom is about as big of a fan as I am. Instead of going out with the guys to watch the games, he would come over to my house and watched every minute with my parents and I in our family room. My mom would eat her favorite game snack, Jelly Beans, and root for the Spurs while Charlie, my dad, and I would be cheering for the Heat. Long story short, the Heat won Game 7 to claim the NBA throne. The very next day, Charlie rings our doorbell, hands my dad and I a "Miami Heat NBA Finals Champions" shirt and then hands my mom the same shirt wrapped around a giant box of assorted Jelly Beans. I think about that month of June in 2013 a lot, and every time it reenforces how lucky I am to have a friend like Charlie Tan.

Sincerely,
Lauren D'Hont

September 7, 2018

Sean Flynn
6713 Pine Bank Drive
Naples NY

Honorable Judge Frederick J. Scullin Jr.:

Charlie has been a dear friend of mine since about the start of middle school. We have known each other since we were on the same youth soccer team in fourth grade, around the time we started to hang out together. I remember I liked him because he was a very goofy, fun-loving individual, and we had similar senses of humor, even at that age. When we reached middle school, we started to have classes together, as previously we went to different elementary schools. We quickly became close friends and would spend hours together doing what kids do: playing video games, playing games outside, or just watching TV/movies together. We often spent our time at his house behind a closed door just off of his living room.

Even at a very young age, I became quite accustomed to hearing Charlie's father yelling at his mother, and I simply chalked it up to being something cultural that I didn't understand, especially because the yelling was always in Chinese. Charlie always seemed embarrassed that we had to hear what was going on. Nonetheless, Charlie's mom would later come into the play room with a tray of hot food or snacks for us to eat and was all smiles, despite all of the yelling and screaming that had just occurred.

As we grew older and started to have larger social circles, Charlie always seemed to serve as the glue between multiple somewhat disparate groups of friends. He was always funny and easygoing, so he was an easy friend to a lot of folks that might not make friends so easily. He was especially good at befriending kids in classes that he sat next to, even if the kid wasn't "cool" or they "didn't had the right friends". He was very good at remembering birthdays and would always give you some type of card or goofy present, and even remind you when one of our friends' birthdays were coming up so you wouldn't miss it.

When we got to the age of being able to drive and visit each other's houses we would sometimes drop in to each other's houses randomly. I remember Charlie being very adamant that I knocked before entering, which wasn't too uncommon for friends to ask. I remember times where I would neglect to do so, and he would be red in the face and so concerned that I didn't knock before coming in. One specific time I opened the door without knocking to see all of the Tans quickly coming up from the basement looking like they had seen a ghost or were just caught red-handed. It was burned in my memory because it was so unusual, but it didn't make any sense really until years down the line.

I remember that he always wanted me to stay the night after hanging out, even when it didn't make a lot of sense like having an early morning practice. I always thought that he just really like to have sleepovers for whatever reason. I used to fight him on it at times, so I could sleep comfortably in my own bed, but he just wanted to have a friend with him in the house.

I did a lot of musical extracurricular activities growing up, and Charlie would always volunteer to usher at these events, so he could definitely make it. He would always stay after to tell you what a good job you did and either give me something goofy or give flowers to my sister for her part in the play or concert. The kicker is that he didn't really enjoy musicals or select choir, he just knew that these things meant a lot to me and my sister, so he was sure to attend and support us. He has always been very thoughtful that way.

By the time we reached college age, Charlie and I would communicate often to see how things were going and he would always remind me I was always welcome to visit him at school. When I finally took him up on the offer one day, he was so gracious and bought my dinner at the dining hall. He was careful to introduce me to all of his friends by name and tell us what things we had in common. He was unbelievably good at bringing his friends together. When it finally reached time for us to go to bed I remember him building a makeshift bedding on the floor, which I obviously assumed was for me to sleep on. He told me that the bedding on the floor was for him to sleep on, because he "always slept on that bed, and [I] was his guest so [I] should sleep comfortably". It was this kind of altruism that always made Charlie such an amazing friend to be around.

During the first trial, Charlie became a personal trainer of sorts to me and several of my friends. He would organize times for us to meet up and work out together, and always motivate us and push us to do our best. He was so good at doing this that it was somewhat infectious, as I took his workout plan and brought it up to my friends from school in Vermont. He was always cooking healthy meals for us and showing us how easy it was to eat plenty of vegetables.

