IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | Case No.   5:17-CR-228 (FJS) |
| v. | GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM |
| CHARLES TAN, | |
| Defendant. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On October 26, 2018, pursuant to the Uniform Presentence Order issued by the Court, the United States filed a sentencing memorandum in the above-captioned matter. The Sentencing Memorandum of the United States addressed the Presentence Investigation Report (PSR) only, as the defendant's sentencing memorandum had not yet been filed. The Government reserved its right to respond in writing to any sentencing objections and arguments raised by the defendant after the filing of our memorandum.

On October 29, 2018, the defendant filed his sentencing memorandum, and this response is filed in reply to arguments raised therein.

**GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM**

**I.     The Guidelines Calculation**

While the defendant filed no objections to the PSR, (*see* Addendum) he now argues that he should be afforded the 1-level reduction under U.S.S.G. § 3E1.1(b) for prompt entry of his plea of guilty, even though that plea came just days before trial. Defendant's Sentencing Memorandum, pp. 4-5, 21. The defendant misunderstands the application of this provision.

A reduction under § 3E1.1(b) "may only be granted upon a formal motion by the Government at the time of sentencing," and "[i]n general, the conduct qualifying for a decrease in

offense level under subsection (b) will occur *particularly early in the case* … so that the government may avoid preparing for trial and the court may schedule its calendar efficiently." U.S.S.G. § 3E1.1, Commentary, App. Note 6 (emphasis added); Pub. Law 108-21 § 401(g).

The defendant has had full discovery of volumes of evidence since 2015, and because of his state trial, he is in the unique position of having heard, and cross-examined, most of the witnesses scheduled to testify at the federal trial. Nevertheless, the defendant argues that since his plea was "heavily influenced" by some evidence turned over a week before trial, he should be afforded the reduction of 3E1.1(b). Defendant's Sentencing Memorandum, p. 21.

The additional discovery referred to appears to be reports of the forensic examination of cellular telephones belonging to the defendant and his mother, seized as a part of the 2015 murder investigation. In 2015, law enforcement did not have the technology to unlock the phones for examination. In the years since their initial seizure, technology has advanced, and *in preparation for trial,* the Government obtained a warrant allowing us to examine the contents of the phones. Even with newer technology, this was no small task. It took weeks, and thousands of dollars, to have the phones unlocked, and their contents extracted. Once that was accomplished, the results, which corroborate witness testimony and other evidence well known to the defendant for years, were immediately turned over.

Nothing in the application of § 3E1.1(b) requires or even contemplates that all possible evidence be disclosed before a defendant's plea is considered untimely. It is the very nature of criminal cases that investigation continues, and evidence is gathered, right up to, and often throughout, trial. The purpose of § 3E1.1(b) is to prevent the expenditure of these resources by providing an incentive for a defendant to resolve his case early. The defendant did not do that

here. Instead, he pled guilty just four days before trial, and only after a significant amount of time and resources were spent in preparation. Accordingly, the Government is not making the motion required for this reduction to be applied. *United States v. Sloley*, 464 F.3d 355, 358-59 (2d Cir. 2006) (subject to "narrow limitations" not relevant here, "a government motion is a *necessary prerequisite* to the additional one-level decrease under Guidelines § 3E1.1(b).") (emphasis added).

## II.     The Defendant's Requested 5-year Sentence is Substantively Unreasonable

In the face of a Guidelines sentence of 25 years,[1] the defendant requests that the Court impose a sentence of just 5 years. Defendant's Sentencing Memorandum, p. 22. This request represents an extraordinary and unwarranted variance of 16 levels, a radical 15-year reduction, and would result in a substantively unreasonable sentence.

The Court must take a variety of factors into consideration in arriving at its final sentence, the history and characteristics of the defendant is only one of them. While the defendant focuses exclusively on himself: his personal and family history, background, and community support, this Court must also consider many other important factors, including the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, … to provide just punishment for the offense, … to afford adequate deterrence to criminal conduct, … the sentencing range established [by the guidelines], … and the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(2)(A), (B), (4), (6).

---

[1] Absent the statutory maximums, which cap the Guidelines sentence at 25 years, the defendant would have faced a Guidelines recommendation of 324 – 405 months, or 27 – 33.75 years. PSR ¶ 102.

No argument raised by the defendant, alone or in combination, justifies the dramatic reduction he seeks.

The defendant sets forth his age at the time of the offense as a factor favoring leniency in sentencing. Other than the *fact* of his age, the defendant offers no explanation why his age matters. Defendant's Sentencing Memorandum, pp. 8, 21. At 19 years old, the defendant was an adult whose supporters describe him as mature, and a strong leader. *See*, e.g., Dkt. 86, pp. 42, 79. He was an accomplished Ivy League student, varsity athlete, social chair of his fraternity, and ran a business selling drugs on campus.[2] He was old enough, mature enough, and smart enough to understand and appreciate the gravity, and ramifications, of murder. And this murder was not impulsive. The defendant devised a plan, and took great steps to carry it out.

Nor does the reported history of abuse in the Tan home merit the severe sentencing reduction the defendant requests. Defendant's Sentencing Memorandum, pp. 10 – 14. Again, the defendant does not explain *what* about that history rationalizes murder, or merits a reduced sentence, he just points to the fact. Even if that were sufficient, which it is not, the history presented has only one side. While there is little doubt that there were issues in the family, the accounts are inconsistent,[3] and influenced both by the goal of achieving leniency for the

---

[2] Tan's phone records confirm that he sold marijuana to other students (charging $200 an ounce), had received a 5-pound shipment of marijuana from California for $12,000 in January of 2015, and that he also sold psilocybin mushrooms, and DMT, both of which are psychedelic drugs. PSR ¶ 88.