We have continued to stay in touch this entire time be it by phone or mail. He called me just last weekend to make sure I was having a good time on Labor Day weekend. All he ever wants to talk about is our lives and what's going on with us. It seems like he doesn't want to burden us with his troubles. He is so selfless that way. Even when I directly ask about something troublesome he always responds with something like "Oh you know, I'm doing just fine" and manages to change the subject to something pertaining to me.

I will always love Charlie like a brother, and all I want for him is for him to receive the same graciousness, kindness and sympathy that he gives out to the world.

Hon. Frederick J. Scullin Jr.

I have been friends with Charlie Tan for more than eight years and throughout that time, I have only known him to be a caring, compassionate, and motivated person. Charlie and I went to high school together and remained extremely close even when he was at Cornell and I was at RIT. I was able to see first-hand how much positivity he could bring to our entire Pittsford community, whether it be through athletics, academics, or through his day to day interactions with others. Charlie is a benefit to any community he has found himself in and brings his energy to anyone he comes across. It would be a loss for everyone if Charlie was not able to influence the community in such a positive way.

Charlie is a motivated person who cares more about other people's success than himself. He took nearly every Advanced Placement class and thrived in them, yet you would find him helping others outside class and studying with friends. Charlie is both academically and socially skilled and succeeds in any environment and learning style he is put into. Our friend group is very intelligent, most being near the top of the class, and Charlie would push us every year to do more and be the best we could be. During freshman year, he signed a group of us up for Math League where we went against schools across the area in group and individual math questions. He encouraged us all to come and test our knowledge and was able to bring our drive from athletics, into the classroom. Charlie also motivated me to take AP Statistics because he knew math was my favorite subject. He took it the year before me and would help out with questions I had and stop by just to say hi to the teacher and ensure I was enjoying it. He also would pull our desks together during AP US History and help walk through debates and events since it was a difficult class to comprehend. Throughout our years in school together, you could tell Charlie cared so much about the success of his friends and peers and wanted to help them however he could.

Charlie is also an incredible leader, not only by role as he was our Class President, but he is also a leader by action. During the rainbow classic, a basketball game that raised over $50,000 in two years for Golisano Children's Hospital, Charlie was the one leading cheers across the gym and wearing our jerseys to provide as much support from the stands as possible. Charlie motivated myself and so many others by always being there during the good games and the bad. I still am not sure how he did it, but while being in academics, class president, in a relationship with one of our friends, and playing football, Charlie would still make the trek out to sporting events near or far to cheer on his friends and classmates. He drove to Syracuse to come watch our states basketball games, he drove out to watch our almost every softball game including sectionals and regionals, and he came up to the top of Bristol Mountain to watch the cross country skiing events. If there was a friend on the field, Charlie would do all he could to be there cheering and supporting them on. Charlie absolutely loves sports and that has not changed and never will. I know his football team was like family to him and every time I have seen him these last few years, we would go lift and push each other to be the best we could be. Charlie knew I was playing college sports and would push me to wear weighted vests, race his dogs, do one more rep, and go one more mile. He was motivation during every workout and every gym community he has been a part of, has felt the same way. Charlie is one of the strongest leaders I know throughout every aspect of life.

Not only is Charlie motivated and a leader, but he is also one of the most caring guys I know. He checks up on all of our friends and would do anything to make us happy. Charlie would come to the park with us and hike in honor of our friend who passed away, and he came to a concert with me for my birthday even though he did not like country because he knew it was my favorite artist. Nearly everything he did, he thought of others first which was even apparent during his "Random Acts of Kindness" video that he created for Psych class. Charlie also touches way more than just peers, as my family and many others adore him. When my mom was going through Chemo, Charlie would come back from Cornell and drop off flowers to keep her encouraged and strong during a very difficult time. He was the one that would always bring

food and drinks to my big family events and would stay back to help clean up and chat with my parents. Charlie cared about everyone so passionately and the positive small acts that he continues to make, show just how genuine of a person he is inside and out.

Charlie effortlessly makes others close to him feel special, and any community would benefit greatly from having his energy around. I miss him and the happiness that surrounds him, every day that he is not able to be with us. Thank you for taking the time to read this and I hope you too can see just how great of a person Charlie is.

Sincerely,
Anna Valentine

To the Hon. Frederick J. Scullin Jr.,

My name is Jacob Grossman and I am a 23 year old student living in Rochester, NY and attending Monroe Community College. My friendship with Charlie Tan has stretched well over 10+ years dating back to when we met in the 6th Grade.