[3] For example, compare PSR ¶ 54 (alleging that Jim Tan did not allow his wife to have friends) with PSR Addendum, p. 34 (statement of a *long-time friend* of Jean Tan), and Dkt. 86, p. 38 (letter from another friend of Jean Tan); and PSR ¶ 47 (incident reports by *both* Jean and Jim Tan) with ¶ 80 (now blaming Jim Tan).

defendant, and by the Tans' flight to Toronto after the murder, where they had three days to plan how to handle the narrative of how and why Jim Tan was murdered.  Moreover, the argument does not bear the weight for which it is offered.  *Cf. United States v. Brady*, 417 F.3d 326, 334 (2d Cir. 2005): "We have recently explained that the requirement of a causal nexus restricts the circumstances in which a departure on the grounds of abuse is permitted only to cases where the abuse brings about a mental condition that leads to or causes the criminal conduct.".

There should likewise be no sentencing reduction based upon the possibility that the defendant may be required to return home to Canada following the completion of his sentence. The defendant's assertion that deportation is "imminent" is overstated.  There has been no deportation order, and immigration proceedings will not even take place until after the defendant completes his sentence.  PSR ¶ 77.  Regardless, well before his federal arrest, the defendant moved to Toronto.  Deportation will not take him from his home and plunge him into an unfamiliar country; instead, it will return him to a place where he himself chose to live.  There is simply no rational basis to reduce the defendant's sentence because of his citizenship.

The defendant also offers a large volume of letters of support from friends and family, all of whom request leniency, some even to the point of suggesting that *no* imprisonment should be imposed.  *See*, e.g., PSR Addendum, p. 35 (the defendant is "not the kind of person who should be imprisoned.").  To be sure, the defendant was, and is, accomplished and extremely well liked. However, not only does the Court have to consider that defendant *took a life*, an important goal of sentencing is to avoid "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  There is no place for

5

the intelligent, privileged, and popular to be treated differently than the marginalized.[4]  The bulk of the letters of support, and the defendant's sentencing memorandum, mirror a common sentiment: they believe that the defendant has suffered enough, that he "has already paid a meaningful price," and that incarceration will be an unnecessary hardship. Dkt. 86, p. 86.  No one mentions the fact that Jim Tan's *life* was intentionally ended by the defendant.  Instead, they talk about how Jim Tan's murder has negatively impacted the defendant.  There seems to be no recognition that the penalty for crimes resulting in death, particularly premeditated murder, must be met with serious consequences, regardless of who the offender is, and what degree of popularity he enjoys.

Finally, the defendant still has not admitted what it is he has done.  In his letter to the Court, the defendant calls his actions a "series of immature and irrational decisions," but never once describes what it is that he *did.*  Likewise, in their sentencing memorandum, his attorneys admit that the defendant "took a shotgun with him" when he went home on February 5, 2015, but end their explanation of the facts with: "things went horribly wrong."  Defendant's Sentencing Memorandum, p. 23.  The facts omitted by these vague statements are significant.  The defendant loaded a 12 gauge shotgun with rifled hollow-point deer slugs, took it with him into the house, climbed the stairs, approached his father as he sat behind the desk in his home office, pointed the gun, and fired three shots - two of them at close range: a shot to the middle of his chest, and a shot across his face.[5]  There was no struggle, no threat of imminent harm.  Instead, the

---

[4] Similarly, the Guidelines caution that "civic, charitable or public service … and similar prior good works are not ordinarily relevant in determining whether a departure is warranted." U.S.S.G. § 5H1.11.

[5] Attached as Government Exhibit B (Exhibit A was filed with our original sentencing

defendant waited with friends for his father to return home from work, and then carried out a plan to execute him and flee the country.

## CONCLUSION

This Court is charged with equal application of the law.   Charles Tan is not allowed to decide who lives or dies, just the same as any other person from any other background who buys a gun intending to kill, and then pulls the trigger.   Not one of the factors raised by the defense, alone or in combination, supports the unreasonable and unwarranted reduced sentence he requests. The defendant intentionally carried out the pre-meditated murder of his father.   He values that crime at 5 years.   No reasonable view of the law agrees.


Respectfully submitted this 6th day of November, 2018,

GRANT C. JAQUITH
United States Attorney

/s/   *Lisa M. Fletcher*

Lisa M. Fletcher
Assistant United States Attorney
Bar Roll No. 510187

---

memorandum) is the state trial testimony of the Medical Examiner, Dr. Caroline Dignan, confirming that the shotgun blasts to the face *and to the chest* were fired at close range. *See* Testimony at pp. 643, 657-58.

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

*******************************

UNITED STATES OF AMERICA

                                                Case No.:     5:17-CR-228 (FJS)

    v.

CHARLES TAN,

            Defendant.
*******************************

### CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2018 I filed the **Government's Response to the Defendant's Sentencing Memorandum** with the Clerk of the District Court and sent copies of said documents via ECF to the following:

    Brian C. DeCarolis, Esq.
    James L. Nobles, Esq.

                                                    /s/

                                                 Paula Briggs