From the very early days of 6th grade until now, Charlie has been an incredible friend, classmate and teammate. Despite looking like two totally different people as I was always one of the biggest guys and Charlie was one of the smallest, we connected and bonded immediately with the love we both shared in our hearts and our passion to make others happy and to smile.  My relationship with Charlie has been just that of everyone else who was able to call him a dear friend: Amazing. Of everyone I graduated high school with, in 2013 from Pittsford Mendon High School, Charlie was one of the few people who "Got it". Whenever he would run into my Mom, Charlie was always quick to open his arms for a big hug. When we coached 5-10 year olds as part of our Varsity football volunteer coaching experience, Charlie worked with the younger kids and I can still see the smile on his face now.

Charlie is someone who regardless of whatever was going on in his own personal life, was able to still smile and spread positivity. I don't know if you have been able to view the Youtube Video "Charlies Random Acts of Kindness" but that is who Charlie Tan truly is. He is a person with love to share and spread.

My respect for this court is in the highest regard, and I greatly appreciate the courts time.

Sincerely,

Jacob Grossman

Dear Hon. Frederick J. Scullin Jr.,

I have had the pleasure of knowing Charlie Tan for several years now. Throughout high school we had always had a few mutual friends but our paths didn't cross too much. Our sophomore year, I lost one of my best friends, Molly, very suddenly to an illness. Charlie also knew Molly, and we saw each other a lot those first few months at events and vigils being held for her. From that first day I saw him in the school gym the day after she had passed, he had always been there for me and my friends if we ever needed to talk or even just get our mind off of things. Charlie and I became really great friends by this point, and we spent a lot of time together during our lunch periods and after school before our sports practices. As time went on we became even closer and eventually realized that we cared for each other more than just being friends. We began to talk about hanging out, just the two of us outside of our usual group. We had made plans to meet up after his Sectional Final Football game in 2012. I was an avid athlete in high school, who would have been extremely upset after a loss that he and his team had suffered that night. I had assumed that he would want to cancel our plans. I was wrong, he said he wanted to hang out more than ever to get his mind off of the loss in his final high school football game. When I arrived that day, I remember thinking to myself that I wish I could have the same composure and mindset that he had after a tough loss. He simply said that it was upsetting, but there was nothing that he could do about it and he didn't want to dwell. We ended up hanging out and talking all night. The next week we began dating.

We had only been dating for a couple of weeks and he wanted to meet my parents. I was a little nervous as I had never really brought any boys home to meet my parents but he insisted that he wanted to get to know them. He got to know both of my sisters and parents very well over the next 9 months that we were dating. My parents got to know Charlie very well and appreciated his constant respect. My sisters also loved Charlie. He always asked about them and how their lives were going, As the youngest of my family, they were always protective of me. They knew I was in good hands with Charlie. He was always my biggest fan, and came to every single one of my sports games during our senior year, which was a lot. By the end of our senior year I had expressed that I did not want to be in a relationship by the time I left for college. So we decided after a long talk that we would stay together until we couldn't anymore. About 3 weeks before I left for college we decided that we loved each other, but we needed to try and live our own lives apart from each other in college. We never wanted to hold each other back and left our relationship behind with no regrets.

Over those 9 months together, I learned a lot about myself and Charlie. I learned that a hug from Charlie Tan could immediately change your mood for the better. I learned that when something was wrong, he was the first person that I could talk to about it knowing that he was listening and truly understanding me. I learned that there are good people in the world that truly care about who you are no matter how unique. And even after we had broken up, I still truly felt this way. Over the past 5 years I have always had Charlie there to care about me when I didn't think others did. He always encouraged me to chase after my dreams and to never hold back in

anything that I do. Charlie Tan changed my life for the absolute better. He taught me how to have confidence in myself, and that was something that I have always struggled with. He was not only a great boyfriend, but he still remained one of my best friends after we had broken up, and I'm not sure many people can say that about their former partners. Charlie Tan changed my life for the better, and I will always be grateful that he chose to be a part of it.


Sincerely,

Courtney Case

Maggie McMahon
94 Hammocks Drive
Fairport NY, 14450

Nobles & DeCarolis
45 Exchange Blvd.
Suite 275
Rochester NY, 14614

September 9, 2018

To Hon. Frederick J. Scullin Jr. –

Charlie Tan was a close friend of mine in of high school. He dated one of my best friends for years, and I had known him since middle school. Most notably when I think of Charlie, I think about how he consistently acted with kindness. Below are a few examples.

For years, he sent carnations to our friend's little sister in middle school, so she would feel special on Valentine's Day.

I gave a speech at a school ceremony very shortly after my best friend, Molly Thomas, passed away. I was nervous and emotional beforehand, and he hugged me, held my hand, and told me I would get through it. I don't know a lot of high school boys that would do that as a casual act of friendship.

He gave me cards for Christmas and my birthday. Never presents, but the sweetest cards that I still have and occasionally read. They were kind and sentimental. He planned out what he would write in my yearbook for days and wrote long paragraphs describing me and the adventures we had gone on together. I know that sounds trivial, but it was some of the nicest words anyone had spoken about me, and he meant what he wrote. He was a good friend.

He took me out for lunch and ice cream on random occasions. We would sit on a bench and talk for hours. He was so interested in hearing about my life, my family, how school was going, sports. He even came watch me race on Bristol Mountain on multiple occasions. If we're being honest, Nordic skiing races are not that interesting and are very cold. He was one of few of my friends who came out to watch multiple races.

He was friends with many different groups of people in high school, and he had a way of bringing everyone together. He had a way of making everyone feeling included. He made everyone laugh and had a way of encouraging people to talk who were shy and brought them out of their shells. He got along incredibly well with teachers, parents, coaches.

He spent time and got to know every member of my family. He would come over and we all watched movies together, and my siblings and parents liked him a lot. He remembered little details of their lives and would ask them how that area was going for them.

It's hard to describe how difficult his absence has been these past few years, in my own life and with our larger group of friends. I wish him all the best.


Thank you kindly,
Maggie McMahon

August 21, 2018

Mr. and Mrs. Greg Sample
4674 Mystic Dr.
Atlanta, GA 30342
Ph: 404-303-1230

Dear Hon. Frederick J. Scullin Jr.:

The purpose of this document is to serve as a letter of support on behalf of Charlie Tan and to ask for maximum leniency during sentencing. We are residents of Atlanta since the early 90's, parents of two daughters (now 17 and 20 yrs) in our early 50's, employed by The Coca-Cola Company for 25 years, undergraduates of LSU and Vanderbilt in Engineering and Math, and MBAs of GA Tech and Emory Business School.

We met Charlie for the first time at our gym in Spring of 2016 in Atlanta. He was dedicated to fitness and observed a disciplined workout and diet regimen. As we were becoming friends, Charlie was forthcoming about all that he had just experienced, including his recent case. As an early point of good character, he was open and honest and did not want us to feel he had befriended our family without our knowing his recent past and deciding for ourselves whether to continue the friendship.

Many times over the next few months, we invited him over for dinner, family time, and weekend vacation. We have two daughters close in age to Charlie, who enjoy his companionship like a brother. Our family felt compassion for him and genuine desire to spend time with him. It was obvious the then 20-year old had grown up with domestic abuse, had persevered to earn his way to Cornell, had been through a terrible emotional experience, was in Atlanta alone reeling from this recent ordeal, and trying to get back on his feet again.

It is in Charlie's fabric that in spite of all he had just been through, he showed energy, hope, and ambition to complete his education, become employed, and contribute meaningfully to society. During the time we spent with him, he was busily preparing college admissions applications and essays to Emory, Georgia State, and other colleges, which were unfortunately denied due to concerns admissions officers held after reading about him on the internet. Also, while in Atlanta, he became a Certified Personal Fitness Trainer. He trained his dog Tiger to become a Certified Service Animal as well. He obviously loves people and animals. He is a good communicator, often inquiring about career counseling and mentorship. He is an avid reader and is always trying to improve himself and those around him. Charlie takes nothing for granted and expresses gratitude, curiosity, humbleness, and desire to learn every day.

To offer a sense of Charlie's character – after family dinners, Charlie was the first one to jump up from the table and wash dishes by hand until every single pot and pan was stored away. He would gladly go pick up our daughter at school carpool because we were in a time bind. One day, he sat in the kitchen for almost one hour untangling three small necklaces with a toothpick

for our daughter's best friend so she could wear them again. He would often bring our family fruit bowls as his dinner contribution. He showed kind gestures of thanks to the family such as flowers and food. He played board games and did swimming pool stunts with our girls. His friends would visit from out-of-town for the weekend, and he took pride in barbequing for all and creating camaraderie. Charlie showed us many times how thoughtful, kind, patient, and generous he is. He consistently showed high work ethic and integrity. He's a bright shining star filled with joy of life and a very endearing personality that brings others together.

We ask that you please be lenient on him. We are in no way overlooking the magnitude of this tragic situation. He has already paid a meaningful price for what has happened throughout his growing up years and his jail time served thus far. He has had his education and early adult years significantly interrupted and stripped away. He has not had the fulfillment of a loving and supportive family as many of us have, and in spite of all this he's still managed to be a really positive person. He could benefit from a better hand than the one he was dealt. It is not too late for him. It is our hope that Charlie is allowed to put this tragic situation behind him, as he is not a threat to society. Please help give him the chance to get back onto the life path of completing his education, getting the counseling he needs to repair and heal, hopefully starting a family of his own one day, and contributing to the betterment of others and society. If so, it seems he is destined to thrive and to inspire others to do great things too. Thank you for your consideration.


Respectfully,

Alison and Greg Sample



Brian DeCarolis <brian@noblesdefense.com>

**Letter for Charlie Tan**

positivek9inc@yahoo.com <positivek9inc@yahoo.com>
To: brian@noblesdefense.com

Sun, Sep 9, 2018 at 6:24 PM

Good evening ,
   I am sending you this letter on behalf of my dear friend Charlie Tan.
Please let me know if there is anything else that I can provide to help .
   Best ,
   Melissa A Cocola
   2150 Sherburne Rd
   Walworth  NY 14568
      585-727-4015

Dear Honor Fredrick J. Scullin Jr,

Please allow me to introduce myself .
My name is Melissa A Cocola . I am the owner of
Creekside Resort Inc. and Positive K9 Inc .
I have  three locations in the Walworth ,New York
area .
My businesses are full service Dog Resorts and
Training  Centers.
   I met Charlie in the spring  2016 after a long time
friend had contacted me stating that he had a young
man who was interested in volunteering his time to
Care for animals .
Upon interviewing Charlie , it was very apparent that

he had a  strong passion for dogs . I was immediately impressed with his level of enthusiasm and warm demeanor.

Charlie began his volunteer work with my Dog Training and Boarding Facility immediately.

He was prompt , hard working , and eager to learn about animal behavior .

I have a team of 23 employees who were equally impressed with Charlie's work ethic .

Charlie quickly made friends as well as gained the respect of our entire team. He had the reputation of always lending a hand . He is very much a "team player".  Even during our most hectic days , Charlie was always smiling and exuded a level of positivity that was contagious amongst his peers .

Charlie also displayed a natural gift to bond with the aggressive dogs who were being housed for training . He handled them with compassion and respect . He was always patient and understanding of their at times inappropriate behaviors .

Although it was a volunteer position , Charlie worked harder then much of my full time staff which improved the overall work performance of my team .

His dedication and commitment to excellence was noticed by all who witnessed his work .

As the months passed Charlie developed strong bonds with my staff. He rarely came to Work empty handed . He would bring lunch, or bottles of water for the staff on hot days . There were many gestures of kindness that left a lasting impression on all of us who had the pleasure of working along side of Charlie .

I have had many employees over 25 years of being a business owner . Charlie is truly one of the kindest , most hard working young men who has ever walked through our doors.

Charlie sincere and genuine kindness has left a lasting impression on his fellow coworkers as well as our clients.

Please feel free to contact me with any additional questions.


Sincerely,


Melissa A. Cocola

September 6, 2018

Hon. Frederick J. Scullin Jr.

I am honored to write this letter on behalf of Charlie Tan.  I met Charlie in August of 2016 when he moved into the house across the street.

Charlie is incredibly outgoing and polite and soon knew everyone on the block and in the neighborhood.  We (adults) also all knew of his past as he did not want any of us to feel deceived by him.

Charlie is incredibly polite, respectful, and the first to jump up to help someone in need.  He is generous with his time and would spend hours with my two sons then ages 9 and 10 teaching and playing football with them.  When my boys came home from school most days, they would look to see if Charlie was outside and would wander over to see what he was doing.   Playing with his dogs was always a favorite.  Charlie had the best dogs!  He would ask them if they had finished their homework and ask about school.  Often he would walk them down the street to the local Subway for an after school snack.   Charlie quickly became a part of the family.

Charlie was always helping someone out.  He talked about "paying it forward".  One day I was looking out my back kitchen window and saw Charlie helping a neighbor on the next block with his backyard pool.   Another day he was bringing dinner to someone who wasn't feeling well.   He was often seen doing little random acts of kindness for the people around him.  And he was grateful.  Grateful for the friendship, grateful for the support and never hesitated to show it.  If you did something for Charlie he would come the next day with flowers or food and a thank you note.   He didn't take anything for granted.

Charlie moved again in June of 2017.  He was here for a short time but had an enormous impact on our lives.

Our entire family adores Charlie and wish him the best outcome for this case.   You may also contact me at 773-835-5948 if you have any questions regarding this letter or Charlie.

Sincerely,

Lisa Beemsterboer
10235 S. Seeley
Cihicago IL

Dear Honorary Fredrick J. Scullin Jr.,

My name is Nola O'Keefe and I am writing on behalf of Charlie Tan. Charlie moved 2 houses down from us in 2016 and stayed for approximately one year. During this time he had grown to be a big part of our family.

Together my husband and I have 7 children and at the time we met Charlie they were 12,11,10,9,5,2, and 2. We all took a strong liking to Charlie right away as he came over with his 2 dogs and introduced himself to us and invited us and other neighbors over to dinner to get to know him better.

Throughout this year I had gotten to know Charlie and can easily describe him as a person who is genuine, full of kindness and heart, has a loving soul, and puts others before himself. Raising 7 children is no easy task and Charlie was always offering his help. He would run errands with the kids, drive them to places, help them with homework, help take in the groceries, help put the groceries away, watch the kids, bring us lunch, bring us dinner, show the kids how to train and take care of a dog, and just simply play with the kids. Charlie did this with a huge smile and lots of laughter and happiness.

Charlie never did any of these tasks for money or because I asked him to, he reached out to a mom that has her hands full. He did what comes naturally to him, he asked if he can help. When I reflect on all the things Charlie has done for us and all the other people on the block and in the neighborhood, I am amazed of his selfless acts of kindness.

The most important thing in my life is my children and having Charlie in their life and ours was an absolute blessing.

Sincerely,

Nola O'Keefe

August 18, 2018

Dear Hon. Frederick J. Scullin Jr.,

My name is Vanja Misimovic and I live in Toronto. I had the privilege to meet Charlie Tan last year in March and share seven months with him almost every day until September 22 of 2018.

I met Charlie one morning in March at my local Goodlife Gym where I work out regularly. Charlie was a brand new face at the time with an unforgettable smile. His charming smile and friendly personality was what instantly attracted me to him. Having a strong need and dedication to fitness and sports was definitely something that brought us closer together in a short time.

Charlie easily made friends, not only at Goodlife where he also worked as a Personal Trainer for the time being, but anywhere we went together. His kind personality went a long way without a question.

One of the first walks we went on with his two German Sheppard dogs around the neighborhood is an example I can share with you. A gentleman was walking across the street from us and when Charlie spotted him, he instantly greeted him with a wave and a "Hello Sir, how are you?"

My initial thought was but Charlie you do not know him, why are you saying hi. But the smile Charlie received from that man was indescribable. It made me think that sometimes or a lot of times actually, that is all it takes to make someone's day better. To Charlie that skill comes naturally. His positive attitude and energy easily shines on people surrounding him, including myself.

In my case, Charlie helped me significantly as I was going through some tough times being a single mother with two small boys. Charlie didn't talk much, he basically just did things to show me that he appreciated me without even being asked to do it. As I am used to doing things on my own, I am not used to asking or receiving any help from others. But in my case, Charlie just wanted to help me.

He was great with my children and voluntarily coached them in different sports, as it came so naturally to him. He was also willing to help them with their homework, as he excelled that skill as well. He did tutor kids in high school and told me that he really enjoyed it. He certainly has the skill to teach and show others how things can be done. in my opinion, Charlie is excellent in that.

In the summer of 2018, we decided to move in together and spent the last three months inseparably.

Charlie helped with house work and brought groceries home without even being asked to do it. He made things so easy around him and was loved by so many people, including myself first.

My boys had a chance to go to a basketball and baseball game in the summer as Charlie said to me:

"What do you mean Vanja, that they haven`t been to a game?" He was puzzled.

To him, it was very important for kids to see and do kids' stuff. He definitely left them with amazing memories of the both games, along with hats and jerseys they got to take home as well.

My kids were thrilled.

I can describe Charlie as a very confident, humble, sincere and a very kind individual and an awesome man he has become and still has a lot to see and do in life.

But I also got to see that inner child in him as well, through my kids that perhaps was still seeking for a sense of security and love that he may have not been fully provided with growing up. Our upbringing and childhood shapes us and makes us into individuals that we are today. Having said, all I can say is that very few people would turn out to be as Charlie has today, considering all aspects of his childhood that none of us really know but him but can only imagine.

I truly say this from the bottom of my heart. I believe his loyalty to people he touches, kindness he gives and sincerity that is within him will take him far in life. I feel privileged to have met him and I have said this to so many people in my life. He changed my life and that is for sure. He made me see and believe that there is a light at the end of each tunnel for each one of us out there.

When I am having a bad day, all I can think of is Charlie and I hear him say to me:

"Vanja, baby, keep smiling because that smile is beautiful!" And I instantly do.

Charlie Tan has touched my heart in so many ways, as he did many others as well. I am thankful for having him in my life, as he is one huge heart with a captivating smile beyond words can explain.


I thank you in advance for taking your time to read my letter, as my words are pure and come from the bottom of my heart.



Sincerely Yours,

Vanja Misimovic

# HEINEKE & BURKE, LLC
### ATTORNEYS AT LAW

120 NORTH LaSALLE STREET   SUITE 1450
CHICAGO, ILLINOIS 60602

TELEPHONE (312) 580-7300

FAX (312) 580-9200

September 7, 2018

Honorable Fredrick J. Scullin, Jr.

    Re:    Charlie Tan

Dear Judge Scullin:

    I am writing this letter on behalf of Charlie Tan. Along with my wife, Carolyn, and my two young children Nate and Allison; I reside at 2022 W. 103rd Street, Chicago, Illinois. Between August 2016 and June 2017, Charlie resided just two doors down. From the moment he moved onto the close-knit block, he made himself a known and productive member of the neighborhood. Charlie immediately introduced himself to me and my fellow neighbors. Without being asked, he would help me and the other neighbors with any small projects where an extra set of hands was needed. For example, at his suggestion. Charlie and I repaired our next-door neighbor's trampoline while our neighbors (Mr. Ed O'Keefe and family) were out of town. On another occasion, I recall he helped me erect a basketball goal in my driveway. I am also thankful that on another occasion, during a driving snowstorm, he unloaded and moved heavy furniture into my house (which frankly would have been ruined if left to this 50 year-old author to do myself).

    Additionally, he would regularly engage and play with the many, many children who live in the near vicinity. The kids in the area would routinely play with Charlie's two dogs, Tiger and Molly. With the kids, Charlie would frequently organize and participate in football games and the like. During these episodes, he was always sure to include all the kids irrespective of their age differences. Charlie was well liked by everyone in the neighborhood that crossed paths with him. During this time period, Charlie was a frequent guest in our home as a dinner guest and from our conversations, I became to admire him as a mature and industrious young man.

    Charlie is intelligent and exceedingly unselfish. Given the opportunity, he can and will accomplish many things.

        Most sincerely,

        Matthew G. Burke

MGB:pd

# EXHIBIT C

# Audio of 911 call, January 28, 2015

Submitted separately and available at https://soundcloud.com/democrat-and-chronicle/128-jean-tan-911-call-he-choked-me-and-im-so-scared.

# EXHIBIT D

1    Q    And at that point in time, he was now not a

2  co-worker of yours, not the marketing manager, but he was

3  actually the boss, correct?

4    A    Right.

5    Q    How did things change when he became the boss?

6    A    How did things change?

7    Q    Well, describe how your working interaction with

8  Mr. Tan was after he became the boss?

9    A    A little more stressful at times.

10    Q    Okay.  Fair to say that in the work place he would

11  be a bully?

12    A    Yes.

13    Q    He tried to be a bully to you?

14    A    At times.

15    Q    He tried to intimidate you?

16    A    He tried to a few times.  He would make little

17  comments, yes.

18    Q    And you have a pretty strong constitution?  You can

19  take that sort of thing pretty well?

20    A    I kind of just shoved it off.

21    Q    There were certainly other employees that it had a

22  more detrimental effect on, correct?

23    A    There were probably people that were more easier

24  marks, if that's the right word.

25    Q    What do you mean by easier mark?  Can you describe

M. Sullivan - CX by Mr. Nobles

1    that for the jury?

2    A    A person --

3         THE COURT:  You have to speak up a little

4         louder, if you could.

5    BY MR. NOBLES:

6    A    He might target one person more than another person.

7    How's that?

8    Q    Okay.  And you saw him, you visually observed him --

9    A    Yes, I have.

10   Q    Let me finish the question.

11        THE COURT:  Hold on a second.  Let him ask the

12        whole question.

13   BY MR. NOBLES:

14   Q    Mr. Sullivan, the reason is she has to take down our

15   words and your words and if we are talking at the same time

16   she can't do that.

17        You certainly saw him demean your co-workers in

18   front of other co-workers?

19   A    Yes.

20   Q    Yell and scream at them?

21   A    Yes.  In fact, he would bring us together so he

22   could do that in front of us.

23   Q    So he would assemble the employees so that he could

24   single someone out and yell at them?

M. Sullivan - CX by Mr. Nobles

1    Q    Demean them?

2    A    Yes.

3    Q    Bully them?

4    A    Yes.

5    Q    Intimidate them?

6    A    Yes.

7    Q    You saw that on several occasions, correct?

8    A    Yes, sir.

9    Q    Was it ever directed at you?

10   A    Not like that, no.

11   Q    Okay.  You certainly are aware that some of your

12   co-workers left the employment at Dynamax because of

13   Mr. Tan, correct?

14   A    Correct.

15   Q    You certainly saw him have temper tantrums?

16   A    Yes.

17   Q    Saw him slam doors?

18   A    Not slam doors, but I have seen him throw things.

19   Q    Things?  But throw things?

20   A    Yes.

21   Q    And this wasn't a rare occurrence?  This was

22   something that happened at least a few times a month, if not

23   more, correct?

24   A    Yes.

25   Q    What was the environment of the work place like?

1    A    Stressful, very stressful.

2    Q    Did people --

3    A    It's kind of -- I'm sorry.

4    Q    Go ahead.

5    A    It was you didn't know sometimes day-to-day if

6 whether something would happen or nothing would happen.

7    Q    So some days he would be completely fine?

8    A    Yes.

9    Q    Some days he would rant and rave the whole day?

10    A    Yes.

11    Q    And you had no idea when that was going to happen?

12    A    Correct.

13    Q    Or what or who set him off?

14    A    Yes.

15    Q    Fair to say people would walk on egg shells around

16 him?

17    A    At times.

18             MR. GARGAN:  Objection, speculation.

19             THE COURT:  Sustained.

20 BY MR. NOBLES:

21    Q    Fair to say that at times you were careful what you

22 said and did around him?

23    A    Yeah.  Yes.

24    Q    Fair to say that he liked to argue with people?

25             MR. GARGAN:  Objection, speculation.

M. Sullivan - CX by Mr. Nobles

1             THE COURT:  Sustained.

2  BY MR. NOBLES:

3      Q    Did you get the sense that he enjoyed demeaning

4  these folks?

5             MR. GARGAN:  Objection, calls for speculation.

6             THE COURT:  Sustained.

7  BY MR. NOBLES:

8      Q    Did he try -- did you ever observe or become aware

9  of efforts to pit employees against each other by Mr. Tan?

10     A    He would sometimes tell the people there different

11  stories at times.

12     Q    Would that cause friction among you and co-workers?

13     A    It would at first and then we would work it out

14  among ourselves.

15     Q    How is the work environment at Dynamax now?

16             MR. GARGAN:  Objection, relevance.

17             THE COURT:  Yes, sustained.

18  BY MR. NOBLES:

19     Q    You have indicated that there are -- that there are

20  other people who are now in charge of the company, Jeanne

21  and Jeff Tan, correct?

22     A    Correct.

23     Q    And do they behave in the same manner?

24     A    No.

25     Q    Has that improved morale among the staff?

M. Sullivan - CX by Mr. Nobles

1    A    Yeah, I believe so.

2    Q    Are you as stressed going to work now as you were

3    before?

4    A    Not as much, no.

5    Q    That type of behavior, demeaning employees,

6    threatening employees, bullying employees, that doesn't

7    exist at Dynamax anymore does it?

8    A    I have not seen it, sir.

9    Q    You talked about knowing Charlie from before, right?

10   A    Yes.

11   Q    Just from interning at Dynamax the summer of 2013?

12             THE COURT:  I think he said '14.

13   A    Fourteen.

14   Q    I'm sorry, 2014.  Did you have any significant

15   interaction with him or did you just see him coming and

16   going?

17   A    See him coming and going; say, Hi, and welcome

18   aboard.  That's about it.

19   Q    Fair to say you're all over Dynamax?  You are in and

20   out of the clean room, in and out of the office all day?

21   You are kind of running around doing everything?

22   A    Usually, yes.

23   Q    You're the do-everything guy?  I think that's your

24   unofficial title?

25   A    Kind of.